FILED
U.S. DISTRICT COURT
DISTRICT OF COLORADO

2013 APR 25  PM 4: 38

JEFFREY P. COLWELL
CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

BY_____DEP. CLK

Civil Action No.  '13 - CV - 01117

JOHN McNAMARA,

     Plaintiff,

v.

GEORGE BRAUCHLER, CHRISTOPHER OPFER, FRANCINE GONZALEZ, MITCHELL
MORRISEY, C. STEPHEN HOOPER, JOHN GLEASON, WILLIAM ROBERT LUCERO,
APRIL McMURREY, MONICA GOMEZ and LAWRENCE BOWLING,

     Defendants.

## COMPLAINT

COMES NOW the Plaintiff/Petitioner, John McNamara, pro se, to state and aver the following

allegations:

1.    Plaintiff John McNamara is a citizen of the State of Colorado.

2.    Defendant George Brauchler is the elected district attorney for Colorado's Eighteenth

    Judicial District, which is made up of Arapahoe County, Douglas County, Elbert County

    and Lincoln County in the State of Colorado.  No current wrongdoing is alleged on the

    part of George Brauchler, he is a party to this civil case to request that he file the

    criminal charges outlined in this lawsuit.

3.    Defendant Mitchell Morrissey is the elected district attorney for Colorado's Second

    Judicial District, which is made up of the City and County of Denver.  No wrongdoing

is alleged on the part of Mitchell Morrissey, he is a party to this civil case to request that he file the criminal charges outlined in this lawsuit.

4. Defendant Christopher Opfer is a Colorado state employee working as a deputy district attorney for the Eighteenth Judicial District Attorney's Office in the State of Colorado.

5. Defendant Francine Mendez, now known as Francine Gonzalez, is a Colorado state employee hired as a records custodian/records witness for the Colorado Department of Revenue, Division of Motor Vehicles.

6. Defendant Lawrence Bowling is a County Court Judge for Douglas County, Colorado.

7. Defendant Monica Gomez is a County Court Judge for Douglas County, Colorado.

8. The United States District Court for the District of Colorado has subject matter jurisdiction over this case pursuant to 28 U.S.C. ββ 1331, 1343(a)(3) & 1367(a).

9. John McNamara was admitted as an attorney licensed by the Colorado Supreme Court in May 1990.

10. From September 1989 to August 1990, Plaintiff John McNamara was employed as a judicial clerk by the Colorado Supreme Court, performing legal research and drafting memos and draft opinions for one of the justices (now retired) on the Colorado Supreme Court.

11. From September 1990 to July 1992, Plaintiff John McNamara was employed as a deputy district attorney by the Seventeenth Judicial District Attorney's Office in Adams County, Colorado. While employed as a deputy district attorney in Adams County, John McNamara prosecuted misdemeanor cases ranging from theft charges to assault/domestic violence charges, as well as DUI cases and other traffic cases.

12. From July 1992 to April 1995, Plaintiff John McNamara was employed as an assistant county attorney for El Paso County, Colorado.  While employed as an assistant county attorney, John McNamara provided legal advice and representation to the El Paso County Sheriff's Office; defended county employees in federal court and Colorado state court in claims involving allegations of denial of constitutional rights or allegations of personal injury; responded to notices of claim (written insurance claims for personal injuries caused by government employees or government action/inaction) under the Colorado Governmental Immunity Act; and responded to requests for government records made pursuant to the Colorado Open Records Act and the Colorado Criminal Justice Records Act, in addition to other employment duties as an assistant county attorney.

13. John McNamara was the lead appellate attorney on three published appeals cases: Johnston v. Commissioner of Internal Revenue, 114 F.3d 155 (10th Cir. 1997);  Midwest Mutual Insurance Co. v. St. Anthony Hospital, 37 P.3d 521 (Colo. App. 2001); and Defelice v. Johnston, 931 P.2d 548 (Colo. App. 1996).

14. From April 2006 through December 2011, Plaintiff John McNamara was self employed as an attorney in a solo general practice law firm.  While self employed, John McNamara handled plaintiff's civil rights cases, criminal defense cases, family law cases representing both males and females, plaintiffs' and defendants' civil lawsuits and appeals.

15. While self employed, John McNamara won a $135,000.00 settlement in Boulder County District Court Case No. 07 CV 498 on behalf of a woman who had been sexually assaulted in the City of Longmont, Colorado, after the lead police detective

investigating the sexual assault failed to interview, investigate or DNA test the suspect that the woman/victim had identified.

16. John McNamara also won a $45,000.00 settlement in United States District Court Case No. 03-MK-2085 for a recent legal immigrant to the United States who was assaulted without reason by a Lochbuie, Colorado police officer, after also getting the made-up criminal charges against the immigrant dismissed in Weld County Court.

17. +++John McNamara has also gotten criminal cases dismissed in Arapahoe County, Colorado, when the Eighteenth Judicial District Attorney's Office tried to conceal/delayed disclosing the fact the arresting officer had disappeared (see paragraphs x-z below), or that the officer did not really have the evidence he claimed to have in his police report (see paragraphs x-z below). While justice was done in these cases, pursuant to Colorado law, there frequently seemed to be angry resentment on the part of the District Attorney's Office, and some of the judges, when legitimate questions were raised about receiving all mandatory information that was supposed to be received from the District Attorney (known as "discovery"). It seemed that there was an expectation, particularly in the Eighteenth Judicial District, that a criminal defense attorney was simply supposed to go through the accepted routine of accepting a deputy district attorney's plea bargain thankfully, without asking too many questions, or rocking the boat, and making sure the attorney's client paid fines to the state courts, and paid for state counseling and state probation services. In these cases, it seemed that the presumption of innocence, a key principle in the United States Constitution, was forgotten.

4

18. In the process of this legal representation, Plaintiff John McNamara has made some powerful people unhappy.  Before being hired in both the Longmont case and the Lochbuie case, the clients in those cases stated that they had had a very difficult time finding representation, because other attorneys were concerned about making the police angry and causing the police or their attorneys to seek retribution against an attorney suing the police.

19. When the question of police misconduct comes up in publicized cases, the official police department position usually is that the police want to keep their police agency clean, so that the public maintains confidence in that agency.  In private, however, there is the normal complaining by law enforcement about the public not understanding the rigors and challenges of police work, police officers being second guessed, and anger towards the attorney handling the litigation.

20. Most police officers and law enforcement officers are good people, and try to do the right thing, but there are those that can not control their frustrations; there are those who let their power go to their head; there are those who view criminal cases as a type of sport to be won, even at the cost of not telling the truth; and there are those who are dishonest, just like any other occupation or career.

21. Judges and prosecutors are not above breaking the law.

22. An attorney suing a police agency may have the motivation of keeping government clean; preserving constitutional rights and responsibilities; and aiding a victim of governmental misconduct, in addition to getting paid.  One does not have to be a tie-died 1960's radical to want law enforcement officers to follow the law, respect citizen rights to be left alone by the police, and not have police officers or other state

employees injure individuals, when the government employee becomes displeased with an individual.

23. The Colorado State Judicial Branch relies heavily for the income for its budget on money collected from criminal and traffic fines, and money paid for supervised probation. Neither the state courts, nor the district attorney's offices, make money when a case is dismissed, and even though justice may be served when a case is dismissed, there are some judicial branch employees and some district attorney employees who view a dismissed case as the Colorado Judicial Branch losing money and as the district attorney's office losing money.

24. There are seven justices on the Colorado Supreme Court. (Exhibit 1, Colorado Office of Judicial Performance Evaluation recommendations).

25. Of the seven justices on the Colorado Supreme Court, two of the justices, Nathan Coats and Brian Boatright are former deputy district attorneys. (Exhibit 1).

26. Of the seven justices on the Colorado Supreme Court, five of the justices, Nathan Coats, Nancy Rice, Allison Eid, Monica Marquez, and Gregory Hobbs are former attorneys for the Colorado Attorney General's Office. (Exhibit 1).

27. Of the seven justices on the Colorado Supreme Court, only Brian Boatright and Nancy Rice had any prior judicial experience, all the other justices were entry-level judges at the state supreme court level. (Exhibit 1).

28. It has become trendy over the last couple of decades, in both the state and federal court system, for a governor or president to appoint a non-judge to the respective supreme courts, in order to make it hard for political opponents to question the judicial candidate's record and potential political agenda once they are on the court.

29. For approximately the last five (5) years, if not longer, many of the court clerk's offices in the Denver metro area have been posting signs outside their offices regarding office hours being cut back as a result of Colorado state legislature budget cuts to the Colorado Judicial Branch. These signs and hour reductions were a Colorado Judicial Branch decision made in the hope that people in court, and especially attorneys, would complain to the state legislature about decreased services at the courts, so that the courts would get more money in future Colorado state budgets.

30. At the same time, the Colorado Judicial Branch has increased its filing fees in civil cases, so that now, nearly a third of every filing fee goes to pay for the new Colorado Supreme Court building at the intersection of 14th Avenue and Broadway in Denver, Colorado.  While the old Supreme Court building at most took half a block of space and had five usable floors, the new building now covers the entire block at the south east corner of Broadway and 14th Ave., has many more floors, and rivals the size of the state capitol building, but still houses the same number of judges and justices as the old building.

31. Surprisingly, when the new Supreme Court building opened,  it not only housed the Colorado Supreme Court and Colorado Court of Appeals, but also the Colorado Attorney General's Office.  (See Exhibit 2 attached, Wikipedia article on Colorado Supreme Court).

32. The fact that the Attorney General's Office is housed with the appeals courts is surprising, because that fact is not mentioned in the Colorado Judicial Branch website and because state courts in Colorado are usually housed in separate buildings from district attorney's offices, public defender's offices and private law firms, to avoid the

appearance of inappropriate access or greater access to the judges by any legal office. Even the United States District Court for Colorado moved from its original building, which also housed the United States Attorney's Office, to a separate building.

33. As a result of budgetary concerns and not wanting to antagonize either the Colorado legislature or the Colorado state executive branch, and have its budget cut, upon information and belief, there is an unwritten understanding in the Colorado Judicial Branch, amongst the justices and judges, to go easy on issuing legal decisions, and especially monetary judgments, negatively impacting Colorado government agencies and Colorado government employees.

34. Of all the issues facing both liberal and conservative politicians and conservative and liberal judges, the one issue that seems to unite them all is not wanting to award plaintiffs, suing the government for unconstitutional conduct or negligent/deliberate injurious conduct, very much money, if any money. Conservatives, like insurance companies, dislike what they view as inflated verdicts in personal injury actions, while liberals tend to dislike finding that the government or its employees did something wrong, and diverting money to payment of court judgments, that could have been used for government programs or projects.

35. Just recently, the Colorado House of Representatives passed legislation to reduce or cap awards to plaintiffs who are wrongly imprisoned by Colorado state courts.

36. The most famous instance of this was when Larimer County and the City of Fort Collins settled with plaintiff Timothy Masters for a combined sum of approximately ten million dollars, after the police and prosecutors failed, some would say deliberately, to disclose evidence to Masters defense attorneys, before he was sentenced to life in prison, and

served ten years, for a murder that DNA evidence showed he did not commit. (Exhibit attached).

37. In another instance, plaintiff's attorney Mark Brennan reportedly won a large civil judgment against the City of Denver in an employment lawsuit for his client. Reportedly, federal judge Robert Blackburn, a George Bush appointee, clashed with attorney Brennan throughout the case, but the jury awarded Brennan's client over a million dollars in damages. Subsequent to the jury verdict, reportedly Judge Blackburn then reduced the jury's damages award to be paid by the City of Denver and reportedly Blackburn made an ethics complaint against Brennan to the Colorado Supreme Court, reportedly for disrespectful behavior in court. (Exhibit  , attached).

38. There have been understandings in the past between the Colorado Judicial Branch and other entities when it comes to the handling of court cases. In the 1980s, upon information and belief (after being told the following by a former Colorado chief deputy district attorney, now county court judge), an unwritten understanding was reached between the Colorado Judicial Branch, the Colorado district attorneys and women's victim advocacy groups, that a woman making a criminal complaint alleging domestic violence type crimes would not be prosecuted for the crimes of perjury or false reporting to authorities, if the complaining woman later recanted her allegations of assault/harassment/domestic violence against the man arrested for domestic violence type charges, or the domestic violence allegations were later determined to have been false.

39. One way to aid state agencies or state employees in avoiding negative rulings or negative monetary judgments is for a Colorado judge to play dumb or look past state

343df3d90afa433

agencies or state attorneys acting slowly, if at all, in providing discovery/disclosure of

evidence favorable to the opposing party.  In addition, a judge will look the other way

and never penalize a state agency, or district attorney's office or state attorney/deputy

district attorney when the state agencies or attorneys try to conceal evidence or delay

providing the evidence for as long as possible, if they ever do produce the evidence.

When the attorney representing an individual citizen opposing the state tries different

means to enforce discovery/production of records, the Colorado state judge will either

delay    requiring    the    Colorado    state    attorney    to    produce    the    required

evidence/records/information or blame the individual's attorney, in front of the client,

for not being more aggressive in not dropping all the attorney's other cases, to spend

much more time and client's legal fees in writing numerous letters and motions/written

requests to the court to pursue the discovery/information evidence that should have been

produced either automatically at the beginning of the case or following one written

request.  Judges know that a state agency can wear a private attorney down with

disclosure delay and discovery delay, because attorney's for the state have no budgetary

restraints in dragging out discovery, the State of Colorado and insurers of local

governments like CIRSA (Colorado Intergovernmental Risk Sharing Agency) are happy

to fight long discovery battles, because the state always has more money and more

people to fight such battles, where a private attorney can't spend lots of time and client

attorney fees trying to get information that the state already is obligated to turn over.

40.  Three of the worst Colorado government agencies at providing timely/proper disclosure

of evidence/information or discovery are the Eighteenth Judicial District Attorney's

Office, the Colorado Attorney General's Office and the Colorado Supreme Court's

Office of Attorney Regulation Counsel.  **The Office of Attorney Regulation Counsel is, ironically enough, the office of state attorneys that prosecutes attorneys alleged to have violated attorney ethics rules and also provides legal representation to the Colorado Commission on Judicial Discipline, the body that allegedly investigates unethical behavior by judges**.

41.   In reality, the Office of Attorney Regulation Counsel tries to cover up allegations made against judges who violate the Colorado Code of Judicial Conduct and/or Colorado case law decisions and/or other Colorado law or procedural rules, by dismissing the bad judicial conduct raised in complaints as trivial, ***or by going after the attorney who raises the concern.***   The Office of Attorney Regulation Counsel goes after attorneys who blow the whistle on biased judges or who question bad judicial conduct.  (See paragraphs x-y below).

42.   There are two primary ways an attorney may gather information from either a Colorado state employee or a Colorado state agency in a civil lawsuit: 1) through the discovery process in a civil lawsuit (written interrogatory questions, written requests for production of documents, depositions, etc.); and writing written requests to Colorado employees or agencies citing to the Colorado Open Records Act and/or the Colorado Criminal Justice Records Act, which are the Colorado state law versions of the federal Freedom of Information Act law.

## THE COLORADO OPEN RECORDS ACT

43.   The Colorado Open Records Act was enacted by the Colorado General Assembly in 1968 with the stated purpose that "all public records shall be open for inspection by any

person at reasonable times, except as provided in this part 2 or as otherwise specifically provided by law." C.R.S. β24-72-201 (2011).

44. **In 1974, the Colorado Supreme Court wrote that C.R.S. β24-72-201 "establishes the basic premise that in the absence of a specific statute permitting the withholding of information, a public official has no authority to deny any person access to public records." <u>Denver Publishing Co. v. Dreyfuss</u>, 184 Colo. 288, , 520 P.2d 104 (1974).**

45. The wording of C.R.S. β24-72-201 has not changed since 1968.  C.R.S. β24-72-201 (2011).

46. The Colorado Open Records Act and the Colorado Criminal Justice Records Act are essentially Colorado state law versions of the federal Freedom of Information Act (FOIA), 5 U.S.C. β. 552.

47. The United States Supreme Court wrote: "The Freedom of Information Act, 5 U.S.C. β552, is a revision of . . . the Administrative Procedures Act, 5 U.S.C. β1002 . . . which was generally recognized as falling far short of its disclosure goals and came to be looked upon more as a withholding statute than a disclosure statute." <u>E.P.A. v. Mink</u>, 410 U.S. 73, 79, 93 S.Ct. 827, , 35 L.Ed.2d 119,  (1973).

48. The United States Court of Appeals for the District of Columbia Circuit wrote: "The purpose of the Freedom of Information Act is to pierce the veil of administrative secrecy and open agency action to the light of public scrutiny . . . ." <u>Wisconsin Project v. U.S. Dept. of Commerce</u>, 317 F.3d 275 (D.C. Cir. 2003)(citing, <u>Dep't. of the Air Force v. Rose</u>, 425 U.S. 352, 361, 96 S.Ct. 1592, 1599, 48 l.Ed.2d 11, (1976)). "FOIA embodies 'a general philosophy of full agency disclosure unless information is exempted under

clearly delineated statutory language.'" Id. "FOIA accordingly mandates a 'strong presumption in favor of disclosure, under which the statutory exemptions are to be narrowly construed'". Id.

49. The Colorado General Assembly emphasized the importance it placed on the Colorado Open Records Act by providing for criminal penalties, if the law was violated by state or local government employees.

50. C.R.S. β24-72-206 (2010) provides that **"Any person who willfully and knowingly violates the provisions of this part 2 is guilty of a misdemeanor and, upon conviction thereof, shall be punished by a fine of not more than one hundred dollars, or by imprisonment in the county jail for not more than ninety days or by both such fine and imprisonment."**

51. **"A person acts 'knowingly' or 'willfully' with respect to a result of his conduct when he is aware that his conduct is practically certain to cause the result."** C.R.S. β18-1-501(6) (2010).

52. The provisions of the Colorado Open Records Act were rarely changed or amended, until a flurry of amendments took place between the years 2000 and 2010, in which the statute was amended nearly every year to create exceptions to what was defined as a public record and which government officials were subject to the open records law.

53. C.R.S. β24-72-202(6)(a)(I) states that "'Public records' means and includes all writings made, maintained, or kept by the state, any agency, institution, a nonprofit corporation incorporated pursuant to section 23-5-121(2) C.R.S., or political subdivision of the state, . . . ."

54. According to the Colorado Open Records Act, public records are NOT defined as records that are frequently distributed to the public, like tax forms or motor vehicle forms- the term "public records" essentially means any records maintained by a public/government entity, except if the record is protected by a specific law.

55. C.R.S. β24-72-204(1) (2010) provides that "[t]he custodian of any public records shall allow any person the right of inspection of such records or any portion thereof except on one or more of the following grounds or as provided in subsection (2) or (3) of this subsection:

(a) Such inspection would be contrary to any state statute.

(b) Such inspection would be contrary to any federal statute or regulation issued thereunder having the force an effect of law.

(c) Such inspection is prohibited by rules promulgated by the supreme court or by the order of any court.

(d) Such inspection would be contrary to the requirements of any joint rule of the senate and the house of representatives pertaining to lobbying practices.

(2)(a) The custodian may deny the right of inspection of the following records, unless otherwise provided by law, on the grounds that disclosure to the applicant would be contrary to the public interest;

(I)   Any records of the investigations conducted by any sheriff, prosecuting attorney or police department, any records of the intelligence information or security procedures of any sheriff, prosecuting attorney, or police department, or any investigatory files compiled for any other law enforcement purpose; . . . .

14

56. C.R.S. β24-72-204(4) (2010) provides that "If the custodian denies access to any public record, the applicant may request a written statement of the grounds for the denial, which shall cite the law or regulation under which access is denied and shall be furnished forthwith to the applicant."

57. In addition, C.R.S. β24-72-203(2)(a) (2010) provides that "If the public records requested are not in the custody or control of the person to whom application is made, such person shall forthwith notify the applicant of this fact, in writing if requested by the applicant. In such notification, *the person shall state in detail . . .the location of the records, and what person then has custody or control of the records*." (emphasis added).

58. Violation of C.R.S. β24-72-203(2)(a) and/or C.R.S. β24-72-204(4) (2010) is a misdemeanor, pursuant to C.R.S. β24-72-206 (2010), supra.

59. C.R.S.β24-72-204(5) (2010) states "[a]ny person denied the right to inspect any criminal justice record covered by this part 2 may apply to the district court of the district wherein the record is found for an order directing the custodian of such record to show cause why said custodian should not permit the inspection of such record. . . . Hearing on such application shall be held at the earliest practical time. Unless the court finds that the denial of inspection was proper, it shall order the order the custodian to permit such inspection and shall award court costs and reasonable attorney's fees to the prevailing applicant in an amount to be determined by the court. . . .

60. There is another government disclosure law dealing more specifically with records relating to criminal investigations and law enforcement agencies, called the Colorado

Criminal Justice Records Act, enacted by the Colorado General Assembly in 1977. C.R.S.β24-72-301, et seq.

61. The Colorado General Assembly wrote that "[i]t is further declared to be the public policy of this state that criminal justice agencies shall maintain records of official actions, as defined in this part 3, and that such records shall be open to inspection by any person and to challenge by any person in interest, as provided in this part 3, and that all other records of criminal justice agencies in this state may be open for inspection as provided in this part three or as otherwise specifically provided by law." C.R.S.β24-72-301(2) (2010).

62. Under the Criminal Justice Records Act, the law distinguishes between two main types of records: "records of official action" and "criminal justice records". C.R.S.ββ24-72-303 & 304 (2010).

63. "Criminal justice records" are defined as "all books, papers, cards, photographs, tapes, recordings, or other documentary materials, regardless of form or characteristics, that are made, maintained or kept by any criminal justice agency in the state for use in the exercise of functions required or authorized by law or administrative rule, including but not limited to the results of chemical biological substance testing to determine genetic markers conducted pursuant to sections 16-11-102.4 and 16-23-104, C.R.S.". C.R.S. β24-72-302(4) (2010).

64. An "official action" "means an arrest; indictment; charging by information; disposition; pretrial or posttrial release from custody; judicial determination of mental or physical condition; decision to grant, order, or terminate probation, parole, or participation in

correctional or rehabilitative programs; and any decision to formally discipline, reclassify, or relocate any person under criminal sentence."

65. Records of official action are a subcategory of "criminal justice records".

66. C.R.S. β24-72-303(1)(2010) provides that "records of official actions shall be maintained by the particular criminal justice agency which took the action and shall be open for inspection by any person at reasonable times, except as provided in this part 3 or as otherwise provided by law."

67. Similarly, C.R.S. β24-72-304(1)(2010) provides that "all criminal justice records, at the discretion of the official custodian, may be open for inspection by any person at reasonable times, except as provided in this part 3 or as otherwise provided by law".

68. C.R.S. β24-72-305(1) (2010) provides that "[t]he custodian of criminal justice records may allow any person the right of inspection of such records or any portion thereof except on one or more of the following grounds or as provided in subsection (5) of this subsection:

    (a) Such inspection would be contrary to any state statute.

    (b) Such inspection is prohibited by rules promulgated by the supreme court or by the order of any court.

69. C.R.S. β24-72-305(6) (2010) provides that "If the custodian denies access to any criminal justice record, the applicant may request a written statement of the grounds for the denial, which statement shall be provided to the applicant within seventy-two hours, shall cite the law or regulation under which access is denied or the general nature of the public interest to be protected by the denial, and shall be furnished forthwith to the applicant."

70. In addition, C.R.S. β24-72-304(2) (2010) provides that "If the requested criminal justice records are not in the custody or control of the person to whom application is made, such person shall forthwith notify the applicant of this fact, in writing if requested by the applicant. In such notification, *he shall state in detail . . .their[the records] location, and what person then has custody or control of the records*." (emphasis added).

71. Violation of C.R.S. β24-72-304(2) and or β24-72-305(6) (2010) is also a misdemeanor, pursuant to C.R.S. β24-72-309 (2010).

72. C.R.S.β24-72-305(7) (2010) states "[a]ny person denied access to inspect any criminal justice record covered by this part 3 may apply to the district court of the district wherein the record is found for an order directing the custodian of such record to show cause why said custodian should not permit the inspection of such record. A hearing on such application shall be held at the earliest practical time. Unless the court finds that the denial of inspection was proper, it shall order the order the custodian to permit such inspection and, upon a finding that the denial was arbitrary or capricious, it may order the custodian to pay the applicant's court costs and attorney fees in an amount to be determined by the court. Upon a finding that the denial of inspection of a record of an official action was arbitrary or capricious, the court may also order the custodian personally to pay to the applicant a penalty in an amount not to exceed twenty-five dollars for each day that access was improperly denied."

73. Each day that a record is arbitrarily or capriciously withheld from access to a member of the public is an ongoing violation of the law, similar to an ongoing criminal trespass. C.R.S. β24-72-305(7) (2010).

74. ++++Cite to statute of limitations case

75. In Colorado, the state and local governments use multiple ways to avoid disclosing information they are supposed to disclose under the Colorado Open Records Act and the Colorado Criminal Justice Records Act.  The government agency or employee will avoid answering the records request by one of the following ways: 1) ignore the request and hope that the requesting party has too little money or is too intimidated to go to court to request the records; 2) the government agency or employee will lie and say that they are not covered by the Colorado Open Records Act and/or the Colorado Criminal Justice Records Act; 3) the government agency/employee will assign a secretary or administrative assistant or co-worker to answer the claim, so that when a different person answers the request, the original party to whom the request was made, can blame the second party who answers the request, but to whom the original request was not made (hereinafter "the shell game technique"), in an attempt to confuse the requesting party with a circuitous path of numerous bureaucrats to chase and confuse the sympathetic courts into believing "it was all a misunderstanding" and "a simple mistake by our large and very busy and stressed state agency" that the requested records were not produced.

76. When a Colorado state court refuses to enforce the Colorado Open Records Act or the Colorado Criminal Justice Records Act, that judge or group of judges is telling the public that not all laws need to be followed; that it matters more if a person has friends in high places, than whether the person follows the law; and that the Colorado judicial system is rigged in favor of the state.

77. Frequently, the Colorado state agencies that provide the worst customer service are also the worst at complying with the Colorado Open Records Act and the Colorado Criminal Justice Records Act.  It is an attitude that starts with the person who is the head of the agency, who views Colorado citizens as "annoying people to be dealt with", rather than "citizens to be served and without whom, our agency would not exist".

78. The Fourteenth Amendment to the United States Constitution provides in part as follows at section 1: "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

*G.C. v. Zavaras, et. al., United States District Court Case No. –The Colorado Department of Corrections, at the prompting of the Colorado Attorney General's Office, fails to respond to Open Records and Criminal Justice Records Requests and commits other discovery ploys to evade records production*

79. On March 6, 2009, Plaintiff John McNamara conducted a deposition of former Denver Police Chief Ari Zavaras, who at that time was employed by the State of Colorado as the executive director of the Colorado Department of Corrections (hereinafter "CDOC").  Zavaras was a named party defendant in the civil rights lawsuit in which the deposition was scheduled.

80. While Zavaras was employed as the Denver Police Chief, he and his subordinates frequently worked with then Denver Deputy District Attorney, now Colorado Supreme Court Justice, Nathan Ben Coats.

81. Justice Coats spent most of his career as an attorney defending police conduct or deputy district attorney conduct which had been called into question in the course of criminal cases.

82. Justice Nathan Ben Coats is a friend of Ari Zavaras.

83. Justice Coats is now the justice (judge) from the Colorado Supreme Court assigned to oversee the Office of Attorney Regulation Counsel, which also serves as the investigative arm of the Colorado Commission on Judicial Discipline.

84. Assisting Justice Coats in overseeing the Office of Attorney Regulation Counsel and the Colorado Commission on Judicial Discipline is Justice Monica Marquez, a former assistant attorney general under Attorney General John Suthers, until she was appointed to the Colorado Supreme Court. (Exhibit 1).

85. Justice Marquez worked for the Colorado Attorney General's Office while the G.C. v. Zavaras case was being litigated.  Marquez was well trusted within the Attorney General's Office, as she was assigned to represent the former Governor, Bill Ritter, who also was previously the Denver District Attorney.  Former Governor Ritter made Monica Marquez his only Colorado Supreme Court judicial appointment.

86. The focus of the Zavaras deposition was to determine who the responsible CDOC employee was that had made the decision to delay hip replacement treatment and surgery on McNamara's client, who had bone grinding on bone in his hip for ten months while the CDOC delayed treating the condition as long as possible to save money, in

violation of the client's Eighth Amendment right against cruel and unusual punishment, the punishment consisting of delaying medical treatment for a very painful condition.

87. Prior to Zavaras' deposition, Plaintiff John McNamara had sent combined Colorado Open Record Act Requests and Colorado Criminal Justice Records Act requests to multiple CDOC employees to obtain the client's treatment records and find out what the CDOC's reason was for delay was in treating the client.

88. Prior to Zavaras' deposition, Plaintiff John McNamara also sent discovery questions to Zavaras regarding the CDOC's lack of treatment of the client.

89. During Zavaras' deposition, Zavaras testified that if, as executive Director of the CDOC he received reports of inappropriate activity by CDOC employees, he would cause the inappropriate activity to be investigated. (Exhibit 3, Zavaras Transcript, p. 9, l. 16-p. 10, l. 3).

90. During Zavaras' deposition, Zavaras testified that though he had been served with a lawsuit in July of 2008, he had not caused any investigation to take place into the delay in treating Plaintiff John McNamara's client. Zavaras stated, "Well, no, I - - I have no reason to [investigate]. There's obviously litigation filed now and, you know, I had no reason to order any sort of an investigation during the process of the lawsuit." (Exhibit 3, Zavaras Transcript, p. 12, l. 22-p. 13, l. 9).

91. Zavaras didn't think that investigating wrongdoing or delay in providing medical treatment to an inmate suffering from bone grinding on bone in the inmate's hip, when the inmate walked, was worth investigating.

92. During Zavaras' deposition, Zavaras testified that he did not know why a CDOC paralegal had signed Zavaras' sworn-under-oath discovery reponses, rather than Zavaras

himself signing his own discovery answers under oath. (Exhibit 3, Zavaras Transcript, p. 11, ll. 4-13).

93. When Zavaras doesn't sign his own discovery answers under oath, he can't be held liable later for lying under oath or perjury, if his discovery answers are later determined to be lacking in truth, or just plain false.

94. Zavaras testified under oath that he did not know whether he was required to sign the signature-given-under-oath portion of his deposition. (Exhibit 3, Zavaras Transcript, p. 11, ll. 4-16).

95. Zavaras testified that that he had participated in over a hundred depositions previously and that he had been sued "several hundred times I would say". (Exhibit 3, Zavaras Transcript, p. 6, ll. 1-9).

96. Apparently none of Mr. Zavaras' attorneys in the Denver City Attorney's Office or the Colorado Attorney General's Office had ever explained to him about the need to sign discovery responses in the earlier hundreds of lawsuits, or Zavaras was not telling the truth about not knowing whether he needed to sign discovery responses- a fairly easy and basic legal concept.

97. Zavaras' statement he did not know he needed to personally sign discovery responses is a classic example of a Colorado state employee feigning ignorance in order to avoid his or her responsibility for responding truthfully to information requests the employee is required by law to answer. State employees feign ignorance and then count on Colorado judges to give them a pass on their legal duty to respond to discovery requests, Colorado Open Record Act requests and Criminal Justice Records Act requests.

98. Having a paralegal sign Zavaras' interrogatory answers was a legal strategy used by the Colorado Attorney General's Office to slow down the discovery process by attempting to force John McNamara to spend additional time and money to file a motion to get Zavaras to sign his own discovery responses, when the signing of interrogatories normally happens in civil cases without any second thought, controversy or request.

99. The reason Colorado state employees and local government employees, like Zavaras, do not provide information is the hope that by concealing, or hiding, or refusing to provide information, the employee can avoid being held liable for a monetary judgment for deliberate and/or negligent bad conduct.

100. Zavaras' own attorney from the Colorado Attorney General's Office, James Quinn, let Zavaras get away with the answer feigning ignorance about personally signing answers to discovery.

101. Zavaras knew that Colorado courts and Colorado state attorneys will let him get away with feigning ignorance, based on courts' respect for the high ranking title he had with the State of Colorado.  Zavaras and other state employees who fail to candidly respond to discovery requests, Colorado Open Record Act requests and Criminal Justice Records Act requests play Colorado state judges for knaive fools and many judges are usually all too willing to let the state employees with a title get away with it, either out of knaivete or because some judges have a "root-for-the-home-town-team" mentality in cases involving state agencies or employees, or because the judges dislike private attorneys who investigate government employees' actions.

102. Many judges were state or local employees before becoming state judges.  (See Exhibits 1 and   ).

24

103. During Zavaras' deposition he testified that he was familiar with the Colorado Open Records Act, and the Colorado Criminal Justice Records Act, that it was his policy to obey the Open Records Act, if none of the law enforcement provisions apply, and that it was not his policy to wait as long as possible to reply to a request. (Exhibit 3, Zavaras Transcript, p. 27, l. 5-p.28, l.10).

104. In his deposition, Zavaras testified that he did not know that, if a records request was denied, that if requested, the requesting party is required to receive a written explanation of the reason for the government employee not providing the requested record and that there were sanctions for violating the records-request laws. (Exhibit 3, Zavaras Transcript, p. 28, l. 3-p. 29, l. 4).

105. Zavaras testified that he was unaware of any sanctions under the Colorado Open Records Act or the Colorado Criminal Justice Records Act for failure to comply with those laws, and in particular that failure to comply was a misdemeanor crime. (Exhibit 3, Zavaras Transcript, p. 28, l. 24-p. 30, l. 12).

106. Zavaras testified that "if I found out someone had violated the law, first thing I would do is have it investigated, and then take appropriate action with the results of that investigation." (Exhibit 3, Zavaras Transcript, p. 30, l. 15-18).

107. Zavaras later testified that when he is sued as the Executive Director of the Colorado Department of Corrections, he does not call his subordinates within the CDOC to learn about or investigate any alleged misconduct by CDOC employees, instead he avoids investigating, learning about, and correcting misconduct and getting his hands dirty by stating "I would not make that call. You know, if a suit were filed, it is - - it is turned over and, obviously, routed through legal channels and we would work with our

attorneys [the Colorado Attorney General's office], so I can tell you unequivocally, I would not make that call." (Exhibit 3, Zavaras Transcript, p. 40, ll. 1-20).

108. Zavaras testified that the buck stopped with him as executive director of the CDOC and that he had the authority under Colorado Revised Statute 17-1-103.8 to appoint an inspector general within the CDOC to "conduct investigations of inappropriate activity within the Colorado Department of Corrections". (Exhibit 3, Zavaras Transcript, p. 60, ll. 14-25).

109. However, when it comes to lawsuits requesting money damages from the CDOC, Zavaras testified that "we have contacted our counsel, obviously the Attorney General, and have worked in conjunction with them, which would be our departmental procedure." (Exhibit 3, Zavaras Transcript, p. 61, ll. 1-20).

110. Zavaras testified that when it came to the specific lawsuit in which his deposition was being taken, in which a former inmate was suing for a violation of his Eight Amendment rights under the United States Constitution, to be free from cruel and unusual punishment, neither Zavaras nor the CDOC Inspector General conducted any sort of investigation into a nearly year long delay in hip replacement surgery. (Exhibit 3, Zavaras Transcript, p. 61, ll. 12-20).

111. The former inmate could not leave the prison on his own to obtain medical treatment. The former inmate had to rely on the Colorado Department of Corrections, and supervisors like Ari Zavaras, to make sure medical care for his injury was provided while in custody in the prison, rather than Zavaras commit cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution, by

denying medical care for a serious injury, when the former inmate could not seek help outside prison on his own.

112. The Colorado Attorney General, John Suthers, is soft on constitutional violations and government corruption.  Rather than have the Colorado Attorney General's Office investigate questionable behavior within the Colorado Department of Corrections, John Suthers' office's approach is to try to conceal the government's unconstitutional, or deliberate, or negligent behavior.

113. When Zavaras was questioned why one of his subordinates, a woman named Shoemaker, who was identified by the CDOC as a custodian of records, had failed to respond to an Open Records Request and a Notice of Intent to sue, he first claimed that a records custodian had answered the letter, but could not identify who or when, even when other CDOC officials had written back saying that Shoemaker would have the requested records. (Exhibit 3, Zavaras Transcript, p. 61, l. 21- p. 64, l. 15).

114. Over the next several pages of Zavaras' deposition, Zavaras embarrasses himself by refusing to call CDOC headquarters to first hand ask his subordinates who made the decision to delay the inmate's treatment, claiming that he does not know how to find out who made the decision not to provide surgery for the bone-grinding-on-bone hip injury for the client for ten months, while denying that he is covering up negligent and unconstitutional activity by a state employee, while his assistant attorney general, James Quinn, made empty objections and tried to run interference.  (Exhibit 3, Zavaras Transcript, p. 64, l. 15-p. 87, l. 16). Zavaras repeatedly states that he listens to the advice of his attorney, Senior Assistant Attorney General James Quinn, who instructs Zavaras over and over not to investigate and not to answer questions.

115. Quinn and Zavaras would have made Mitchell, Haldeman and Ehrlichman proud.

116. At the end of Zavaras' deposition, after the parties had agreed there would be no more questions and the court reporter had stopped typing, Zavaras, in the tone of someone who wanted to be helpful, asked John McNamara for his business card. **Zavaras then said he was going to share John McNamara's name with the state patrol and tell the state patrol to keep an eye out for McNamara on the roads.**

117. Zavaras and Quinn know that judges will not hold them accountable and that unless the matter is brought out in the media, they can get away with covering up unconstitutional, not to mention cruel, torturous behavior, in the name of saving the State of Colorado money.

118. Some judges do not like to hold government officials responsible or monetarily liable, when those officials, or their superiors, might be able to affect a judge's ability to be promoted to a higher judicial position or impact a courthouse's budget.

119. Another deposition was held in the same case involving allegations of an Eighth Amendment violation. The second deposition was of a nurse and clinical team leader Dolores Montoya. (Exhibit 4, Deposition of Dolores Montoya).

120. When Ms. Montoya was subpoenaed to provide all of the client's medical records, she only provided copies she received from the Colorado Attorney General's Office, who was holding the client's original medical file. (Exhibit 4, Deposition of Dolores Montoya, p. 41, l.10-p. 43, l.7; p.137, l.9-p. 139, l.7). Even then, the CDOC, through Dolores Montoya, did not provide all the records requested, in particular the appointment record for the client with doctors at the CDOC.

121. It is Colorado Attorney General John Suther's policy to use improper discovery evasion techniques in civil lawsuits to avoid monetary judgments against the State of Colorado by covering up negligent or deliberate or unconstitutional actions by Colorado state employees. John Suthers is soft on constitutional violations and on government corruption and misconduct.

*__McNamara v. Kolle__, El Paso County District Court Case No. 07 CV 1948- The Colorado Department of Corrections convinces El Paso county District Court Judge David Prince to accept the "shell game" defense*

122. It is the State of Colorado's stated policy to provide mental health treatment to people convicted of sex crimes to try to prevent repeat crimes by sex offenders.

123. Most sex offenders are not imprisoned for life, and it is to everyone's benefit to have convicted sex offenders treated, so that when sex convicted offenders are eventually released from prison, they are less of a threat to commit similar crimes in the future.

124. The State of Colorado has even established a Sex Offender Management Board to specify which mental health professionals in Colorado can provide sex offender therapy to sex offender inmates.

125. In 2006, the Colorado Department of Corrections was refusing to provide sex offender therapy to an inmate, "WKN", who was otherwise eligible for parole. "WKN' was told that he was being denied sex offender therapy because of one answer on a polygraph test, but no other information was forthcoming inside the Colorado state prison, where

the state can pretty much do whatever it wants to a person, unless the person has family to get legal help on the outside.

126. On August 8, 2006, John McNamara sent a combined Colorado Open Records Act request and a Colorado Criminal Justice Records Act request to Thomas Kolle, who was identified as the records custodian for the Colorado Department of Corrections headquarters in Colorado Springs. (See Exhibit ++ attached). The records request was sent on law firm stationery and identified John McNamara as WKN's attorney.

127. Kolle sent back two letters on August 11, 2006 and September 6, 2006 asking for a signed records release from the inmate and money for copies of records.

128. Subsequently, John McNamara faxed another combined Colorado Open Records Act request and a Colorado Criminal Justice Records Act request to Thomas Kolle on October 6, 2006, with a signed records release he had mailed to WKN, inside the Department of Corrections, and which WKN had signed and gotten notarized inside the Department of Corrections, before sending it back to John McNamara.

129. ++When records were produced by the Colorado Department of Corrections, they were not all the records requested. No Colorado state law or Colorado procedural rule was provided for not providing any of the requested records not provided, as is required by C.R.S. β24-72-++.

130. ++ In addition, the response and records provided contained no name of another state employee who would have possession of the records, pursuant to C.R.S. β24-72-++.

131. John McNamara e-mailed Thomas Kolle and his supervisors, Joe Stommel and Barry Pardus, along with Colorado assistant attorney general Paul Sanzo on January 10, 2007 and January 12, 2007, with no response. (Please see Exhibit ++ attached).

132. On March 9, 2007 John McNamara faxed a Notice of Intent to File Application to Thomas Kolle, again with no response from Kolle or the Department of Corrections. (Please see Exhibit ++ attached)

133. On March 30, 2007, John McNamara had to file a Petition to Show Cause for Denial of Production of Government Records in El Paso County District Court, Case No. 2007 CV 1948. (Please see Exhibit ++ attached).

134. Thomas Kolle's defense essentially was that "I am not the custodian of the records requested", though again, he never provided a name and address of the proper custodian, after being requested to do so in writing on three occasions, and in violation of C.R.S. ββ24-72-203(2)(a)-(3)(b)&304(2)-(3).

135. Thomas Kolle's defense of saying, in effect "I was not the custodian and another unnamed person, whom I do not provide an address or phone number for, is the right contact" is the "shell game defense", where the government employee says don't ask me and tries to involve other unnamed, or later named officials, in a circuitous chase after the requested records.

136. After filing the lawsuit in 07 CV1948, all the trouble getting the records requested from the Department of Corrections went away very quickly and all the records were produced, and no statute or procedural rules were cited as a reason for holding back and not producing the previously requested records.

137. Essentially, until the lawsuit was filed, the Department of Corrections position was "We don't want to provide you all the records requested, and if you want them, make us produce them."

138. +++In Kolle's brief in the case, assistant attorney general Joseph Sanchez, who at that time was a candidate to become a judge on the Adams County District Court, ignored Kolle's responsibility under C.R.S. β24-72-   to provide the name and address of any other records custodian in possession of the records being sought, and argued that John McNamara should have contacted unnamed parties at offices in other cities without any address, namely unnamed records officials at unnamed prisons, to get the records requested.  Sanchez also acknowledged that after the Notice of Intent to Sue was received by the Department of Corrections, the Department of Corrections went behind attorney John McNamara's back directly to inmate WKN and gave him a bill for $161.00 to get the requested records, knowing that an inmate is not going to have that kind of money is his prison commissary account, and knowing that it would take the inmate some time to communicate this information to attorney John McNamara.

139. ++The Colorado Attorney General's office never provided any evidence to show that an alternative records custodian's name or address had been supplied to John McNamara.

140. ++++In the end, **El Paso County District Court Judge David Prince** bought into the shell game defense and found that Thomas Kolle provided the records he was in possession of, and did not order him to pay penalties, even though Kolle never provided documents showing that he had provided the names and addresses of alternate records custodians who had most of the records requested, pursuant to C.R.S. β24-72-.++

141. **El Paso County Judge David Prince** was subsequently under consideration to be appointed a Colorado Supreme Court Justice, by former Denver District Attorney and former Colorado Governor, Bill Ritter.  Former Governor Ritter instead chose Monica Marquez.

142. It is easier for an elected politician to prosecute poor people with little resources to fight back, or ignore claims made by poor people about government misconduct, than it is for a politician with no courage to fight either wealthy or prominent people with the resources to fight back, and/or a state job or elected office, and who have occasional media connections.

143. Carol Chambers was the district attorney for Colorado's Eighteenth Judicial District, covering Arapahoe, Douglas, Elbert and Lincoln counties.

144. Chambers was a district attorney who formerly worked as a judicial clerk for one of the judges on the Colorado Court of Appeals, and was one of the most visible and powerful women politicians in the State of Colorado.

145. The Eighteenth Judicial District Attorney's Office has a reputation for an "Us vs. the World" cliquishness and a condescending attitude.

146. Thirteen of the twenty-one district court judges in the Eighteenth Judicial District are former prosecutors, law enforcement officers or assistant attorneys general. Those who worked for the district attorney's office often appear to have a college-alumni-like loyalty to the district attorney's office. For some, the relationship with the District Attorney's Office is particularly close.

147. Former Eighteenth Judicial District **Judge Grafton Biddle** was forced to resign after he carried on an extra-marital affair with a female deputy district attorney from the Eighteenth Judicial District Attorney's Office, who frequently handled cases in his courtroom. Please see Exhibit ++ and paragraphs x-z below).

148. A former magistrate in Douglas County, **Louis Gresh**, used to routinely tell people coming into his courtroom, that when selecting an attorney to represent them, it was

more important to know how well the attorney knew the judge handling the case, than how well the attorney knew the law.

149. Carol Chambers was the subject of a 2006 attorney disciplinary case, Colorado Supreme Court Case No. 06 PDJ 036, when she threatened a civil collections attorney, falsely claiming that there had been multiple complaints made against him, and threatening that he would be the subject of a grand jury investigation, when, in fact, multiple complaints had NOT been made against the collections attorney.  (See Exhibit   attached, case decision in <u>People v. Chambers</u>).

150. The Colorado Supreme Court took as little action as they could against Chambers by publicly censuring her, claiming that Chambers false claim of receiving many complaints against the collections attorney was negligently made in a hasty way and that there was not enough evidence to find that the phony allegation of many complaints being made against the collections attorney was "knowingly false or misleading".  (See Exhibit attached, case decision in <u>People v. Chambers</u>).

151. It was unclear in the "presiding disciplinary judge's" decision, how he, **Judge William Robert Lucero**, came to the conclusion that telling a collections attorney that there had been many complaints against him (when there had NOT BEEN ANY complaints other than from one of Carol Chambers' political/elected official friends) and that he was going to be the subject of a grand jury investigation and that Carol Chambers wanted to talk to him about the civil case the collections attorney had filed against Chamber's political friend, was anything other than unethical political arm twisting and the threat of criminal prosecution used to influence a civil case.

152. Apparently presiding disciplinary judge **William Robert Lucero** based his laughable and deliberately false conclusion that, when Chambers told the collections attorney that many legal complaints had been made against him and that the collections attorney would be subject to a grand jury investigation, Chambers statement was made in a negligently hasty way and that Chambers did not act in a "knowlingly false or misleading way", on the idea that Chambers could not remember the facts of the collection attorney case when she threatened the collections attorney.

153. Presiding Disciplinary Judge **William Robert Lucero** is an older man who came of age in the 1960's and is out of touch with today's culture. William Robert Lucero still thinks that women are not smart enough, cunning enough or aggressive enough to try to lie to hurt another person, to profit the woman. **William Robert Lucero** has an old, outdated view of women as uneducated or knaive matrons and homemakers, instead of aggressive people competing on an equal level with men in education, career paths, and ambition, with all the pluses and negatives that entails, including on occasion, cunning and lack of integrity.  See paragraphs x-y below.

154. There are no mere "coincidences" when it comes to the Colorado Judicial Branch.

155. When a Colorado state judge is up for retention election, the two most important, most organized groups a judge has to worry about in an election, if those groups turn against the judge are the Colorado District Attorney's Council (CDAC) and the Colorado Womens Bar Association (CWBA).

156. Upon information and belief, the presiding disciplinary judge took it easy on Chambers, so that Chambers would help the Colorado Supreme Court's Attorney Regulation Counsel in the future and to mollify the CDAC and the CWBA..

157. John Scott Gleason is the head Regulation Counsel for the Colorado Supreme Court's Office of Attorney Regulation Counsel, the office that prosecutes ethics charges against attorneys, and was in charge of prosecuting Carol Chambers.

158. It is unclear whether John Scott Gleason has any familial relationship to Rebecca Sperling Gleason, a supervisory deputy district attorney within Carol Chamber's district attorney's office, whether as husband and wife, or brother and sister, or some other relationship.

159. John Scott Gleason and presiding disciplinary judge William Robert Lucero work closely together, in the same office building, are friends and many of the normal walls of separation between a judge and an attorney's office are lowered between William Robert Lucero and John Scott Gleason's Office of Attorney Regulation Counsel. "Judge" Lucero will frequently delay ruling on the most routine motions filed by attorney's opposing the Attorney Regulation Counsel Office. Judge Lucero also has his secretary e-mail attorney's in the Office of Attorney Regulation Counsel to remind them an answer is due to a motion. (See Exhibit ++ attached). Most attorney's don't get that special kind of friendly service or help from most judges.

160. In the past, there have been news reports that Carol Chambers has threatened to clog judges schedules in the Eighteenth Judicial District, if they rule against her office in court. (See Exhibit     attached, May 4, 2007 internet article on the Denver Channel.com).

161. In addition, articles have been written about Carol Chambers withholding evidence on criminal cases. (See Exhibit   attached, The Atlantic 2012 internet article).

162. Carol Chambers, through her deputy district attorneys, improperly withheld evidence in criminal cases, in order to make the odds more likely her office would get convictions and to impose more fines and court costs and probation fees in her jurisdiction.

163. In the past, newspapers have reported that Carol Chambers was ignoring exculpatory evidence and paying her deputy district attorneys a bounty for taking cases to trial and winning.

164. It is often, and not unusual, for police officers to make reference to evidence in their police reports, and then not provide a copy of such evidence to the district attorney's office, or the district attorney's office receives all the evidence from the police officer, but then does not provide copies of that information to the defendant or the defendant's attorney in the criminal case. See paragraphs ++-++ below.

165. Such missing evidence can take the form of DUI records and reports, e-mails between witnesses, training records for police officers showing that an officer is trained and qualified to use a piece of scientific equipment, evidence that a witness against the defendant has been in trouble with the law previously, or other records or statements received from witnesses.

166. The Colorado Supreme Court has adopted a set of procedural rules that apply to all criminal cases in Colorado, except municipal ordinance and municipal charter violations.

167. ++Colorado Rule of Criminal Procedure 16 is attached hereto as Exhibit **.

168. Colorado Rule of Criminal Procedure 16 provides in pertinent part that the prosecuting attorney shall make all police reports, arrest reports, offense reports, all witness statements, "a written list of the names and addresses of the witnesss then known to the

district attorney whom he or she intends to call at trial" and "any material or information within his or her possession and control which tends to negate the guilt of the accused as to the offense charged or would tend to reduce the punishment therefore." Colo.R.Crim.P.16(I)(a)(1)(I),(VII)&(2).

169. **The prosecuting attorney shall perform all other obligations under subsection (a)(1) as soon as practicable but not later than thirty days before trial.** Colo.R.Crim.P. 16(I)((b)(3).

170. "The prosecuting attorney shall ensure that a flow of information is maintained between the various investigative personnel and his or her office sufficient to place within his or her possession or control all material and information relevant to the accused and the offense charged." Colo.R.Crim.P.16(I)(b)(4).

171. The United States Constitution states the following in the Fourteenth Amendment: "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const., amend XIV, β 1.

172. Similarly, the Colorado Constitution provides that "No person shall be deprived of life, liberty or property, without due process of law." Colo. Const. Art. II, sec. 25.

173. The Colorado Constitution also provides that "**Equality of justice.** Courts of justice shall be open to every person, and a speedy remedy afforded for every injury to person, property or character; and right and justice should be administered without sale, denial or delay." Colo. Const. Art. II, sec. 6.

174. The Colorado Supreme Court wrote the following in a grievance case against a district attorney, <u>In the Matter of Attorney C</u>, 47 P.3d 1167, 1170-71 (Colo. 2002):

In *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the United States Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." . . . .Hence, the materiality standard of *Brady* and *Bagley* applies to Rule 16 disclosures in


———————————————— **Page 1171** ————————————————

Colorado. Rule 16(I)(a)(2) mandates that "[t]he prosecuting attorney shall disclose to defense counsel *any* material or information within his possession or control *which tends to negate the guilt of the accused as to the offense charged or would tend to reduce the punishment therefor."* . . . .

A prosecutor has the responsibility of a minister of justice and not simply that of an advocate. This responsibility carries with it specific obligations to see that the defendant is accorded procedural justice and that guilt is decided upon the basis of sufficient evidence. Precisely how far the prosecutor is required to go in this direction is a matter of debate and varies in different jurisdictions. *Many jurisdictions have adopted the ABA Standards of Criminal Justice Relating to Prosecution Function, which in turn are the product of prolonged and careful deliberation by lawyers experienced in both criminal prosecution and defense.*

Model R. Prof. Conduct 3.8 cmt., *reprinted as* Colo. RPC 3.8 cmt.

The ABA *Standards for Criminal Justice: Prosecution Function and Defense Function* 3--3.11(a) (3d ed.1993) provide that:

A prosecutor should not intentionally fail to make timely disclosure to the defense, at the earliest feasible opportunity, of the existence of all evidence or information *which tends to negate the guilt of the accused or mitigate the offense charged or which would tend to reduce the punishment of the accused.*(fn7).

175. In <u>Masters v. Gilmore</u>, 663 F. Supp. 1027 (D. Colo. 2009), a Colorado United States District Court Judge, Lewis Babcock, wrote the following:

Canon 5 of the American Bar Association ("ABA") Canons of Professional Ethics adopted in 1908 provides:

The primary duty of a lawyer engaged in public prosecution is not to convict, but to see that justice is done. The suppression of facts or the secreting of witnesses capable of establishing the innocence of the accused is highly reprehensible.

In turn, Ethical Consideration ("EC") 7-13 of the ABA Code of Professional Responsibility adopted in 1969 provides:

The responsibility of a public prosecutor differs from that of the usual advocate; his duty is to seek justice not merely to convict. ... With respect to evidence and witnesses, **[**4]** the prosecutor has responsibilities different from those of a lawyer in private practice: the prosecutor should make timely disclosure to the defense of available evidence, known to him, that tends to negate the guilt of the accused, mitigate the degree of the offense, or reduce the punishment. Further, a

prosecutor should not intentionally avoid pursuit of evidence merely because he

believes it will damage the prosecutor's case or aid the accused.

These principles have been acknowledged by the Colorado Supreme Court in *People v. District*

*Court, 632 P.2d 1022 (Colo. 1981).* The Court stated

> Our analysis begins with recognition that the duty of the prosecutor is to seek
>
> justice, not merely convict. As stated in *Singer v. United States, 380 U.S. 24, 85 S.*
>
> *Ct. 783, 13 L.Ed.2d 630 (1965)* "... the (prosecutor) in a criminal prosecution is
>
> not an ordinary party to a controversy, but is a 'servant of the law' with a 'twofold
>
> aim ... that guilt shall not escape or innocence suffer.'" *Id. at 37, 85 S.Ct. at 791.*

*Id. at 1023.* But there is more. These principles are enshrined in the jurisprudence of the United

States Supreme Court. *See Young v. United States ex rel. Vuitton et Fils S.A., 481 U.S. 787, 107*

*S. Ct. 2124, 95 L. Ed. 2d 740 (1987);* **[\*\*5]** *Singer v. United States, 380 U.S. 24, 85 S. Ct. 783,*

*13 L. Ed. 2d 630 (1965).* In *Young,* the Supreme Court said

> This distinctive role of the prosecutor is expressed in [EC] 7-13 of Canon 7 of
>
> the [ABA] Model Code of Professional Responsibility (1982): "The responsibility
>
> of a public prosecutor differs from that of the usual advocate; his duty is to seek
>
> justice, not merely to convict."

*Id. at 803.* These principles even find expression chiseled into the stone of the Robert F.

Kennedy Center (Department of Justice Headquarters, Washington, D.C., constructed in

1935) where it is admonished that "[t]he United States wins its case whenever justice is

done one of its citizens in the Courts."

Implicit in these principles is the notion that justice be done to victims, to their **[*1032]** families, and to the United States Constitution. This happens when fundamental fairness applies to convict the truly guilty. Bedrock principles, yes. Fundamental and objectively reasonable within the meaning of the *Due Process Clause of the Fourteenth Amendment of the Constitution*, of course.

176. In the <u>Masters</u> case, Larimer County, Colorado resident Timothy Masters had been convicted of first degree murder and sentenced to life in prison by a Colorado district court in Fort Collins, Colorado.  Two of the prosecutors working on the case, Terrence Gilmore and Jolene Blair, were alleged to have withheld information from expert witness for the prosecution, ignored and destroyed expert opinions that conflicted with their prosecution theory of the case, and withheld exculpatory evidence, among other unethical activities, in an apparent effort to protect another suspect, an eye doctor, from investigation.  The eye doctor happened to go to church with Gilmore and Blair was one of the eye doctor's patients.

177.  At the time the <u>Masters</u> case was written, both Terrence Gilmore and Jolene Blair had been appointed by the governor as Colorado district court judges in Ft. Collins, in no small part based on the trust the average citizen places on a person holding a law enforcement job to be an honest person of good character.  However, state job titles and law enforcement careers do not always mean a person is honest or of good character.  UPDATE

178. Colorado Rule of Professional Conduct 5.1 provides as follows:

Rule 5.1.  Responsibilities of a Partner or Supervisory Lawyer

. . . .

(b) A lawyer having direct supervisory authority over another lawyer shall make reasonable efforts to ensure that the other lawyer conforms to the Rules of Professional Conduct.

(c) A lawyer shall be responsible for another lawyer's violation of the Rules of Professional Conduct if:

(1) the lawyer orders or, with knowledge of the specific conduct, ratifies the conduct involved;

(2) the lawyer is a partner or has comparable managerial authority in the law firm in which the other lawyer practices, or has direct supervisory authority over the other lawyer, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action.

*__People v. R.O.__, Douglas County Court Case No. 08 M 1861- The Eighteenth Judicial District Attorney's Office and Castle Rock Police Department fail to respond to Open Records requests and Criminal Justice Records requests to conceal the non-existence of evidence referenced in the police report, and conceal witness name and contact information*

179. In People v. R.O., Douglas County Court Case No. 08 M 1861, R.O. was in the process of discussing getting a divorce from his wife, when she had him arrested for harassment on or about August 9, 2008.

180. John McNamara's client, R.O. was a former Texas state corrections officer.

181. It is well known by attorneys in divorce cases and people who have friends that have been in court, that one of the easiest ways for a spouse to gain the upper hand in a

divorce case is to have the other spouse arrested for some sort of domestic violence charge, knowing that the courts will issue a protection order against the other spouse to keep him out of the marital house, with few if any of his personal papers or possessions, and possibly also keeping him away from the couple's children, if there are any. The male spouse is then behind the eight ball in the divorce court, because the divorce court judge will know about the criminal case and the automatic protection order in the criminal case and the divorce court will hold it against the male spouse, particularly with respect to child custody/parental responsibility; the male spouse will be spending money to try to hire an attorney to get him access back to his home to get his clothing and, if possible, his personal papers (tax returns, credit card bills, bank statements, etc.) and car keys, so that he can go to work without embarrassing himself and calling friends for rides, money, a place to stay, etc.; the male spouse will be spending extra money on temporary housing at a motel and on restaurant meals; the male spouse will be spending money on trying to see his children; and the complaining spouse will have possession of the marital home and children, without even waiting for a first hearing in the divorce case. This puts the male spouse at a huge disadvantage and the mercy of the complaining spouse in negotiations to settle the divorce, to stop the huge financial bleeding the male spouse is undergoing, and to see his children.

182. The Eighteenth Judicial District Attorney's Office, led by District Attorney Carol Chambers, prosecuted the harassment charge in People v. R.O..

183. C.R.S.β18-9-111 is the Colorado criminal statute describing harassment. The statute is a catch-all statute that has seven subsections,(1)(a)-(c) and (1)(e)-(h) describing seven unique types of unlawful conduct, ranging from shoving someone, to directing obscene

44

language at someone, to causing a phone to ring repeatedly, to insulting or taunting someone in coarse language.

184. Castle Rock Officer DeClaire's ticket/summons to R.O. did not specify which subsection of the harassment statute or type of harassment was being alleged against R.O.

185. Castle Rock Police Officer DeClaire's police report describes the wife as allegedly "receiving harassing messages from [R.O.] through e-mails and phone conversations." DeClaire also reported that the wife received two e-mails from R.O. on her phone while the wife was speaking to Officer DeClaire on August 9, 2008.

186. However, Officer DeClaire did not report/concealed the content of the two e-mails in his police report. No other communication between R.O. and his wife on August 9, 2008 is identified in the police report, and the content of the phone conversations also was not disclosed.

187. Officer DeClaire should have written in his report what specifically was allegedly said in the alleged e-mails and phone calls between R.O. and the wife, that was considered to be harassing.

188. It makes a harassment case hard to defend, when the specific nature of the harassing conduct is not clearly described in the police report and not specified by statute subsection number in the summons.

189. On August 27, 2008 attorney John McNamara filed a Defendant's Discovery Motion requesting, among other things, "any statement, whether oral, written, recorded or otherwise transcribed . . . made by the accused".

190. The Eighteenth Judicial District Attorney's Office never provided the two e-mails reportedly sent to the wife's phone by R.O. on August 9, 2008, nor any e-mails the wife reportedly sent to R.O. the same day.

191. What the Carol Chambers' District Attorney's Office did do is dump a bunch of e-mails between the two spouses from March 10, 2008 through early August 2008 as part of the district attorney's discovery disclosures, but never the e-mails that resulted in R.O. being arrested and placed in jail. The earlier e-mails disclosed by Carol Chambers' office were irrelevant to Douglas County Court Case No. 08 M 1861, as shown by the Eighteenth Judicial District Attorney's Office eventual dismissal of this case.

192. On January 30, 2009, John McNamara faxed a combined Open Records Request and Criminal Justice Records Request to the records custodian at the Castle Rock Police Department and the records custodian at the Douglas County District Attorney's Office.

193. The combined Open Records Request and Criminal Justice Records request requested, among other things, "copies of the alleged e-mails sent by [R.O.] to [wife] while she was conversing with Officer James DeClaire on August 9, 2008" and a"copy of each and every threatening e-mail and text message allegedly sent by [R.O.] to [wife] which is the basis of the harassment charge in Douglas County Court Case No. 08 M 1861".

194. Neither the Eighteenth Judicial District Attorney's Office, nor the Castle Rock Police Department, ever responded to the combined Open Records Request and Criminal Justice Records Request.

195. By failing to provide a written reason or statutory or procedural explanation for the failure to produce the records, after being requested to do so pursuant to C.R.S. β24-72-305(6) and C.R.S. β24-72-204, Carol Chambers, the Eighteenth Judicial District

46

Attorney's Office, and the Castle Rock Police Department were silently conceding that there was no Colorado state law or Colorado administrative procedural rule they were relying on to deny production of the requested records.

196. **Carol Chambers and the Eighteenth Judicial District Attorney's Office were, by their nonverbal conduct, essentially saying "if you want the records I am constitutionally and statutorily required to provide you, but don't want to provide you, make me provide them to you, if you can."**

197. The reason that neither the Eighteenth Judicial District Attorney's Office, nor the Castle Rock Police Department did not answer the open records and criminal justice records requests was to continue to try to put pressure on R.O. to accept a plea bargain deal and get fine and court cost money for the state, and possibly to conceal police misconduct or error that could have subjected the Castle Rock Police Department to a civil rights lawsuit under the federal civil rights enforcement law, 42 U.S.C. β1983.

198. Carol Chambers and her subordinate attorneys are confident that they can get away with committing the misdemeanors of violating the Open Records Act and the Criminal Justice Records Act.

199. Carol Chambers and her subordinate attorneys know that she has gotten away in the past with sending a threatening e-mail a year earlier, on or about April 17, 2007, to the Chief Judge in the Eighteenth Judicial District, threatening to clog court schedules in the Eighteenth Judicial District, and the Colorado Supreme Court and the Office of Attorney Regulation Counsel took no action. (Please see Exhibit ++ attached).

200. Carol Chambers and the specific attorneys working under her supervision don't care about what the Colorado General Assembly says or writes concerning disclosure of

governmental records for multiple reasons.  Those reasons are: 1) based on the current

members of the Colorado Supreme Court, including two former deputy district attorneys

and five former assistant attorneys general (six of the seven justices), the Colorado

Supreme Court is very unlikely to take any disciplinary action against an attorney

employed by the state in a law enforcement role; 2) upon information and belief, the

current Colorado Supreme Court has an unstated policy of looking the other way when

it comes to misconduct on the part of attorneys employed by the state; 3) the Colorado

Supreme Court could have already punished Carol Chambers pretty hard for the

unethical action of threatening a civil attorney with criminal prosecution in order to help

Chambers' friend in a civil case, and the Supreme Court did not, again, upon

information and belief, in part because the Supreme Court Justice in charge of attorney

discipline, Nathan Ben Coats, is a former prosecutor, the disciplinary judge, William

Robert Lucero, is a former prosecutor and the attorney regulation counsel, John Scott

Gleason, may or may not be related to a deputy district attorney in Chambers' office,

Rebecca Gleason; 4) Carol Chambers and her attorneys know that the judges in the

Eighteenth Judicial District are soft on discovery violations by state attorneys; 5) Carol

Chambers and her attorneys know that most criminal defendants do not have the money

resources to pursue an appeal; 6) Carol Chambers and her attorneys know that, in

county court cases, the appeal goes to the local district court first, and then to the

Colorado Supreme Court, if the defendant has the money; 7) Colorado district courts

and county courts are usually housed in the same building, the judges know each other

and work together in the same building and district courts rarely overturn their fellow

judges on the county court;  and 9) the Colorado Supreme Court appellate case law

decisions are mere written words that lower court judges rarely have the will or the inclination to enforce, if the lower court judge disagrees with the decision, **and there is nothing the Colorado Supreme Court will do about it.**

*DOUGLAS COUNTY COURT CASE NO. 08 T 3094- The Eighteenth Judicial District Attorney's Office tries to hide the fact that the arresting officer is no longer employed by the Lone Tree Police Department and the D.A.'s Office does not know where he is*

201. In People v. R.M., Douglas County District Court Case No. 08 T 3094, the Eighteenth Judicial District Attorney's Office, led by District Attorney Carol Chambers, prosecuted a Driving Under the Influence (DUI) case.

202. The DUI ticket in People v. R.M. was written by Lone Tree Police Department Officer Thomas Suter on or about May 11, 2008. (Please see Exhibit ++ attached, p. 5).

203. Lone Tree Police Officer Thomas Suter wrote the police report for People v. R.M.; Suter also signed the paper work as the police officer who changed the chemical solution used in the intoxilyzer-alcohol analyzer used in People v. R.M.; and Suter administered the intoxilyzer test used in People v. R.M. (Please see Exhibit ++ attached, pp. 6-9).

204. Defense counsel entered his appearance for R.M. and filed a discovery motion requesting police reports, test results, witness names and addresses on June 24, 2008. (Please see Exhibit ++ attached, p. ++ ).

205. A Colorado Department of Revenue, Division of Motor Vehicles drivers license revocation hearing was held on June 30, 2008, at which time Lone Tree Police Officer Suter failed to appear at the hearing, after being subpoenaed to attend. (Please see Exhibit ++ attached, p. 10).

206. The Colorado Department of Revenue, Division of Motor Vehicles maintains hearing files for revocation cases by the Department of Revenue with respect to a Colorado resident's drivers license. (Please see Exhibit ++ attached, pp. 5-10).

207. The Colorado Department of Revenue, Division of Motor Vehicles' hearing file for R.M.'s revocation hearing showed that Officer Suter was no longer working for the Lone Tree Police Department as of June 30, 2008. (Please see Exhibit ++ attached, p. 10).

208. The Douglas County District Attorney's Office never provided any discovery in People v. R.M., other than the strange memo dated July 10, 2008 attached as part of Exhibit++ and the documents referenced as part of Exhibit ++ at pages 12-13. (Please see Exhibit ++ attached, p. 11-13).

209. The July 10, 2008 discovery memo sent to John McNamara leaves the reader with the impression that "because of the nature of the charges [DUI, unsafe lane change, etc.], the District Attorney's Office will NOT be opening a file on this case" and police reports can be copied from the court/judge's file in the court clerk's office. (Please see Exhibit ++ attached, p. 10).

210. In nearly every DUI case in Adams, Arapahoe, Denver, Douglas, Jefferson, and Weld counties, there is ALWAYS a District Attorney's file with copies of the ticket, police reports and scientific testing records. While there may not be files for speeding ticket cases or red light violation cases, there are always district attorney case files for DUI cases.

211. While waiting for the pretrial conference hearing on July 24, 2008, John McNamara telephoned the Lone Tree Police Department to ask to speak to Officer Suter. John

McNamara was transferred twice before speaking to a sergeant who asked who was calling and why he was calling.  The sergeant then admitted that no one at the Lone Tree Police Department knew where Officer Suter was anymore.  (Please see Exhibit ++ attached, pp.1-2, para.6).

212. During the July 24, 2008 pretrial conference, defense counsel John McNamara asked the female deputy district attorney representing the Eighteenth Judicial District Attorney's Office whether there was anything she wanted to tell defense counsel about the case. The deputy d.a. said "no".  Defense counsel John McNamara then confronted her with the fact that Officer Suter was missing and had been missing for roughly a month.  The deputy d.a. acknowledged that she had heard of Oficer Suter's disappearance the previous week, but that the Douglas County District Attorney's Office was looking for him.  The district attorney's office refused to dismiss the case and at defense counsel's request, the case was set for trial on November 18, 2008.  (Please see Exhibit ++ attached, p. 2, paras. 7-8).

213. Without Officer Suter present at trial, there was no witness to describe any alleged bad driving by R.M.; no witness to describe any physical observations of R.M.'s alleged intoxication; and no witness to describe the necessary scientific steps taken to lay a scientific evidence foundation for the specific intoxilyzer-alcohol analyzer test used on R.M., for that test to be admissible in court.

214. On August 13, 2008, the Douglas County District Attorney's Office persisted in the fiction that Officer Suter was still employed by the Lone Tree Police Department, by **sending out a witness list directly to the client, R.M., which stated that Officer Suter's address was the Lone Tree Police Department**.  (Please see Exhibit ++

attached, p. 2, paras. 7-8). **This was improper ex parte communication by an attorney with John McNamara's client.**

215. On or about September 3, 2008, John McNamara called the Lone Tree Police Department and was again told that Officer Suter's whereabouts were unknown.

216. On September 3, 2008, John McNamara filed a Motion to Dismiss with Prejudice for Discovery Violation in Douglas County District Court.

217. During the time between that Motion and the Douglas County District Court dismissing the case, the Douglas County District Attorney's Office persisted in telling John McNamara that things would go tough for R.M., if R.M. did not take a plea bargain.

218. The Douglas County District Attorney's Office deliberately withheld the information that Officer Suter's location was unknown to law enforcement, in order to try to trick R.M. into accepting a plea bargain agreement.

219. In 2002, the Colorado Supreme Court quoted a United States Supreme Court case in its decision in In the Matter of Attorney C, 47 P.3d 1167, 1170 (Colo. 2002), when the Colorado Supreme Court wrote:


In *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the United States Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." . . . .Hence, the materiality standard of *Brady* and *Bagley* applies to Rule 16 disclosures in

———————————————————— **Page 1171** ————————————————————

52

Colorado. Rule 16(I)(a)(2) mandates that "[t]he prosecuting attorney shall disclose to defense counsel *any* material or information within his possession or control *which tends to negate the guilt of the accused as to the offense charged or would tend to reduce the punishment therefor."*

. . . .

A prosecutor has the responsibility of a minister of justice and not simply that of an advocate. This responsibility carries with it specific obligations to see that the defendant is accorded procedural justice and that guilt is decided upon the basis of sufficient evidence. Precisely how far the prosecutor is required to go in this direction is a matter of debate and varies in different jurisdictions. *Many jurisdictions have adopted the ABA Standards of Criminal Justice Relating to Prosecution Function, which in turn are the product of prolonged and careful deliberation by lawyers experienced in both criminal prosecution and defense.*

Model R. Prof. Conduct 3.8 cmt., *reprinted as* Colo. RPC 3.8 cmt.

The ABA *Standards for Criminal Justice: Prosecution Function and Defense Function* 3-- 3.11(a) (3d ed.1993) provide that:

A prosecutor should not intentionally fail to make timely disclosure to the defense, at the earliest feasible opportunity, of the existence of all evidence or information *which tends to negate the guilt of the accused or mitigate the offense charged or which would tend to reduce the punishment of the accused.*(fn7).

220. Carol Chambers and the specific attorneys working under her supervision don't care about what the Colorado Supreme Court says or writes in its decisions for multiple reasons. Those reasons are: 1) Based on the current members of the Colorado Supreme Court, including two former deputy district attorneys and five former assistant attorneys

53

general (six of the seven justices), the Colorado Supreme Court is very unlikely to take any disciplinary action against an attorney employed by the state in a law enforcement role; 2) Upon information and belief, the current Colorado Supreme Court has an unstated policy of looking the other way when it comes to misconduct on the part of attorneys employed by the state; 3) the Colorado Supreme Court could have already punished her pretty hard for the unethical action of threatening a civil attorney with criminal prosecution to help Chambers' friend in a civil case, and it did not, again, upon information and belief, in part because the disciplinary judge, William Robert Lucero, is a former prosecutor and the attorney regulation counsel, John Scott Gleason, may or may not be related to a deputy district attorney in Chambers' office, Rebecca Gleason; 4) Carol Chambers and her attorneys know that the courts in the Eighteenth Judicial District are soft on discovery violations by state attorneys; 5) Carol Chambers and her attorneys know that most criminal defendants do not have the money resources to pursue an appeal; 6) Carol Chambers and her attorneys know that, in county court cases, the appeal goes to the local district court first, and then to the Colorado Supreme Court, if the defendant has the money; 7) Colorado district courts rarely overturn their fellow judges on the county court in the same building; 8) the Colorado Supreme Court rarely addresses traffic cases; and 9) the Colorado Supreme Court appellate case law decisions are mere written words that lower court judges rarely have the will or the inclination to enforce, if the lower court judge disagrees, and **there is nothing the Colorado Supreme Court will do about it.**

***ARAPAHOE COUNTY CASE NO. 09 T 1066 – The Eighteenth Judicial District Attorney's Office violates the Open Records Act and the Criminal Justice Records Act and a Judge's Discovery Order in front of Judge Vahle, and Vahle takes it out on the Defendant***

221. In 1980, the Colorado Supreme Court decided the case of <u>People v. Walker</u>, 610 P.2d 496 (Colo. 1980), a speeding case that dealt with the issue of the scientific acceptability of police radar guns as evidence of a car speeding in traffic cases.

222. In <u>People v. Walker</u>, Colorado Supreme Court Justice William Erickson wrote:

> "[t]o support a conviction based on the use of a radar device, the court must first take judicial notice of the scientific principles underlying the use of radar to determine vehicular speed. [Citations to out-of-state cases omitted]. As a further foundation for admission of a radar reading, the court must then consider whether the particular radar unit was properly operated and whether the radar unit was accurate at the time the defendant's speed was measured." [citations omitted].

> . . . .

> At the outset, it is useful to review the scientific principles underlying the operation of the radar device itself. Briefly stated, radar devices of the type used in this case utilize a scientific phenomenon known as the 'Doppler Effect'. The 'Doppler Effect' is based on the proposition that when sound waves of a continuous frequency are reflected off a moving object the resulting frequency of the reflected sound waves will vary in proportion to the velocity of the moving object. . . .

. . . .

. . . some minimum [evidentiary] foundation must be established to insure 'that the persuasive force of scientific results is not improperly triggered.' [Citation to out-of-state case omitted]. **Accordingly, where a tuning fork is used to calibrate a radar device, we hold that the prosecution must show that two tuning forks have been used, or, alternately, that the single tuning fork used has been certified as accurate within one year of the test. Upon such a showing, the trial court may admit the proffered radar evidence.** [emphasis added].

People v. Walker, 610 P.2d 496, 498&500 (Colo. 1980).

223. Most Colorado courts will refer people on trial in traffic cases to People v. Walker as the legal authority for allowing police radar gun evidence of a car's speed. However, what most Colorado courts gloss over and don't tell defendants is that most police officers **today use LIDAR (Light Detection And Ranging) guns that use concentrated light beams, rather than the radar guns that used sound waves and the "Doppler Effect" Justice Erickson discussed in the Walker decision thirty-two years ago.** (Exhibit xxx internet article on LIDAR)

224. LIDAR guns use a whole different scientific method-concentrated infra red light- to measure the speed of automobiles, compared to the radar gun sound waves discussed in People v. Walker, and the use of tuning forks will not help in measuring the accuracy of a LIDAR gun using light beams.

225. The Colorado Supreme Court and many of the Colorado District Courts have not made any written decision on the scientific acceptance and admissibility of LIDAR technology as evidence in court to prove the speed of moving cars.

226. As a result, many traffic cases involving charges of speeding have LIDAR evidence used as the primary evidence by the police officer or prosecutor, even though the judges quietly know that the state supreme court has not issued a written decision recognizing LIDAR as an accepted scientific technique for measuring the speed of an automobile.

227. Judges who say nothing to the person on trial and the prosecutor/police officer about the presentation of LIDAR evidence, in traffic cases involving the presentation of LIDAR evidence, upon information and belief, do so because the Colorado Judicial Branch relies greatly on traffic ticket revenue and because the judges assume the driver is guilty when ticketed and are willing to ignore the constitutional presumption of innocence and Colorado case law concerning the admissibility or acceptability of specific types of scientific evidence. There is no other explanation for admitting this evidence that is not within the normal person's sphere of everyday scientific knowledge. These judges who overlook the fact that LIDAR has not been declared as a scientifically reliable technique to measure automobile speeds by the Colorado Supreme Court, as radar was in the Walker case, know that LIDAR and radar are different scientific technologies.

228. Shreck case++

229. On January 20, 2009, Colorado State Patrolman Davey stopped John McNamara for allegedly speeding on E-470 and issued a ticket to John McNamara with a charge of speeding.

230. The back of the speeding ticket provided to the Arapahoe County District Court indicated that Trooper Davey had used LIDAR to allegedly measure John McNamara's speed.

231. Andrew Carl Steers is a deputy district attorney with the Eighteenth Judicial District Attorney's Office. Steers was the first deputy district attorney assigned to handle the speeding ticket.

232. At the first hearing in the case, the arraignment hearing, Andrew Carl Steers made a plea bargain offer to John McNamara, but John McNamara asked that the case be scheduled for a pretrial conference. Steers got irritated with John McNamara and told John McNamara that the arraignment was the pretrial conference, which was a lie, and told John McNamara that the plea offer would not change.

233. John McNamara politely told Steers that the hearing was in fact an arraignment and that he did not want to argue with Steers and wanted a pre-trial conference.

234. Andrew Carl Steers angrily insisted it was a waste of time to have a pretrial conference and filled out a Notice to Set form.

235. As the deputy district attorney assigned to the speeding case, Steers had access to all the information in the district attorney's speeding case file and was in charge of selecting witnesses and supplementing the case file with additional information as was necessary.

236. On April 8, 2009, John McNamara faxed a discovery motion to the Arapahoe County District Attorney's Office. At paragraph 4 of the Discovery Motion, John McNamara requested any records of equipment certification tests, equipment operator certificates and the results of any scientific tests. This was done to determine whether the state patrol had properly complied with training and testing requirements for the LIDAR technology used by the state patrol.

237. The Arapahoe County District Attorney's Office failed to provide any discovery before the April 15, 2009 pretrial conference. When asked about discovery at the pretrial conference, Andrew Carl Steers told John McNamara that he could read the back of the traffic ticket in the Court file, which John McNamara did. When asked about the LIDAR equipment certification, Andrew Carl Steers impatiently responded that the information would not be requested by the District Attorney's Office unless the case was scheduled for trial, and challenged John McNamara to schedule the case for trial. John McNamara stated that he wanted the discovery that he had requested and wanted to see the certifications for the LIDAR gun and the officer's training. Andrew Carl Steers again challenged John McNamara to schedule the case for trial. John McNamara stated that he would do an Open Records request and told Steers he did want to argue and to schedule the case for another pretrial conference.

238. Apparently Andrew Carl Steers, the deputy district attorney working for and under the supervision of Carol Chambers had no concerns about what the Colorado Supreme Court wrote in Colo.R.Crim.P. 16, supra, about providing all material and information relevant to the offense charged to the defendant. Upon information and belief, it is Carol Chambers' policy to make production of additional information, that was not

originally selected to be disclosed to defendants, as difficult as possible to obtain, and

by her actions essentially saying, 'make me provide you the information".

239. As stated above, Colorado Rule of Criminal Procedure 16 provides in pertinent part that

the prosecuting attorney shall make all police reports, arrest reports, offense reports, all

witness statements, "a written list of the names and addresses of the witnesss then

known to the district attorney whom he or she intends to call at trial" and "any material

or information within his or her possession and control which tends to negate the guilt

of the accused as to the offense charged or would tend to reduce the punishment

therefore." Colo.R.Crim.P.16(I)(a)(1)(I),(VII)&(2).

240. **The prosecuting attorney shall perform all other obligations under subsection**
**(a)(1) as soon as practicable but not later than thirty days before trial.**
Colo.R.Crim.P. 16(I)((b)(3).

241. "The prosecuting attorney shall ensure that a flow of information is maintained between

the various investigative personnel and his or her office sufficient to place within his or

her possession or control all material and information relevant to the accused and the

offense charged." Colo.R.Crim.P.16(I)(b)(4).

242. Carol Chambers and the specific attorneys working under her supervision don't care

about what the Colorado Supreme Court says or writes in its decisions for multiple

reasons. Those reasons are: 1) Based on the current members of the Colorado Supreme

Court, including two former deputy district attorneys and five former assistant attorneys

general (six of the seven justices), the Colorado Supreme Court is very unlikely to take

any disciplinary action against an attorney employed by the state in a law enforcement

role; 2) Upon information and belief, the current Colorado Supreme Court has an

unstated policy of looking the other way when it comes to misconduct on the part of attorneys employed by the state; 3) the Colorado Supreme Court could have already punished her pretty hard for the unethical action of threatening a civil attorney with criminal prosecution to help Chambers' friend in a civil case, and it did not, again, upon information and belief, in part because the disciplinary judge, William Robert Lucero, is a former prosecutor and the attorney regulation counsel, John Scott Gleason, may or may not be related to a deputy district attorney in Chambers' office, Rebecca Gleason; 4) Carol Chambers and her attorneys know that the courts in the Eighteenth Judicial District are soft on discovery violations by state attorneys; 5) Carol Chambers and her attorneys know that most criminal defendants do not have the money resources to pursue an appeal; 6) Carol Chambers and her attorneys know that, in county court cases, the appeal goes to the local district court first, and then to the Colorado Supreme Court, if the defendant has the money; 7) Colorado district courts rarely overturn their fellow judges on the county court in the same building; 8) the Colorado Supreme Court rarely addresses traffic cases; and 9) the Colorado Supreme Court appellate case law decisions are mere written words that lower court judges rarely have the will or the inclination to enforce, if the lower court judge disagrees, and **there is nothing the Colorado Supreme Court will do about it.**

243. On May 5, 2009, John McNamara faxed a combined written Open Records Request and Criminal Justice Records Request to Andrew Carl Steers and to State Patrolman Davey.

244. Andrew Carl Steers was the "official custodian" for the Eighteenth Judicial District Attorney's Office speeding case file against John McNamara, as defined by C.R.S.§24-

72-202(2) and C.R.S.§24-72-302(8) and the custodian for the Eighteenth Judicial District Attorney's Office as defined by C.R.S. §24-72-302(5).

245. Defendant "Trooper" Davey is a records custodian for the Colorado State Patrol and "official custodian" as defined by C.R.S.§24-72-202(2) (2006) and C.R.S.§24-72-302(8) (2006) and the custodian for the Colorado State Patrol as defined by C.R.S. §24-72-302(50 (2006).

246. The combined Open Records Request and Criminal Justice Records Request, sent to the trooper and Steers was made to obtain records about Trooper Davey's "LIDAR" gun he used in issuing a speeding ticket, after Steers did not produce such information in response to a discovery motion.

247. Defendant Andrew Carl Steers failed to respond to the May 2009 combined Open Records Request and Criminal Justice Records Request.

248. Defendant Davey failed to respond to the May 2009 combined Open Records Request and Criminal Justice Records Request.

249. On May 13, 2009, a hearing was held during a pretrial conference in Arapahoe County Court Case No. 09 T 1006. John McNamara told Judge Darren Louis Vahle that he had requested production of the troopers LIDAR records in both the Discovery Motion and the Criminal Justice Records Act request, and that he had also requested any documentation that the Arapahoe County Court or any state court in Colorado had recognized the scientific validity of LIDAR technology. Please See Exhibit ++ attached.

250. At the May 13, 2009 hearing, Steers originally claimed that there was no specific request in the discovery motion for scientific records, that he had not received the

Criminal Justice Records Request, and that he was not a records custodian. The first two assertions were not truthful and as to Steers not being a records custodian, Steers was informed that, if he was not the records custodian, that he had a duty to identify who was the records custodian. C.R.S. β24-72-304(2).

251. At the May 13, 2009 hearing Steers agreed to get the requested Lidar records by a pretrial conference scheduled for June 17, 2009. (Exhibit ++, Transcript, 5/13/09 p. 12, l. 9-p.13, l.2).

252. Neither deputy district attorney Andrew Carl Steers, nor Trooper Davey, ever identified an alternate records custodian, even after being requested to do so in writing in the May 5, 2009 request.

253. A file clerk at the Colorado State Patrol office in Castle Rock provided a certificate showing the Lidar gun was certified, but only AFTER the date of the ticket. It was unclear whether Trooper Davey had LIDAR training that was valid at the time of the ticket.

254. When government employees, such as police officers or deputy district attorneys or city attorneys hand Open Records Requests or Criminal Justice Records Requests off to another employee to whom the records request is not addressed, they do so, not because they are too busy, but because they are trying to suck another government employee into the picture, to whom the records request was NOT expressly made, to have that employee act as a shield. By doing this, the police officer, deputy district attorney or city attorney hope to shift blame and monetary penalties and criminal responsibility to a lower ranking, secretarial employee, when records requests are not responded to by the police officer or attorney. **Police officers and deputy district attorneys know that**

**judges are less likely to punish a secretary for not producing a record, and that the police officer and deputy d.a. can avoid producing evidence that will weaken their case with impunity, a double win for crooked law enforcement.**

255. On June 4, 2009, John McNamara faxed a Notice of Intent to File Application pursuant to C.R.S.§24-72-204(5) to Andrew Steers and Trooper Davey.

256. Since June 4, 2009, neither Trooper Davey, nor Andrew Carl Steers have responded to the Open Records Request and Criminal Justice Records requests sent to them.

257. Since June 4, 2009, neither Trooper Davey, nor Andrew Carl Steers have provided any statute or procedural rule that would excuse them from responding to the Open Records Request and Criminal Justice Records requests sent to them.

258. By failing to cite a statute or procedural rule upon written request by John McNamara, both Andrew Carl Steers and Trooper Davey have legally conceded that there was no legal reason for denying the records, other than a power play designed to violate the due process clause of the United States and Colorado Constitutions, and the Colorado Supreme Court's Colorado Rules of Criminal Procedure, Rule 16.

259. Colorado Rule of Professional Conduct 5.1 provides as follows:

Rule 5.1. Responsibilities of a Partner or Supervisory Lawyer

. . . .

(d) A lawyer having direct supervisory authority over another lawyer shall make reasonable efforts to ensure that the other lawyer conforms to the Rules of Professional Conduct.

(e)  A lawyer shall be responsible for another lawyer's violation of the Rules of Professional Conduct if:

(3)  the lawyer orders or, with knowledge of the specific conduct, ratifies the conduct involved;

(4)  the lawyer is a partner or has comparable managerial authority in the law firm in which the other lawyer practices, or has direct supervisory authority over the other lawyer, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action.

260. **Carol Chambers and her subordinate attorneys are confident that they can get away with committing the misdemeanors of violating the Open Records Act and the Criminal Justice Records Act.**

261. As the facts below show, they have good reason for feeling this way.  **Anything goes in Colorado state courts in order to protect state employees from getting into trouble or being liable for monetary judgments.**

262. At another hearing on September 9, 2009, on John McNamara's Renewed/Second Motion to Dismiss, filed June 17, 2009, a different, unidentified female district attorney appeared instead of Steers.  At that hearing, John McNamara brought to Judge Darren Louis Vahle's attention that the requested LIDAR records had still not been produced after Criminal Justice Records Requests, a Discovery Motion and multiple motions to dismiss, and that the District Attorney's Office was committing a slow motion misdemeanor in the Court's presence.  John McNamara stated that the LIDAR was the reason he was stopped and ticketed, and that since no LIDAR records were being

produced, there was no reasonable suspicion for the officer to stop John McNamara and the entire ticket should be dismissed.

263. Colorado state judge Darren Louis Vahle is the type of judge who relishes yelling at defendants if they show up a few minutes late in court and relishes hammering defendants at sentencing.

264. However, when current deputy district attorney employees of Darren Louis Vahle's former employers, the Eighteenth Judicial District Attorney's Office and Carol Chambers, break the law by violating the Colorado Criminal Justice Records Act over a several month period of time, Colorado state judge Darren Louis Vahle, like a loyal alum of, or cheerleader for, the District Attorney's Office, had no reprimand or bellowing for the deputy district attorney, as he would for someone walking into court a couple of minutes late.

265. Darren Louis Vahle looked the other way on the misdemeanor committed in his presence, looked the other way on a violation of the Colorado Rules of Professional Conduct Rule 3.4, failed to dismiss the case for lack of reasonable suspicion to stop or discovery violation, failed to find a Fourth Amendment violation and decided to only suppress the LIDAR evidence.

266. John McNamara specifically asked Darren Louis Vahle to find that Trooper Davey had lack of reasonable suspicion to stop John McNamara, in violation of the Fourth Amendment to the United States Constitution, but Vahle would not.

267. Even though eight months had passed since the ticket was written and promises had been made by Andrew Carl Steers, the district attorney, to provide the LIDAR evidence, Darren Louis Vahle deliberately ignored the fact that 1) LIDAR evidence has not been

recognized by the Colorado Supreme Court or the Arapahoe County District Court, as evidenced by both the District Attorney and the state patrol officer failing to provide any case law decisions recognizing the scientific validity of LIDAR technology to measure the speed of an automobile after receiving a written records request; 2) that the district attorney and the state patrolman were breaking the Colorado Open Records Act and Colorado Criminal Justice Records Act and committing misdemeanor crimes in front of Judge Darren Louis Vahle by failing to provide requested records or an explanation for not providing the records; 3) that the traffic stop of John McNamara was based on an allegation that John McNamara had been speeding, when the certification for the equipment used to measure the speeding and the certification for the equipment operator were not effective at the time of the ticket and no alternate certification was provided, because both the DA and the state patrolman were withholding the evidence; and 4) the D.A.'s Office presented no testimony by Trooper Davey to support reasonable suspicion to stop a driver under the Fourth Amendment,  Darren Louis Vahle was either dull-witted enough or corrupt enough to find that Trooper Davey had reasonable suspicion to stop the car driven by John McNamara.

268. **Anything goes in Colorado state courts in order to protect state employees from getting into trouble or being liable for monetary judgments.**

269. During the February 17, 2010 trial on the traffic ticket case, Trooper Davey lied under oath on the witness stand and stated that the Open Records Request and Criminal Justice Records Requests were not addressed to him, when it was clear that they were.  Please see Exhibit ++.

270. Trooper Davey testified in Court that he had been assigned to Colorado state patrol District One for five years and that he receives written correspondence at that office at 4600 Castleton Court in Castle Rock, Colorado (Exhibit ++,Transcript Arapahoe County Court Case No. 09T201066, p. 63, l. 15- p.65, l. 21).

271. When Trooper Davey was handed Exhibit E, the combined Colorado Open Records Act request and Colorado Criminal Justice Records Act request, John McNamara asked Trooper Davey, "Now with respect to Exhibit E, that's a letter to you requesting information in the present case?" (Exhibit ++,Transcript Arapahoe County Court Case No. 09T201066, p. 63, l. 15- p.65, l. 21).

272. Trooper Davey answered "okay". (Exhibit ++,Transcript Arapahoe County Court Case No. 09T201066, p. 63, l. 15- p.65, l. 21).

273. Then John McNamara asked Trooper Davey, "Do you need to take a moment to read the letter through?"

274. Trooper Davey answered, "Actually it's addressed to the records custodians, which is our office administrative staff." Trooper Davey made the statement in order to create the false impression that the letter was actually not addressed to Trooper Davey, but to "Records Custodians".

275. Trooper Davey's statement that Exhibit ++ was not addressed to him, but to "Records Custodians" was a big fat lie and the type of misrepresentation state employees are frequently allowed to get away with, like Trooper Davey, by biased Colorado state court judges like Darren Louis Vahle.

276. Both Darren Louis Vahle and Diego Roman Esquibel were present in Court when Trooper Davey lied on the stand.

277. When John McNamara immediately asked Trooper Davey "State patrolman, I'm going to ask you, would you please read each of the three addresses that are listed on the left hand of the first page of Exhibit E?", deputy district attorney Diego Esquibel objected on the grounds the letter had not been admitted into evidence and Darren Louis Vahle granted the objection.

278. Trooper Davey had just testified who the letter, Exhibit E was addressed to, without the letter being admitted into evidence.  Diego Esquibel made an improper objection that was not supported by any evidentiary rule and Darren Louis Vahle granted the objection to hide Trooper Davey's perjury.

279. John McNamara's question was designed to call into question Trooper Davey's skills at reading and being able to tell the truth, after the trooper volunteered a lie to the jury.

280. John McNamara next asked, "Officer, you just testified under Oath that Exhibit E is addressed to the records custodian."

281. Again deputy district attorney Diego Esquibel objected, stating, "Objection, your honor, we can't testify about exhibits that are not entered into evidence" and cited no Colorado rule of evidence.

282. The reason Diego Esquibel cited no rule of evidence is that again his objection was incorrect, because there has to be testimony about an exhibit for a foundation to be laid to admit the exhibit into evidence; the patrolman had already testified about what the document said; and the question was designed to impeach Trooper Davey's credibility,

based on a statement he had just volunteered, and not to discuss the main contents and topics of the letter for the truthfulness of what was written in the letter.

283. Colorado state judge Darren Lousi Vahle sustained the improper objection and incorrectly stated, " Sustained. He has not exhibited any first hand knowledge of this document" after Trooper Davey had just lied/testified about who the letter was addressed to, thereby showing first-hand knowledge of the letter.

284. It could threaten a state patrolman's career, if he was known to have lied on the witness stand. It is a necessary part of a patrolman's job duties to honestly testify in court, and if a patrolman earned a reputation as a liar, it would make him or her less believable and less effective as a witness.

285. Similarly, admitting to having committed a misdemeanor and concealing documents could damage a patrolman's career.

286. Colorado state judge Darren Louis Vahle and deputy district attorney Diego Esquibel tried to shield Trooper Davey from questions exposing the fact that he was not being truthful on the witness stand, in an effort to help Trooper Davey get away with telling a lie on the witness stand, so that the prosecution could win the case.

287. Colorado state judge Darren Louis Vahle and deputy district attorney Diego Esquibel tried to shield Trooper Davey from questions exposing the fact that he had violated the Colorado Open Records Act and the Colorado Criminal Justice Records Act, both misdemeanors, by failing to comply with a lawful records request. Judge Vahle did not want to give Trooper Davey a legal advisement about his Fifth Amendment rights not to testify against himself about a crime he committed, to avoid getting Trooper Davey in

criminal legal trouble and in an effort to help Trooper Davey get away with telling a lie on the witness stand, so that the prosecution could win the case.

288. Diego Roman Esquibel had a duty to notify the judge that Trooper Davey was not being honest on the witness stand, but declined to do so, to help preserve the fiction that the Trooper was testifying honestly, when in fact, he was lying.

289. **Anything goes in Colorado state courts in order to protect state employees from getting into trouble or being liable for monetary judgments.**

290. It is Darren Lousi Vahle's position that it is more important that the state receive traffic ticket fine money, than that the law regarding the felony of perjury be enforced, than that the law regarding the misdemeanor of Criminal Justice Records Act violation be enforced, and that Colorado state laws, constitutional provisions, Colorado appellate case law or the silly Colorado Supreme Court Rules of Professional Conduct be enforced, **particularly if the public never finds out.**

291. **It is Colorado state judge Vahle's view that the police are always right, even if it takes a few laws and the United States Constitution being bent to get there.**

292. **It is Colorado state judge Vahle's view that all's well that ends well for the D.A.'s Office.**

*Douglas County Case No. T       ,- The case where Douglas County Deputy District Attorney Sue Hong and Douglas County Court Judge Monica Gomez, knowing the traffic ticket defendant had a valid insurance card for the day of the accident, decided to maliciously prosecute the defendant in bad faith, including having the judge make a motion to continue on behalf of the district attorney; Judge Gomez letting Deputy*

*D.A. Hong misrepresent to Gomez when the D.A.'s Office found out that the effective date of insurance would be an issue at trial; Judge Gomez allowing endorsement of new witness nearly a year after the ticket was written and less than two weeks before the third trial date; Judge Gomez refusing to allow Colorado Supreme Court case law decisions regarding prior bad faith breach of insurance contract by the same auto insurer into evidence, and Judge Gomez and Deputy D.A. Hong giving the jury the wrong jury instructions, to get a conviction*

293. On June 6, 2011 John McNamara was scheduled for trial in Douglas County Court on a traffic case, which had previously been continued on March 8, 2011.

294. The charges in the traffic case were careless driving and no proof of insurance.

295. As of June 6, 2011, the Eighteenth Judicial District Attorney's Office had endorsed two witnesses for the case, a Colorado State Patrolman and another driver. No insurance company witnesses were endorsed as of June 6, 2011.

296. On or about June 7, 2011, after John McNamara again showed the deputy district attorney his automobile insurance card for a third time, which was in effect on the date of the ticket. (Please see exhibit ++ attached).

297. The deputy district attorney, Sue Hong, made a verbal motion/legal request to Douglas County Court Judge Monica Gomez to have John McNamara's insurance card excluded from evidence, because the insurance company claimed it was not valid on the date of the ticket, July 19, 2010, **the effective date on the insurance card.**

298. Plaintiff John McNamara objected to this motion, stating this was a discovery violation because the district attorney had not previously disclosed information about what the

insurance company was saying, in any police report, any witness statement or any letter from the district attorney's office.

299. Under Colorado Rule of Criminal Procedure 16, as well as a Case Management Order issued by Monica Gomez in the Douglas County case, the district attorney was supposed to disclose any witnesses and reports thirty (30) days before trial.

300. In order to help the young female deputy district attorney, Defendant Sue Hong, win the case, Colorado state judge Monica Gomez, on her own motion, while theoretically serving as an impartial judge, continued the trial in the case a second time to June 16, 2011, so that the deputy district attorney could cure her discovery violation.

301. On June 14, 2011, Plaintiff John McNamara filed a Motion to Dismiss for Discovery Violation in the Douglas County case, based on no additional witnesses or reports being disclosed.

302. Later in the day on June 14, Defendant Hong called John McNamara to say she had new discovery at the district attorney's office.  John McNamara picked up the discovery that same day.

303. The new discovery consisted of new insurance records in the form of a computerized log extending many months before and after the date of the July 19, 2010 ticket, but the author of the numerous computer entries was not specifically named in the records. (Please see Exhibit ++).

304. On June 16, 2011, Defendant Monica Gomez told Plaintiff John McNamara that on June 6, 2010, the district attorney's office endorsed an insurance company witness and that again on June 15, 2010, the district attorney's office had endorsed a second witness.

305. Plaintiff John McNamara never received mailed or hand delivered copies of these additional disclosures of witnesses in June 2011. They were eventually provided as part of the appellate record in this case.

306. Prior to the trial starting on June 16, 2011, John McNamara asked the court to dismiss the no proof of insurance charge and exclude witness Jessica Anderson, an American Family Insurance agent, and exclude insurance records, because Anderson and the insurance records were endorsed less than 48 hours before trial, in violation of Colo.R.Crim.P. 16. (Record, Transcript, 6/16/11, p.3, ll.14-25).

307. Judge Gomez argued with John McNamara that the District Attorney had not learned about the insurance card being in effect on the date of the accident until shortly before the June 6th court appearance. (Record, Transcript, 6/16/11, p. 5, ll.3-15).

308. John McNamara asked deputy district attorney Hong to clarify whether she called American Family Insurance Company in either November or December 2010. (Record, Transcript, 6/16/11, p. 5, ll. 16-18).

309. Hong stated that she never called the insurance company, someone else did and that John McNamara told her his insurance was not in effect on the date of the accident. (Record, Transcript, 6/16/11, p. 5, l. 20-p. 6, l. 2.).

310. John McNamara then called Hong's bluff, stated that Hong was inaccurate and asked Hong to share her notes from the district attorney's file with the Court for the November 2010 and the December 2010 pretrial conferences. (Record, Transcript, 6/16/11, p. 6, ll. 4-10).

311. Judge Gomez, suspecting that Hong was going to get caught making a misrepresentation to the court, tried to save the young female Hong by arguing on Hong's behalf that

Judge Gomez does not get involved in plea bargaining (an irrelevant statement); that statements "are what they are" (a trite cliché that made no sense in the context of what was being discussed); and that it was improper to review the District Attorney's file to see whether Ms. Hong had made notes that she had spoken to the insurance company at pretrial conferences in November or December 2010 (which would have been very important evidence of whether Hong misrepresented that she had not called the insurance company and very important evidence of the District Attorney being aware of the insurance policy effective date in November or December of 2010 and negligently failing to endorse witnesses to support the district attorney's position that insurance was not in effect). (Record, Transcript, 6/16/11, p. 6, ll. 11-17).

312. The fact that Judge Gomez was making arguments on Hong's behalf, instead on treating Hong like an intelligent women capable of representing the District Attorney's office on her own, shows Gomez' bias and lack of confidence that Hong could win the legal argument on her own without some judicial fixing. It should also be noted that Judge Gomez cited no legal authority or reasoning for her decision not to review the district attorney's notes.

313. John McNamara argued that looking at the notes would show the district attorney had called the insurance company in November or December, then stated that he disputed that he told the district attorney's office that the insurance was not in effect, because it wouldn't make sense to then litigate at trial the fact that insurance existed and was in effect. (Record, Transcript, 6/16/11, p. 6, ll. 18-24).

314. Judge Gomez, again trying to rescue the negligent Hong, by arguing on Hong's behalf, then tried to pull a judicial sleight of hand, by arguing that the issue wasn't what John

McNamara told the district attorney during a pretrial conference, the issue was whether John McNamara had insurance. (Record, Transcript, 6/16/11, p. 7, ll.1-10).

315. McNamara stayed focused and responded to Judge Gomez' argument on behalf of the negligent District Attorney, by stating "whether or not the DA's Office had information that the insurance was not in effect, back in November or December, is relevant to whether there's a discovery violation and whether the charge should be dismissed." (Record, Transcript, 6/16/11, p. 7, ll. 11-14).

316. Judge Gomez, again acting as an advocate on behalf of the negligent Hong, and trying to shield Hong with more judicial sleight of hand, responded that "there's no discovery that the DA gleaned except that which they're telling the Court you provided to them in the plea bargain process. So I don't find a discovery violation. There's nothing that that was discovered to the People the, that hasn't been discovered to you, nothing at all." (Record, Transcript, 6/16/11, p. 7, ll. 15-19).

317. Judge Gomez was drawing a factual conclusion that the District Attorney's Office had not contacted McNamara's auto insurance company, American Family Insurance, without being willing to look at the best record of that- the notes in the District Attorney's file.

318. Judge Gomez showed a huge amount of bias in deciding what information the district attorney's office had, without looking at the evidence –the district attorney's notes; showed a huge amount of bias by making the district attorney's arguments on behalf of deputy district attorney Hong in an effort to shield Hong from being caught being dishonest to the Court; and showed a huge amount of bias in again trying to shift the legal argument away from the question of "whether the district attorney's office knew

about the issue of the effective date of the insurance through contact with the insurance company during the November 2010 and December 2010 pretrial conferences and waited too long, to the eve of trial, to endorse new witnesses it knew of in November or December", to "whether the District Attorney's Office provided all the documents in its file to John McNamara".

319. As this line of legal argument continued on June 16, 2011, *__Hong finally addressed the__* *__question of whether the issue of the insurance policy effective date had been brought__* *__up at pretrial conferences in November 2010 and December 2010, without Judge__* *__Gomez trying to shield Hong, and the District Attorney's Office's account of what was__* *__said at those pretrial conferences changed.__*

320. Earlier in the argument, Judge Gomez had stated, "[t]he record that the DA made, um, was that at two pretrial conferences, that you represented to members of her office that the insurance didn't go into effect until 5:00, which you disputed." (Record, Transcript, 6/16/11, p. 5, ll. 8-11).

321. Hong had previously said, "I never contacted the insurance company, just to clarify the record, it was Ms. Ryder [should be Reuer] who contacted the insurance company minutes before, um, trial was set on Monday, June 13[th] [wrong date]. The only, the only reason the person that represented to me that there was an issue as to the validity of the insurance company [policy] was the defendant himself, to me, personally, on November 15[th], 2010. So, for the record, I personally never contacted the insurance company." (Record, Transcript, 6/16/11, p. 5, l. 20-p.6, l. 2).

322. Subsequently, in the same argument, Hong stated, "[u]m, your honor, according to my notes, and my personal, my personal notes, Defendant stated, it specifically states in

here, on November 15th, that Defendant states that ***the insurance company is now***

***saying that insurance was not effective on date of offense***." "If so, reserve restitution."

"Subsequent to that, on December 17[th], there are notes in here, and I believe it's from

another deputy district attorney, that says that defense counsel, defendant and defense

counsel present pro se, ***and it says insurance company said policy was valid on July***

***19th at 5 p.m., after accident,*** set for trial and motions." "It doesn't say who gleaned

that information or where this person got this information, but ***what's apparent is that***

***Defendant was present at this pretrial conference with this deputy district attorney,***

***where information again was confirmed that, that this policy may or may not have***

***been valid, but again, that's not an issue for trial.***" (Record, Transcript, 6/16/11, p. 12,

ll. 7-22).

323. So, as early as November 15, 2010, the District Attorney's Office knew that there was

an issue of the insurance company saying that John McNamara's auto insurance was not

effective on the date of the accident. (Record, Transcript, 6/16/11, p. 12, ll. 8-11).

324. Deputy District Attorney Hong left notes to determine whether the insurance was or was

not in effect, and if not, to reserve restitution. (Record, Transcript, 6/16/11, p. 12, ll. 10-

11).

325. Then a subsequent deputy district attorney called the insurance company and someone

at the insurance company told the deputy district attorney that the policy was in effect

on July 19th at 5 p.m., after the accident. (Record, Transcript, 6/16/11, p. 12, ll. 12-16).

326. Judge Gomez then made 1) a logical statement; 2) followed by another judicial sleight

of hand changing the legal question from "a discovery violation by the district attorney"

to "a discovery violation by John McNamara"; and 3) an illogical, non-sequitur, factually wrong statement:

"All right, well certainly if the People were presented, for the first time, evidence of insurability on the date of offense, that triggered the People's inquiry and investigation of the insurance company, um, as to whether or not the policy was valid at the time of the accident. So, I, I don't find a discovery violation [by the Defendant John McNamara] that necessitated a, a continuance so that the People could properly prepare their case. *And had that information been turned over to the DA prior to the morning of trial, June 13th, and they had dragged their feet and not inquired further of the insurance company until the morning of trial, that would be a different story,* [Judge Gomez apparently was now ignoring what deputy district attorney Hong told her seconds before at (Record, Transcript, 6/16/11, p. 12, ll. 7-22)] but that's not the case before the court. So the court is going to deny the Motion for Discovery, um, Sanctions." (Record, Transcript, 6/16/11, p. 12, l. 23- p. 13, l. 10.).

327. Judge Gomez either made a really huge factual mistake or deliberately fixed the discovery violation for the District Attorney's Office, depending on how intelligent one thinks Judge Gomez is and how much biased favoritism she showed toward the District Attorney's Office during the entire line of argument.

328. The argument about the District Attorney's Office knowing of the issue of the effective date of the insurance policy and failing to endorse witnesses to testify about it then went on longer. The following argument took place:

Gomez: It became an issue when you presented proof of insurance on the 13th.

John McNamara: It became an issue when I presented proof of insurance on November 15th and December 17th.

Gomez: Did you present your insurance card?

John McNamara: Yes I did.

Gomez: Is that accurate?

Hong: ***He did***, but there was an issue as to whether or not it was valid and the only reason why that's an issue is because, pursuant to the statute, we can't go forward on the case, but if the People then filed an oral motion in court, on the day of trial, to preclude the defendant from presenting that proof of insurance because it was not valid, then ***that certainly cannot go to the jurors because it would cause confusion and essentially that's, that's a major misrepresentation to the Court and the jury.*** (Emphasis added).

John McNamara: Major misrepresentation by the insurance company your honor, and that's why I intend . . .

Gomez: All right, we're going to find out.  We're going to go to trial.  We're going to find out if the insurance company is making, and will perjure themselves and make major misrepresentations as to when the insurance was obtained and not obtained.  Um,

this is a jury issue. I'm going to let the jury decide whether, at the time of the offense, alleged offense, the defendant was insured. . . . This is a jury issue and the jury will decide whether or not the Defendant had insurance.

(Record, Transcript, 6/16/11, p. 13, l. 24- p. 15, l. 1).

## 329. DEPUTY DISTRICT ATTORNEY SUE HONG DID NOT ENDORSE INSURANCE WITNESSES THIRTY DAYS BEFORE THE SECOND AND THIRD TRIAL DATES BECAUSE SHE FORGOT TO.

329. Hong saw John McNamara's insurance card on November 15th ((Record, Transcript, 6/16/11, p. 14 ll. 1-6).

330. She was aware of the need to investigate the issue as early as the pretrial conference on November 15, 2010 in order to decide whether to request restitution. (Record, Transcript, 6/16/11, p. 12, ll. 10-11).

331. Another deputy district attorney called the insurance company and someone from the insurance company said the policy was not in effect at the time of the accident, which was recorded in the DA's file at the December 2010 pretrial conference. (Record, Transcript, 6/16/11, p. 12, ll. 12-16).

332. Judge Gomez said "well certainly if the People were presented, for the first time, evidence of insurability on the date of offense, that triggered the People's inquiry and investigation of the insurance company, um, as to whether or not the policy was valid at the time of the accident." (Record, Transcript, 6/16/11, p. 12, l. 23- p. 13, l. 2).

333. Then Judge Gomez made her major factual mistake and fixed the discovery issue for her friend Hong by stating "***And had that information been turned over to the DA prior to the morning of trial, June 13[th], and they had dragged their feet and not inquired***

*__further of the insurance company until the morning of trial, that would be a different__*

*__story.__* [Judge Gomez apparently was now ignoring what deputy district attorney Hong

told her seconds before at (Record, Transcript, 6/16/11, p. 12, ll. 7-22)] but that's not the

case before the court.  So the court is going to deny the Motion for Discovery, um,

Sanctions." (Record, Transcript, 6/16/11, p. 13, ll. 5-10).

334. **There was a violation of Colo.R.Crim.P.16(I)(a)(1)(I),(VII)&(2)& (I)((b)(3)**

regarding providing the names of witnesses and disclosing exhibits thirty days before

trial, when the district attorney, knowing on November 15, 2010 that there was an issue

about whether John McNamara's auto insurance was in effect on the date of the

accident, negligently forgot to record the name of her insurance company witness in the

DA's file, and failed to endorse insurance company witnesses to state the policy was not

in effect at the time of the accident **until days before the third trial date, because of**

**Hong's negligence, not because the prosecution only became aware of the need for**

**insurance witnesses shortly before trial, as the District Attorney's Brief states.**

(Record, Answer Brief, 6/8/12, p. 12).

335. It should be of concern to any court looking at this case that, after having reviewed the

record and transcript of the trial, the District Attorney's Office is still trying to maintain

the factual fiction that they only learned about the insurance effective date issue shortly

before the second trial date in June 2011, instead of the November 15, 2010 pretrial

conference.

336. In the District Attorney's Answer Brief, the District Attorney states that "[a]t the second

pretrial meeting on December 17, 2010, the prosecution learned from the defendant that

the insurance company stated that his policy was valid on July 19, 2010, but only after 5:00 p.m.". (Record, Answer Brief, 6/8/12, p. 6).

337. The District Attorney's Answer Brief goes on to state, "on June 7, 2011, but on that date, according to the minute orders, the prosecution stated that they had phoned the insurance company and had information on when the defendant retained valid insurance . . .". (Record, Answer Brief, 6/8/12, p. 6). The District Attorney's Brief also states, "[a]lthough the parties disputed when the prosecution had become aware of a need to use Ms. O'Herron and Ms. Anderson as witnesses, the court determined the prosecution had only recently become aware of that need". (Record, Answer Brief, 6/8/12, pp. 6-7). In essence, the District Attorney's position in her brief is that, even though she knew that John McNamara was pleading not guilty to the no proof of insurance charge, knew there was an insurance policy and there had been discussion in December 2010 about whether the policy was effective on the date of the accident, the District Attorney's office had not been aware of the need to call insurance company witnesses to discuss when John McNamara's insurance was in effect, until the day before the second scheduled trial date in June 2011- in other words, negligence in deciding how to prove John McNamara's auto insurance policy was not in effect on the date of the accident. (Record, Answer Brief, 6/8/12, p. 12). The Douglas County District Court should pay close attention to the wording and paraphrasing used by the District Attorney in her brief, compared to the transcript in this case.

338. **The Colorado Supreme Court wrote an appellate decision in <u>People v. Lee</u>, 18 P.3d 192 (Colo. 2001) regarding criminal case discovery violations. In <u>Lee</u>, the Colorado Supreme Court wrote that "[w]hen a sanction primarily designed to**

deter is not appropriate, the goal must be to cure any prejudice resulting from the violation". <u>Id</u>. at 197.

339. **In the same case, the Colorado Supreme Court stated that "Under certain circumstances, the exclusion of evidence or even complete dismissal can be proper remedies to assure compliance with discovery orders." <u>Id</u>. at 196.**

340. In the Douglas County case, where Carol Chambers and her deputy district attorneys waited until hours before the third trial date, and seven months after an issue was discovered and researched, to endorse witnesses and documents to address the effective date of John McNamara's insurance policy, the only real remedy was to dismiss the no proof of insurance charge, pursuant to <u>Lee</u>.

341. In *<u>Brady v. Maryland</u>,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the United States Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."

342. By allowing the District Attorney's Office to proceed forward with evidence that was disclosed way too late, in violation of Colo.R.Civ.P. (I)((b)(3), Gomez made the situation much worse for the attorney she was improperly trying to protect, deputy district attorney Sue Hong.

343. Hong warned that "<u>there was an issue as to whether or not it was valid and the only reason why that's an issue is because, pursuant to the statute, we can't go forward on the case,</u> but <u>if the People then filed an oral motion in court, on the day of trial, to preclude the defendant from presenting that proof of insurance because it was not valid, then **that**</u>

*__certainly cannot go to the jurors because it would cause confusion and essentially that's, that's a major misrepresentation to the Court and the jury.__*"   (Record, Transcript, 6/16/11, p. 14, ll. 6-14).

344. Hong was trying to warn Judge Gomez that there may be some real concerns that John McNamara's insurance actually was in effect on the date of the accident. One wonders why Hong proceeded to trial if she had these concerns, and whether people higher up in the District Attorney's Office were pressuring her.

345. Judge Gomez then said:

"All right, we're going to find out.  We're going to go to trial.  We're going to find out if the insurance company is making, and will perjure themselves and make major misrepresentations as to when the insurance was obtained and not obtained.  Um, this is a jury issue.  I'm going to let the jury decide whether, at the time of the offense, alleged offense, the defendant was insured. . . .  This is a jury issue and the jury will decide whether or not the Defendant had insurance."

(Record, Transcript, 6/16/11, p. 14, l. 17- p. 15, l. 1).

346.     "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." CRE 401.

347. Two very relevant types of evidence of whether "the insurance company is making, and will perjure themselves and make major misrepresentations as to when the insurance was obtained and not obtained", as Judge Gomez said, would be 1) inconsistent, conflicting statements by the insurance company about when the insurance went into effect, and 2) a prior series of incidents in which the American Family Insurance

Company was caught by the courts trying to misrepresent whether American Family Insurance policies covered accidents or injuries, in order to save the insurance company money.

348. John McNamara gave proper notice of his intent to use four Colorado appellate case law decisions in which American Family Insurance had been caught improperly trying to avoid paying legitimate automobile insurance claims in order to save money, when he filed a written pleading called a Defendant's Notice of Intent to Use 404(b) Evidence of Similar Transactions, after learning at the second trial date that the District Attorney planned to call unidentified witnesses from American Family Insurance Company.

349. Once again, John McNamara was open and clear about what evidence he would be presenting, while Carol Chamber's Office was either trying to hide, or failing to disclose, its witnesses.

350. At trial, deputy district attorney Hong called Jessica Anderson as an insurance company witness for the District attorney, who had only been endorsed and subpoenaed the day before the third trial date.

351. During her testimony, Jessica Anderson testified that Defendant's Exhibit C was photocopies of two insurance cards issued by her agency to John McNamara to provide automobile insurance coverage for a 2009 Toyota Yaris from July 19, 2010 to January 16, 2011. (Record, Transcript, 6/16/11, p. 37, ll. 3-25).

352. Jessica Anderson admitted that Defendant's Exhibit C was a fair and accurate copy of two (2) insurance cards issued by her agency for John McNamara's car. (Record, Transcript, 6/16/11, p. 38, ll. 1-23).

353. Jessica Anderson admitted that the two cards showed that John McNamara's car, a 2009 Toyota Yaris, was insured on July 19, 2010. (Record, Transcript, 6/16/11, p. 38, ll. 1-3, 19-23).

354. Jessica Anderson also testified that the insurance went into effect at 5:00 p.m. on July 19, 2010. (Record, Transcript, 6/16/11, p. 39, ll. 14-24).

355. However when asked if there was any doubt about the time the insurance went into effect, Anderson admitted it didn't say that on the insurance cards (Record, Transcript, 6/16/11, p. 39, ll. 4-13).

356. Anderson also said "I'm not specific on the exact time". (Record, Transcript, 6/16/11, p. 38, l. 21-p.39, l. 3-25).

357. Anderson next testified that Defendant's Exhibit D was a fair and accurate copy of a July 26, 2010 letter from Irma    , an adjuster with American Family Insurance, to John McNamara. (Record, Transcript, 6/16/11, p. 40, l. 15-p. 41, l. 4).

358. Anderson then testified that Exhibit D, Irma    's letter from American Family Insurance to John McNamara stated that John McNamara's insurance policy was effective July 20, 2010. (Record, Transcript, 6/16/11, p. 41, ll. 9-12).

359. A little later in her trial testimony Jessica Anderson testified that American Family insurance issued another letter, Exhibit E, with Jessica Anderson's signature on it, stating that the effective date of coverage for John McNamara's car *was **July 21, 2010, the third effective date provided by American Family Insurance***. (Record, Transcript, 6/16/11, p. 44, l. 1-p.45, l. 10).

360. Jessica Anderson admitted that Exhibit E showed the same insurance policy for John McNamara, on the same car, but with an effective date of July 21, instead of July 19. (Record, Transcript, 6/16/11, p. 45, ll. 19-22).

361. During the cross examination of Jessica Anderson, the following testimony took place:

John McNamara:    All right, so we went from an effective date of July 19th, 2010 to an effective date of July 20th, 2010, and now we've got a third document from American Family Insurance saying July 21st, 2010, is that correct?

Anderson:    That's correct, yes.

John McNamara:    Okay. So which one is it?

Anderson:    You know, I would have to view the actual system that reinstated the policy to answer that and I don't have that information available to me.

(Record, Transcript, 6/16/11, p.45, ll. 6-14).

362. Jessica Anderson testified that "you can't come in at 5:00 p.m. and expect to be effective on insurance at 12:01 that morning, we don't do things retroactive." (Record, Transcript, 6/16/11, p. 42, l. 25-p.43, l. 2). Jessica Anderson was asked on redirect examination, "had you received payment on 5:01 p.m. on July 19th, 2010, when would be the earliest that the policy would be in effect?" Jessica Anderson then testified that "so anytime the company writes an insurance policy or collects a payment [after 5:00 p.m.], it's 12:01 a.m." "Um our system is actually shut down at 5:00 in the office, so we couldn't physically process that, um, reinstatement until the next morning." (Record, Transcript, 6/16/11, p. 48, l. 19-p.49, l. 1).

363. However, earlier in Jessica Anderson's testimony, the following exchange took place:

Hong:          So, then if I may, it was in the 5:00 hour that contact was made by the Defendant [John McNamara, on July 19, 2010] with your office?

Anderson: Correct.

Hong:          But prior to that 5:00 hour, you had received no contact and no money?

Anderson:    Not that I'm aware of, no.  We would've documented it, it would've been applied.

(Record, Transcript, 6/16/11, p. 35, l. 1, p. 35, l. 23-p.36, l. 4).

364. A summary of Jessica Anderson's testimony is that three different American Family Insurance documents show three effective dates for John McNamara's American Family Insurance auto insurance policy: July 19, 2010; July 20, 2010 and July 21, 2010.  Jessica Anderson testified that prior to 5:00 pm on July 19, 2010, her American Family Insurance office had not received contact or money from John McNamara, yet John McNamara had two different insurance cards for the same insurance policy for the same Toyota Yaris car, effective July 19, 2010.  At the same time, Jessica Anderson testified that "so anytime the company writes an insurance policy or collects a payment [after 5:00 p.m.], it's 12:01 a.m., um our system is actually shut down at 5:00 in the office, so we couldn't physically process that, um, reinstatement until the next morning." (Record, Transcript, 6/16/11, p. 48, l. 19-p.49, l. 1).

365. Jessica Anderson also testified that the insurance went into effect at 5:00 p.m. on July 19, 2010.  (Record, Transcript, 6/16/11, p. 39, ll. 14-24).

366. However, when asked if there was any doubt about the time the insurance went into effect, Anderson admitted it didn't say that on the insurance cards (Record, Transcript, 6/16/11, p. 39, ll. 4-13).

367. Anderson also said "I'm not specific on the exact time". (Record, Transcript, 6/16/11, p. 38, l. 21-p.39, l. 3-25).

368. **This testimony on the part of Jessica Anderson states that it would have been impossible for her to receive payment on July 19, 2010 after 5:00 p.m. and still issue an insurance card effective July 19, 2010, yet there was an insurance card with an effective date of July 19, 2010, meaning the payment was received at some point prior to 5:00 p.m. on July 19, 2010.**

369. **American Family Insurance's story, presumably based on a State Farm Insurance television advertisement, was that John McNamara came into the office after 5:00 pm to get insurance for an accident earlier in the day. The American Family Insurance version of events does not match up and contains discrepancies, _not to mention three different policy effective dates_.**

370. THE INSURANCE COMPANY DID NOT LIKE THE DEAL IT STRUCK WITH JOHN McNAMARA, SO THE INSURANCE COMPANY CHANGED IT.

371. Hong was correct to worry about the insurance company being wrong before trial and Judge Gomez did want to see the insurance company perjure itself, and even allowed hearsay testimony over multiple objections and a failure to explain her ruling, to try to help Hong and the insurance company win the trial. (Record, Transcript, 6/16/11, p. 13, l. 24- p. 15, l. 1; p. 39, ll. 1-22).

372. This wasn't the first time American Family Insurance said untrue things about it policies in Court.  See, American Family Insurance Co. v. Allen, 102 P.3d 333, 345 (Colo. 2004), [American Family's denial of coverage letters to the insureds "referenced non-existent sections of the policy and contained legal misstatements as a basis for denying" the claim.]

373. At trial, another American Family Insurance witness, named Sheri O'Herron testified. During O'Herron's testimony, the following exchange took place:

John McNamara:   Ms. O'Herron I'm handing you what is marked as Defendant's Exhibit B.  Could you tell me what date that insurance card went into effect?

O'Herron:  It says it went into effect February 16, 2010.

John McNamara: So does that mean it went into effect February 16th or does that mean it went into effect February 18th?

O'Herron: It says February 16th.

John McNamara: So that means effective February 16th.

O'Herron: Uh-huh.

John McNamara: Okay, so same thing with Exhibit C.  If it says effective July 19th, it's effective July 19th, correct?

O'Herron: No. Well, it depends.  If it came from the insurance company, it's effective July 19th.

John McNamara: What do you mean it depends?  If someone is counting on their insurance card to say this is my proof of insurance, what do you mean it depends?

O'Herron: If they have their insurance card, that was mailed to them, then that's when it's effective.  If someone gives you an insurance card because you came in and you're out of force, it's effective at the time that you pay the premium.

John McNamara: Where does it say that?

O'Herron: It doesn't say that, that I know of.

John McNamara:  Okay, you don't have any documents in your possession that say that?

O'Herron: Nope.


. . . . [Judge Gomez makes an incorrect ruling on an objection by Hong, in order to help Hong.]


John McNamara: So, Exhibit C shows that I have insurance, effective July 19th, 2010 on a 2009 Toyota Yaris, correct?

O'Herron: Uh-huh.

John McNamara:  Is that a yes?  The tape recording needs yes or no, rather than uh-hum or uh-uh.

O'Herron: Oh, sorry, I'm sorry, Yes.

(Record, Transcript, 6/16/11, p. 56, l.7- p. 58, l.6).

374. Throughout the trial, Judge Gomez handled objections and legal argument regarding the evidence in very odd ways.

375. In one instance, while John McNamara was making an objection to hearsay written evidence, the judge called John McNamara to make his objection at the bench "for the record" so that the jury wouldn't hear the objection and then Judge Gomez turned off the tape recording while John McNamara made his objection "for the record", so that there was no record. (Record, Transcript, 6/16/11, p. 59, l. 24- p. 60, l. 9).

376. Later, Judge Gomez interrupted John McNamara while he was making the initial portion of his verbal motion for acquittal and asked the DA for a response and then decided the Motion without hearing the entire motion. (Record, Transcript, 6/16/11, p. 65, l.1- p. 66, l. 14).

377. John McNamara filed a Defendant's Notice of Intent to Use CRE 404(b) Evidence of Similar Transactions on the same day the District Attorney's Office endorsed American Family Insurance witness Jessica Anderson to testify, yet John McNamara was not allowed to present that evidence of similar situations where American Family Insurance had improperly denied claims, because Gomez decided the notice was filed too late, yet Gomez allowed Jessica Anderson to testify, where Anderson was obviously endorsed way too late pursuant to Colo.R.Crim.P. 16. (Record, Transcript, 6/16/11, pp. 8-9; p.15, l. 10- p. 17, l. 14).

378. While John McNamara testified to the fact that he had been previously employed as a Colorado Supreme Court judicial clerk; a deputy district attorney in Adams County; the lawyer for the El Paso County Sheriff's Department in Colorado Springs; and had been employed as an insurance defense attorney, where he had one appellate case he won published, concerning automobile insurance being in effect; that the deputy d.a. working on this case had no insurance litigation experience; and that automobile insurance companies frequently deny insurance coverage in order to avoid paying claims, Judge Gomez kept interrupting him to state that the testimony was irrelevant and to try to shut John McNamara up. (Record, Transcript, 6/16/11, p. 77, l. 10 - p. 78, l. 23). This was after the Colorado state patrolman issuing the ticket was allowed to testify regarding his

training and experience investigating traffic tickets. (Record, Transcript, 6/16/11, p. 19, l. 22 - p. 21, l. 9).

379. "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." CRE 401.

380. John McNamara's testimony that he had previously represented insurance companies and knew they frequently denied coverage improperly, in order to save money, made it more probable that, American Family Insurance, in the present case, was saying that John McNamara's automobile insurance was not in effect and was changing the effective dates and times of the insurance policy, in order to save money for American Family Insurance.

381. The only reason for these actions of judicial interference and unexplainably wrong decisions by Judge Gomez was judicial bias and Judge Gomez fixing the case, since she continually failed to cite any legal authority for, or explain her evidence decisions.

382. John McNamara next asked Judge Gomez to take judicial notice of <u>Giampapa v. American Family Mutual Insurance Company</u>, 64 P.3d 230, a Colorado Supreme Court case. (Record, Transcript, 6/16/11, p. 78, l. 24- p. 79, l. 2).

383. Judge Gomez cut John McNamara off again, without any objection originating from the deputy district attorney. (Record, Transcript, 6/16/11, p. 79, ll. 3-5).

384. When John McNamara asked Judge Gomez to explain why she was declining to take judicial notice of Colorado Supreme Court case law, Gomez's response was noteworthy for it's lack of legal basis and its bad, hostile attitude: "Mr. McNamara, you don't need to understand the Court's grounds.   You just need to focus on presenting your testimony.  If you do not, the Court, um, I'm advising you right now, you could be held in contempt.  So, you're here to testify about the events in question, on the day in question. Please refocus yourself."  (Record, Transcript, 6/16/11, p. 79, ll. 9-15).

385. John McNamara then asked Gomez to take judicial notice of the no proof of insurance traffic law, C.R.S.β42-4-1409 and publish John McNamara's Exhibit G copy of the statute to the jury. (Record, Transcript, 6/16/11, p. 79, ll. 16-19).

386. Without waiting for an objection or response from the deputy district attorney, because Judge Gomez had essentially taken over lead attorney prosecution of the case for the

district attorney's office, Judge Gomez denied the request for judicial notice and when asked for her legal basis for her decision, stated, "Mr. McNamara, one more time, if I have to warn you, you will be held in contempt, so please focus on the events of July 19[th], 2010." (Record, Transcript, 6/16/11, p. 79, l. 16-p. 80, l. 3).

387. There was nothing wrong or improper with John McNamara asking a judge to take judicial notice of a Colorado appellate court case law decision or the wording of the state law in effect, whose alleged violation was at issue in the case. It simply was a matter of Judge Gomez deciding that the district attorney was going to win this case, no matter what, in spite of Colorado procedural rules, evidentiary rules, appellate case law and statutory law. Judge Gomez viewed herself as more of an empress, who could do whatever she wanted with a stubborn subject who annoyed her royal temper, without the restrictions of mere law, rather than an impartial judicial officer obligated to interpret the law, not to deliberately ignore it and deliberately conceal it to fix the outcome of a case.

388. At the end of both Jessica Anderson's testimony and Sherri O'Herron's testimony, it was clear that American Family Insurance had issued John McNamara insurance cards for his Toyota Yaris, where the stated effective date was July 19, 2010.

389. Subsequent to the July 19th accident, American Family Insurance issued different documents changing the effective date of the insurance from the date on the insurance cards, because American Family Insurance did not like the agreement it had made and the contract terms it had reached with John McNamara, evidenced by the American Family Insurance Company created insurance cards in Exhibit C.

390. Evidence of prior instances where Colorado appellate courts had found American Family Insurance had illegally broken the terms of its insurance contracts with other people, would have been extremely relevant in the present case as to "whether American Family Insurance witnesses were telling the truth about the effective date of the insurance" and "whether there was reasonable doubt about whether John McNamara was driving without insurance on July 19, 2010", when he had insurance cards showing his car was insured on that date.

391. "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." CRE 401.

392. If American Family Insurance had improperly tried to avoid paying auto insurance claims on several other cases, that would have been relevant to them improperly trying to claim John McNamara's policy was not in effect in this case.

393. John McNamara cited four examples where Colorado's highest courts decided that American Family Insurance had wrongly failed to provide insurance coverage in his Notice of Intent to Use CRE 404(b) Evidence:

394. In Giampapa v. American Family Insurance Company, 64 P.3d 230, 244-245 (Colo. 2003), the Colorado Supreme Court decided that American Family Insurance had willfully and wantonly broken its automobile insurance contract with its insured driver, Jack Giampapa.

395. In Briggs v. American Family Insurance, 833 P.2d 860, 862&864 (Colo. App. 1992), the Colorado Court of Appeals decided that a clause in American Family Insurance's automobile insurance policy was void for being against public policy and held that American Family Insurance was liable for a default judgment it was trying to avoid paying.

396. In Barnett v. American Family Insurance, 843 P.2d 1302, 1309 (Colo. 1993), the Colorado Supreme Court decided that that it was improper for American Family Insurance to try to reduce payment of automobile insurance benefits paid to a driver, in order to save the insurance company money, by an amount the injured driver received from social security disability benefits to the injured driver.

397. In American Family Insurance Co. v. Allen, 102 P.3d 333 (Colo. 2004), the Colorado Supreme Court decided that American Family Insurance's denial of an automobile insurance claim was unreasonable and that American Family's denial of coverage letters to the insureds *"referenced non-existent sections of the policy and contained legal misstatements as a basis for denying" the claim*." Id. at 345.

398. In Allen, the Supreme Court also stated that "[w]hen interpreting an insurance policy we apply principles of contract interpretation" and that "the interpretation of a contract is a question of law." Id. At 340. Finally, Chief Justice Bender wrote that "[w]e give words

in a policy their plain and ordinary meaning, unless the intent of the parties indicates otherwise." Id. at 340.

399. Of course this case law meant nothing to Gomez.

400. "Judicial notice is the process by which a court takes recognition of a fact in the absence of formal proof." A. Best, R. Hardaway, F. Jamison, G. Weissenberger, Colorado Evidence 1995/96 Courtroom Manual 27 (1995).

401. "A court **shall** [not may] take judicial notice if requested by a party and supplied with the necessary information." CRE 201(d) (emphasis added).

402. In the present case, when John McNamara identified the proper case citation for the Giampapa case and the proper statutory citation for the no proof of insurance statute, there was no legitimate legal reason to deny taking judicial notice of the Giampapa case or the no proof of insurance statute, Gomez could not provide a legal reason when asked in open court and the District Attorney in her brief has only made a very short, limited, half-hearted argument that cases showing previous findings by appellate courts of breach of insurance contract by American Family Insurance were not "relevant".

403. Monica Gomez was plainly, obviously wrong in disregarding and deliberately failing to take judicial notice of Colorado Supreme Court case law decisions and a Colorado Court of Appeals case law decision.

404. Monica Gomez does not care what the Colorado Supreme Court writes in its opinions. She knows she can do whatever she wants in her courtroom and the higher judges and their attorneys in the Colorado Judicial Branch will protect her, because most judges know that no one is watching them, if they do something wrong, and if they get caught, the Colorado Supreme Court will cover it up.

405. Monica Gomez did not take judicial notice of these decisions, because she wanted the district attorney to win and is counting on a district court judge in the same court house handling the appeal of this case to cover up her biased mistakes. Gomez knows that district court judges do everything possible to support the position taken by a county court judge on appeal and that when two judges agree on a legal mistake, it makes it look less likely that there was a legal mistake.

406. If the two automobile insurance cards issued to John McNamara with an effective date of July 19, 2010 were not really effective until 5:00 p.m. on July 19, 2010, then it would

not have been necessary for American Family Insurance to change its written statements and provide two alternate effective dates to avoid providing insurance coverage.

407. The dispute was over the effective date of the auto insurance policy, a legal issue that the deputy district attorney asked Gomez to resolve before trial, and which Gomez angrily refused to do.  (Record, Transcript, 6/16/11, p. 14, l. 6- p. 15, l. 1).

408. Colorado criminal law, located in Titles 16-18 of the Colorado Revised Statutes does not provide guidance on when automobile insurance policies, which are contracts, go into effect. However Colorado civil law, and especially Colorado Civil Jury Instructions, written and approved by the Colorado Supreme Court, do provide guidance on disputes over when a contract is in effect.

409. **At various points in this case, both Gomez and Hong seemed to think there was some sort of imaginary wall that prevented Colorado contract law from applying to determine a factual issue in a criminal case.**  (Record, Transcript, 6/16/11, p. 71, ll. 14-20; p. 74, ll. 3-7; p. 75, ll. 5-11).

410. **Neither one of them could explain why, and neither one of them could have been more wrong.**

411. Colorado Civil Jury Instruction 30:12  provides as follows:

"The statement or conduct of the parties before any dispute arose between them is an indication of what the parties intended at the time that the contract was formed.

To determine what the parties intended the terms of the contract to mean, you may also consider the language of the written agreement, the parties negotiations of the contract, any earlier dealings of the parties, any reasonable expectations the parties may have had because of the promises or conduct of the other party, and any other facts and circumstances that existed at the time the contract was formed."

412.   Colorado Civil Jury Instruction 30:13 provides as follows:

"Any dispute over the meaning of any unclear terms must be decided against the party who prepared the contract if the other party had no part in selecting the words written in

the contract."

413. Colorado Civil Jury Instruction 25:6 provides as follows:

"An insurance company owes to those it insures the duty of good faith and fair dealing. That duty is breached if the company unreasonably denies payment and the company knows that its denial is unreasonable or recklessly disregards whether its conduct is unreasonable."

414. C.R.S. β10-3-1104 provides in pertinent part:

**"Title 10. INSURANCE**

**REGULATION OF INSURANCE COMPANIES**

**Article 3. Regulation of Insurance Companies**

**Part 11. UNFAIR COMPETITION - DECEPTIVE PRACTICES**

*Current through Chapter 313, with the exception of Chapters 197 and 264, Regular Session 2011*

**Standard 10-3-1104.  Unfair Methods of Competition - Unfair or Deceptive Acts or Practices**

(1) The following are defined as unfair methods of competition and unfair or deceptive acts or practices in the business of insurance:

(a) Misrepresentations and false advertising of insurance policies: Making, issuing, circulating, or causing to be made, issued, or circulated, any estimate, circular, statement, sales presentation, omission, or comparison which:

(I) Misrepresents the benefits, advantages, conditions, or terms of any insurance policy; or

. . . . .

 (h) Unfair claim settlement practices: Committing or performing, either in willful violation of this part 11 or with such frequency as to indicate a tendency to engage in a general business practice, any of the following:

(I) Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue; or

(II) Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies; or

(III) Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies; or

(IV) Refusing to pay claims without conducting a reasonable investigation based upon all available information; or

(V) Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed; or

(VI) Not attempting in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear; or

(VII) Compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds; or

(VIII) Attempting to settle a claim for less than the amount to which a reasonable man would have believed he was entitled by reference to written or printed advertising material accompanying or made part of an application; or

(IX) Attempting to settle claims on the basis of an application which was altered without notice to, or knowledge or consent of, the insured; or

. . . ."

415. The Colorado General Assembly, the state legislature, would not have enacted such a law, if there had not been problems in the past with insurance companies trying to break their auto insurance contracts, in order to save money for the insurance companies. Judge Gomez and deputy district attorney Hong knew this, but Gomez wanted the district attorney's office to win the case and have John McNamara pay the courts fines and cost money, and Hong followed Gomez' bad direction on this case and looked at the case as a competitive sporting event, in which she wanted another mark in her win column, not a search for the truth and an effort to do what was just.

416. Very few judges care what the General Assembly writes in Colorado laws, and in fact, the judicial branch is getting bolder and bolder in bending the Colorado Revised Statutes, or in ignoring the Colorado Revised Statutes, or stating that the Colorado Judicial Branch is exempt from following Colorado Revised Statutes.

417. When the Colorado trial courts, like the county courts and the district courts, see the appellate courts, like the Colorado Supreme Court or the Colorado Court of Appeals, disregarding state statutes, the trial courts then believe it is acceptable to disregard Colorado procedural rules or Colorado appellate court decisions, just like the more senior appellate court judges do.

418. When American Family Insurance told a representative of the Douglas County District Attorney's Office that John McNamara did not have insurance on July 19, 2010, that was NOT a true statement.

419. John McNamara had automobile insurance at the time of the July 19, 2010 accident, as evidenced by two insurance cards and American Family Insurance tried to avoid providing coverage by changing its documents after the accident, in order to save money, in violation of C.R.S. β 10-3-1104(1)(a).

420. The civil jury instructions cited above could have helped the jury resolve the insurance effective date issue, but Gomez wanted to steer the jury wrong on the insurance effective date issue and make it seem that only the insurance company's statements about whether the insurance was in effect counted.

421. Gomez deliberately mislead the jury again on the law and instructed the jury that, if John McNamara did not have his insurance card with him at the time of the accident, he was guilty of driving without proof of insurance in violation of C.R.S. β 42-4-1409(3).

422. Both Gomez and Hong stated in court that it was their understanding that C.R.S. β 42-4-1409(6) did not apply to an instance where a person was charged with violating C.R.S. β 42-4-1409(3).  (Record, Transcript, 6/16/11, p. 70, ll. 1-23).

423. C.R.S. β 42-4-1409(6) (2010) states as follows:  "***NO PERSON CHARGED WITH VIOLATING SUBSECTION (1), (2), OR (3)*** OF THIS SECTION SHALL BE CONVICTED IF THE PERSON PRODUCES IN COURT A BONA FIDE COMPLYING POLICY OR CERTIFICATE OF SELF- INSURANCE THAT WAS IN FULL FORCE AND EFFECT AS REQUIRED BY LAW AT THE TIME OF THE ALLEGED VIOLATION." (Emphasis added).

424. Gomez consciously ignored C.R.S. β 42-4-1409(6), in spite of John McNamara bringing that part of the law to her attention.  (Record, Transcript, 6/16/11, p. 69, -p. 73, l. 4).

425. When John McNamara asked Gomez how her ruling on the jury instruction regarding the no proof of insurance charge complied with C.R.S. β 42-4-1409(6), Gomez's answer was not a statement of any law, but a smirking, smart aleck answer, "well I guess maybe an appellate court will have to, um, determine the issue."  (Record, Transcript, 6/16/11, p. 73, ll. 1- 4).

426. Even in the District Attorney's Brief, she misstates the law and claims that C.R.S. β 42-4-1409(6) does not apply to charges pursued under C.R.S. β 42-4-1409(3), **which again should cause any court reviewing this case to have doubts about the reliability of anything Carol Chambers' District Attorney's Office says in its brief**.

427. When a judge can't give a legal explanation of her ruling on multiple occasions, with citation to a case decision or a court rule or a law, and instead uses threats of contempt or smart aleck answers, it is a red flag of warning that other things are going on in court, besides an impartial application of the law to the factual evidence presented.

428. The following rules from the Colorado Code of Judicial Conduct should also be considered by the Court:

**Rule 1.1. Compliance with the Law**

**(A) A judge shall comply with the law,\* including the Code of Judicial Conduct.**

**Canon 2.**

**Rule 2.2. Impartiality and Fairness**

**A judge shall uphold and apply the law,\* and shall perform all duties of judicial office fairly and impartially.\***

**Rule 2.3. Bias, Prejudice, and Harassment**

**(A) A judge shall perform the duties of judicial office, including administrative duties, without bias or prejudice.**

[1] A judge who manifests bias or prejudice in a proceeding impairs the fairness of the proceeding and brings the judiciary into disrepute.

**Rule 2.11. Disqualification**

**(A) A judge shall disqualify himself or herself in any proceeding in which the judge's impartiality\* might reasonably be questioned, including but not limited to the following circumstances:**

**(1) The judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge\* of facts that are in dispute in the proceeding.**

**(2) The judge knows\* that the judge, . . . is:**

**(b) acting as a lawyer in the proceeding;**

([1] Under this Rule, a judge is disqualified whenever the judge's impartiality might reasonably be questioned, regardless of whether any of the specific provisions of paragraphs (A)(1) through (5) apply. The term "recusal" is sometimes used interchangeably with the term "disqualification."

429. The Colorado Rules of Criminal Procedure and the Colorado Code of Judicial Conduct, both issued by the Colorado Supreme Court, as well as Colorado appellate court case law decisions, do apply in each of the State of Colorado's counties, including Arapahoe and Douglas counties.

430. The Colorado Court of Appeals quoted the United States Supreme Court, when it wrote, "An accused has a constitutional right to an impartial judge at all stages of the

proceedings against him. *See, Tumey v. Ohio, 273 U.S. 510, 522, 47 S.Ct. 437, 71 L.Ed. 749 (1927).*" People v. Hagos, 250 P.3d 596, 611 (Colo. App. 2009).

431. Since this ruling was made by the Colorado Court of Appeals, it DOES apply in Colorado's Eighteenth Judicial District, including Arapahoe and Douglas counties.

432. Where one might reasonably question the trial judge's impartiality, it is improper for him to preside over the trial. Wood Bros. Homes v. City of Fort Collins, 670 P.2d 9 (Colo. App. 1983).

433. Upon reasonable inference of a "bent of mind" that will prevent judge from dealing fairly with party seeking recusal, it is incumbent on trial judge to recuse himself. Wright v. District Court, 731 P.2d 661 (Colo. 1987).

434. American Family Insurance provided testimony and documentation to three different effective dates for John McNamara's auto insurance policy during the course of the trial in the Douglas County case.

435. American Family Insurance wanted to avoid covering the automobile accident on July 19, 2010, the first day on the insurance policy.

436. All automobile insurance policy contracts in Colorado only have one actual effective date on which the automobile insurance policy begins.


***People v. G.R.,* Arapahoe County Court Case No. 2010 T 202924- The Eighteenth Judicial District Attorney's Office once again fails to respond to a combined Open Records Request and Criminal Justice Records Request for exculpatory information.**


437. On April 11, 2010, at approximately 12:35 a.m., G.R.'s 1998 Jeep Grand Cherokee was struck by a 1999 Mitsubishi Galant driven by nineteen year old Jasmine Carter, as both vehicles were driving eastbound on Hampden Avenue in Aurora, near Tower Road.

438. Photographs of the two vehicles show that Jasmine Carter's vehicle has been in previous accidents, as it is missing its front bumper and the right front hubcap and the hood does not fit correctly, it fits unevenly over the motor of Carter's car.

439. Photographs of the two vehicles show that the right front corner of Jasmine Carter's vehicle impacted behind the left front wheel well of G.R.'s Jeep and then Carter dragged/scraped her vehicle down the side of G.R.'s vehicle.

440. At the time of the accident, G.R. did not have his cell phone with him. Jasmine Carter had her cell phone with her. G.R. drove back to his residence and called the police from his residence.

441. Jasmine Carter called the Aurora Police from her car as she followed G.R. towards his residence. In the call, Carter calmly stated that G.R. had followed her closely on eastbound Hampden, then G.R. allegedly rear ended her, then G.R. allegedly pulled into the right lane, passed her car then swerved in front of her to cut her off and caused a collision between her car and his car. She then stated she had followed G.R. to Hampden and Killarney.

442. When G.R. got home, G.R. called 911 and stated that he had been driving eastbound on Hampden behind Carter, when Carter hit her brakes suddenly, causing him to swerve to the right lane to avoid a collision. Carter then pulled alongside him and swerved into the driver side of his vehicle.

443. G.R. went home to call the police because there was no where to stop along Hampden at the location of the accident to call the police and he wanted to contact the police quickly.

444. Though Carter had a female passenger with her, Aurora Police Officer Darrin P. Degon chose not to separate Carter from her passenger and get either a written or verbal statement from that passenger, to see if as statement from Carter's passenger differed in any way with Carter's statement, or was closer to G.R.'s audio recorded statement to 9-1-1.

445. Aurora Police Officer Darrin P. Degon did what most police officers are trained to do. He took the word of the person who called the police first in time, rather than conducting an impartial investigation, and based his police report on what the first caller told him.

446. Aurora Police Officer Darrin P. Degon issued a ticket to Jasmine Carter for Driving while license cancelled, in violation of C.R.S. β42-2-138(1)(a).

447. Aurora Police Officer Darrin P. Degon also issued a ticket to G.R. for Careless Driving and Leaving the Scene of an Accident.

448. Though nineteen-year-old Jasmine Carter also left the scene of the accident, it is unexplained why Carter was not charged with leaving the scene of the accident in any document prepared by Darrin P. Degon.

449. Police Chiefs and Sheriffs are happier when more tickets are written. They believe that the more tickets written by an officer, the more aggressive the officer is. Then there is the money that comes in, either through city court or county court. It is not unusual for law enforcement officers assigned to patrol duty to be evaluated on their performance by the number of tickets they write.

450. In determining who caused the accident, a jury will be presented by a "he said/she said" situation, in which each driver blames the other for causing the accident.

451. This "he said/she said" situation benefits the courts and law enforcement, since it makes it more likely a jury will go along with the law enforcement officer's decision to charge each driver, as jurors give a very high level of credibility to what police officers say and write. In the end, the courts and law enforcement will receive money from each driver.

452. For G.R., as an innocent driver, hit by another driver, to prove he is innocent, it will be necessary to show that he is the more believable witness to the accident, based on the physical evidence collected by the police officer, and other information that may arise in the investigation of the case.

453. Though there is a constitutional presumption that a person charged with a crime is innocent, in reality, people charged with crimes frequently have to present evidence showing it is more likely they did not commit a crime, or that a witness is lying, in order to overcome the very strong benefit of the doubt given to law enforcement officers, that is not in the Constitution, but is frequently promoted in both news and entertainment media. Commentators or police television shows frequently discuss people charged with crimes getting released on "technicalities", which usually means a either a lack of evidence to convict, or a violation of the United States Constitution, the supreme law of the land designed to protect individuals from the government. The tone is frequently that a guilty person went free, rather than the person charged was innocent; that there was not enough evidence to prove a person guilty; or that the police or prosecutors made large constitutional mistakes and the constitution was written to protect citizens from bad, unconstitutional conduct by the government.

454. G.R. hired John McNamara to defend him on this traffic case in May 2011.

455. On or about May 9, 2011, John McNamara filed a discovery motion requesting police reports, criminal histories for witnesses, photographs and audio recordings and other types of evidence in Arapahoe County Court Case No. 10T 2924, People v. G.R..

456. As part of the discovery, it was revealed that Aurora Police Officer Darin Degon never took any photographs of the back of Jasmine Carter's auto, where she claimed on audio tape twice to have been rear ended by G.R. and Officer Degon took no photographs of the front of G.R.'s Jeep.

457. Aurora Police Officer Darin Degon did not take these pictures because there was no evidence or damage on the cars to show that G.R.'s car had rear ended Jasmine Carter's car, as she claimed twice in audio recordings.

458. In order to believe Jasmine Carter's allegations that G.R. caused the accident, the jury would have to believe that G.R., for no reason whatsoever, took his Jeep, which he owned and insured, and without reason, decided to rear end Jasmine Carter's car, then, without damage to the front of his car or the back of the car Carter was driving, sped around Jasmine Carter with his own relatively unscratched Jeep, prior to the accident, and deliberately cut in front of the uninsured car nineteen-year-old Jasmine Carter was driving, which was reportedly owned by a man in Arvada according to the accident report, which was missing the front bumper and had a hood that could not close all the way down over the engine.

459. The discovery also revealed that Jasmine Carter has fifteen alias names and six different birthdates on her NCIC criminal history, which indicates that she was probably not telling the truth on multiple occasions about her name or her date of birth.

460. The jury might not find out about it, but any prosecutor/deputy district attorney working the case would know that part of the reason Jasmine Carter had so many aliases written on her NCIC criminal history report was because, according to the NCIC criminal history, Jasmine Carter she had been arrested many times in the Los Angeles/Southern California area for being a prostitute.

461. For most prosecutors, having a prosecution witness with 15 aliases, six different birthdates and no damage to the back of their car, after twice verbally claiming to have been rear ended by a driver, would call into question the honesty and believability for that prosecution witness, but not for a tough cookie like Carol Chambers, who rather than looking at what's right and just, looks at what makes money for the state and what's right for Carol Chambers' reputation.

462. In Carol Chamber's mind, if you're innocent of a crime you are charged with, you better be willing to pay and pay and pay for an attorney to keep fighting for you, because no matter how obviously bad a case is, and how questionable the ethics of the prosecution of that case are, Carol Chambers won't dismiss the case and the Colorado Supreme Court, lead by Michael Bender and Nathan Ben Coats, is going to look the other way and direct their presiding disciplinary judge, William Robert Lucero, to look the other way or fix it so Chambers doesn't get punished too hard, if at all.

463. The discovery also revealed that Jasmine Carter was wanted by the Aurora Police Department for "statewide extradition" for making a false statement to city personnel and theft/shoplifting, two crimes of dishonesty.  In addition, she also had a felony charge pending against her for 'Pawnbroker-False Info by Seller" for something that happened in August 2010, though the Eighteenth Judicial District Attorney's Office

failed to record which law enforcement agency made the arrest. Such evidence could be admissible to prove Jasmine Carter's character for dishonesty and would be good evidence that Carter lied about G.R. causing the accident.

464. At a September 27, 2011 hearing in <u>People v. G.R.</u>, John McNamara asked the judge to order deputy district attorney Megan Rasband to provide the police report concerning Jasmine Carter for the same April 21, 2011 traffic accident, and the judge asked Rasband to check around the District Attorney's Office for that report.

465. Deputy district attorney Meghan Rasband completely ignored the request, per Carol Chambers policy of concealing evidence useful to the defense.

466. On November 30, 2011, John McNamara faxed a combined Colorado Open Records Act Request and a Colorado Criminal Justice Records Act request to Megan Rasband at the Arapahoe County District Attorney's Office. (Please see Exhibit ++ attached).

467. Pursuant to Carol Chambers policy of failing to disclose exculpatory information or evidence, deputy district attorney Meghan Rasband failed to respond to the combined Colorado Open Records Act request and the Colorado Criminal Justice Records Act request.

468. By denying John McNamara's request for the records identified, and not providing the requested explanation for the denial of records in writing, pursuant to C.R.S. β24-72-305(6) (2011) and C.R.S. β24-72-204(4) (2011), Meghan Rasband was admitting that there was no legal reason, no statutory reason and no procedural reason for refusing to provide the requested records to John McNamara.

469. By failing to identify in writing who had the requested records and where the records are or were located and when such records would be available, if the requested records were not in Meghan Rasband's possession, Meghan Rasband admitted she had the records and was their records custodian, pursuant to C.R.S. β24-72-203(2)(a)-(3)(b)(2011); C.R.S. β24-72-303(2)-(3)(2011); and C.R.S. β24-72-304(2)-(3).

470. Pursuant to C.R.S.β24-72-204(5) & 305(7), on December 19, 2011, John McNamara faxed a Notice of Intent to file a lawsuit under the Colorado Open Records Act and the Colorado Criminal Justice Records Act to Meghan Rasband at the Eighteenth Judicial District Attorney's Office, and attached a copy of the Notice of Intent to a Combined Motion to Compel Production of Exculpatory Information or Dismiss Case filed in People v. G.R., 10T2924.  (Please see Exhibit ++ attached).

471. Pursuant to Carol Chambers' policy of non-disclosure, again Meghan Rasband and her supervisors decided not to provide G.R. the requested exculpatory evidence in his case.

472. None of the records requested in the combined Colorado Open Records Act request and the Colorado Criminal Justice Records Act request have been provided as of September 10, 2012.

473. Colorado Rule of Professional Conduct 5.1 provides as follows:


Rule 5.1.  Responsibilities of a Partner or Supervisory Lawyer

     . . . .

(f)  A lawyer having direct supervisory authority over another lawyer shall make reasonable efforts to ensure that the other lawyer conforms to the Rules of Professional Conduct.

(g) A lawyer shall be responsible for another lawyer's violation of the Rules of Professional Conduct if:

(5) the lawyer orders or, with knowledge of the specific conduct, ratifies the conduct involved;

(6) the lawyer is a partner or has comparable managerial authority in the law firm in which the other lawyer practices, or has direct supervisory authority over the other lawyer, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action.

474. By failing to provide these requested records which are exculpatory evidence, Carol Chambers and Meghan Rasband made the conscious decision to violate G.R.'s due process rights provided in the Fourteenth Amendment to the United States Constitution.

475. Nearly fifty years ago, the United States Supreme Court wrote that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."

476. The same sentence above was quoted and adopted by the Colorado Supreme Court in the very rare case of a disciplinary case against a Colorado state prosecutor, In re Matter of Attorney C, 47 P.3d 1167, 1170 (Colo. 2002).

477. By failing to provide the records requested in John McNamara's combined Colorado Open Records Request and Colorado Criminal Justice Records Request, without a legal, statutory or procedural reason, Meghan Rasband violated both the Colorado Open Records act and the Colorado Criminal Justice Records Act, C.R.S. β24-72-305(6)

(2011) and C.R.S. β24-72-204(4) (2011), which constitutes a misdemeanor pursuant to C.R.S. β24-72-305(6) (2011) and C.R.S. β24-72-204(4) (2011).

478. By failing to identify in writing who had the requested records and where the records are or were located and when such records would be available, if the requested records were not in Meghan Rasband's possession, Meghan Rasband violated the Colorado Open Records Act and the Colorado Criminal Justice Records Act, C.R.S. β24-72-203(2)(a)-(3)(b)(2011); C.R.S. β24-72-303(2)-(3)(2011); and C.R.S. β24-72-304(2)-(3), and committed a misdemeanor, C.R.S. β24-72-305(6) (2011) and C.R.S. β24-72-204(4) (2011).

479. By taking no action to correct Meghan Rasband's violation of the Colorado Open Records Act and Colorado Criminal Justice Records Act, Carol Chambers ratified Meghan Rasband's unethical and criminally illegal misdemeanor concealment of exculpatory evidence, pursuant to Colorado Rule of Professional Conduct 5.1 and conspired with Rasband to commit the misdemeanor violations of the Colorado Open Records Act and the Colorado Criminal Justice Records Act.

FRIENDS OF THE COURT: The Difficulties and Obstacles Placed in the Way of Obtaining Justice against Judges and Prosecutors

480. In December 2010, Colorado Bar Association President David M. Johnson wrote an article about the problems of judges getting along with, and communicating with attorneys in Colorado, in an article titled "Bench and Bar Relations: A Necessary

Dialogue- Part 1. (Exhibit##, Johnson, David M., "Bench and Bar Relations: A Necessary Dialogue-Part 1", The Colorado Lawyer, December, 2009).

481. Johnson, a former Colorado district court magistrate, quoted the Honorable Robert J. Miner, a judge from the United States Court of Appeals for the Second Circuit, a respected federal appeals court located in New York City, a step below the United States Supreme Court, for cases originating in New York and Connecticut. The quote was, "[I]n my opinion, one of the most important societal duties of lawyers is the duty to criticize the courts. It is my premise that informed criticism of the courts and their decisions is not merely a right, but also an ethical obligation imposed on every member of the bar." (Exhibit##, Johnson, David M., "Bench and Bar Relations: A Necessary Dialogue-Part 1", The Colorado Lawyer, December, 2009).

482. In his article, David Johnson identified several problems Colorado state judges face, which impact attorneys and the bar association: A) "Judges, including magistrates, must remain somewhat detached from their colleagues so as to maintain their neutrality and objectivity", which can result in judges feeling isolated from their attorney friends; B) the effect of perceptions held by lawyers; and C) difficulties for lawyers in providing feedback and communication with judges. (Exhibit##, Johnson, David M., "Bench and Bar Relations: A Necessary Dialogue-Part 1", The Colorado Lawyer, December, 2009).

483. In his article, former Magistrate Johnson notes that, for attorneys, "[d]iscussions with a judge about a given case are improper ex parte contacts unless done in the presence of opposing counsel." (Exhibit##, Johnson, David M., "Bench and Bar Relations: A Necessary Dialogue-Part 1", The Colorado Lawyer, December, 2009).

484. This point made by Johnson is very important with respect to paragraphs xx-yy below.

485. In addition, former Colorado Bar Association president Johnson writes that "[t]he perception is that if lawyers complain openly about judges, they will face subtle retribution from the bench in one courtroom or perhaps many courtrooms." "Also there is a perception that complaints about judges will not be rectified."

486. Johnson's reported perceptions ARE REALITY. See paragraphs XX-YY below.


OPTIONS FOR HANDLING JUDICIAL ERRORS AND MISTAKES

1. APPEALS

487. When a Colorado state judge makes an error, or does something wrong, there are different routes to try to correct the situation, but there are also special privileges the judges have created to protect themselves.

488. When a judge makes a legal error that affects the outcome of a case, the person who is injured by the judge's error can appeal to a higher court to review and correct the lower court judge's mistake. However, some judges have learned how to "game" the system to protect a friend or to spite a party to a case that the judge does not like, or to spite an attorney to a case that the judge does not like.

489. Some ways that either a trial judge or an appeals judge can "game" a person that they do not like in an appeals case are to do the following: 1) turn off the tape recorder recording the proceedings at a key point in the proceedings, so that a person typing a transcript of the hearing has no record of what was said at a point in trial to type up as part of the record read by the appellate court(this frequently occurs at conferences at the judges desk, where the judge is trying to conceal a good legal argument the judge

doesn't want to rule in favor of, from the jury); 2) make the appeal expensive by setting a high appeals bond or making the cost of typing the transcript high, or by sending the transcript to a far flung location to be typed, rather than having the transcript typed locally; 3) have your court reporter delay typing the transcript, in the hope that the appeals court will dismiss the appeal because a transcript was not timely sent by the trial court to the appellate court; 4) the appellate court, finding the appeal to be inconvenient or wanting to shield a fellow judge in the same courthouse or a friend of a judge, writes a deliberately poorly analyzed opinion, usually with little discussion of the facts in the case, known as a "Cop Out" opinion  designed to protect a fellow judge or a friendly litigant, frequently a police officer accused of unconstitutional behavior or other types of wrong doing; 5) the Supreme Court refuses to hear an appeal that would hurt someone the justices feel close to; 6) after the appellate court renders its decision, the trial court ignores some or all of the appellate court's decision, thereby forcing the party in court to decide whether they have the funds to appeal again.

490. In Colorado, trial court judges know that if they don't follow appeals court decisions, from either their own case, or provided by an attorney to show how higher courts have handled a situation in the past, the appeals courts won't do a thing about it.  This in effect makes court of appeals judges highly paid people writing opinions that lower court judges don't follow- in other words highly paid opinion column writers, who in reality have little respect from the lower courts and are frequently not followed.

491. Perhaps one of the most absurd and ridiculous examples of this lack of respect of Colorado appellate decisions by a trial court is a case written by Justice Bender in          , where Justice Bender found that American Family Insurance Company lied about the

terms of its insurance contract.  When an attorney tried to use Justice Bender's decision in a criminal trial in which American Family Insurance claimed that it did not have a policy on a car in July 2010, in spite of  two insurance cards from American Family showing that the car was insured, JusticeBender authorized the attorney regulation counsel to prosecute the attorney using Bender's case and who pointed out that the trial judge refused to let the attorney mention Justice Bender's case to the jury.

492. The question for Justice Bender and the Colorado Supreme Court is "why pay for the expensive salaries and the expensive facilities for a Colorado Supreme Court, if the Colorado Supreme Court's procedural rules and opinions are routinely ignored by lower courts and the Colorado Supreme Court itself?"  Colorado taxpayers don't need to pay for self-important judges who fail to follow the law and create special privileges for themselves or their friends, when there are more important needs.

2.   MAKING AN ETHICS COMPLAINT AGAINST A JUDGE

493. As Chief Justice of the Colorado Supreme Court, JusticeBender is the head of the judicial branch of Colorado's state Government.

494. Chief Justice Michael Bender is a 1964 graduate of Dartmouth College and a 1967 graduate of the University of Colorado Law School.  (See Exhibit  attached, Wikipedia article on Michael L. Bender).

495. To people in Colorado, who live far away from the Ivy League colleges and universities, Dartmouth College sounds like an impressive place to go to college, and to a degree, it is.  However, the Dartmouth College of the early 1960's, when Justice Bender was

going to school there, was the inspiration for the movie "Animal House" (See Exhibit XX attached, Wikipedia article on Christopher Miller, who attended Dartmouth during the same period as Justice Bender), a movie about spoiled college kids bending or breaking the rules; cheating; drinking; treating people differently, based on whether they were socially acceptable insiders or not; and having sexual escapades. In the 1982 edition of "The Insiders Guide to the Colleges", the Yale Daily News staff wrote that "Dartmouth has grown into one of the nation's most famous (or infamous) institutions. Along the way it picked up the stereotype of an "animal school" isolated in the New Hampshire wilds. Although it is no longer the predominant species, the traditional Dartmouth animal has had sufficient influence on the school and will never die out". (Exhibit   , attached, The Yale Daily News, 1981-1982 Edition of The Insiders Guide to the Colleges, pp. 133-135).   "One of the traditions that is nearest and dearest to the hearts of the students, particularly- though by no means exclusively- those in fraternities, is the consumption of copious quantities of beer." (Exhibit  , attached). . . . In short, the "Big Green" has a lot to offer a student who can accept the drawbacks of Hanover [New Hampshire] (Hangover to the rest of the Ivy League)." (Exhibit   , attached).

496. While one can't say that Justice Bender did all these things, this environment in his formative young adult years is informative, without even mentioning the transformation the University of Colorado underwent in the 1960's, while Justice Bender was a student, to its annual ranking today as one of America's best party schools. In another article about student life at Dartmouth, in a Dartmouth alumni article, the following was written, "the fraternity system is cult-like. The kind of hazing going on in Hanover is

destroying student's souls. . . .[one student quoted in the March 2012 edition of Rolling Stone was quoted as saying] " I was a member of a fraternity that asked pledges, in order to become a brother to: swim in a kiddie pool of vomit, urine, fecal matter, semen, rotten food products; eat omelets made of vomit; chug cups of vinegar, . . drink beer poured down fellow pledge's ass cracks . . . among other abuses.". . . .He accused Dartmouth's storied Greek system -17 fraternities, 11 sororities and three coed houses to which roughly half the student population belongs- of perpetuating a culture of "pervasive hazing, substance abuse and sexual assault" as well as an "intoxicating nihilism" that dominates campus social life.   "One of the things I've learned at Dartmouth – one thing that sets a psychological precedent for many Dartmouth men- is that good people can do awful things to one another for absolutely no reason." (Exhibit "The Way of Improvement Leads Home, 3/31/2012).

497. While the student may not have seen a reason for "good people" doing awful things to others, the real reason was the thrill from the ability to exercise power over others-being able to tell others to do unpleasant things, "because I can".

498. "Nihilism" is defined in Webster's New Collegiate Dictionary as "1 a: a viewpoint that traditional values and beliefs are unfounded and that existence is senseless and useless; b: a docrine that denies any objective ground of truth and especially of moral truths; . . . ."

499. Unfortunately, it appears that Justice Bender has brought an "Animal House" philosophy of legal ethics during his time on the Colorado Supreme Court, complete with bending or breaking the rules, allowing judges to get away with drinking and sexual escapades; and treating people differently based on whether they were socially

acceptable insiders, like judges and prosecutors, and "hazing" people who rocked the boat of powerful judges and prosecutors, by investigating attorneys who make complaints about judges or ask judges to remove themselves from cases.

500. However, Justice Bender can't do this alone, without others justices on the Supreme Court either taking advantage of an older, seventy-something JusticeBender behind his back, or other justices simply looking the other way, and/or possibly JusticeBender and/or other justices leaning on each other or trading favors for silence, if there are too many ethical concerns raised.  Justice Bender could wake up and probably reform the Colorado judicial system pretty quickly, if he was awake and wanted to, but so far, Justice Bender either sleeps or doesn't have the integrity or courage to fight and rock the boat too hard before retirement.

501. When Justice Bender was elected chief justice of the Colorado Supreme Court by the other Colorado Supreme Court justices, he reportedly said that it was "too soon to discuss his goals for the future of the courts but he said he understands he is managing 3,400 employees during a budget crisis and while the state's new justice center is under construction."

502. In essence, Justice Bender had no goals for the court system after thirteen years on the Colorado Supreme Court, other than managing a budget crisis and finishing construction of a new, very expensive and very large judicial building that dwarfs the size of the previous judicial building.  Justice Bender did not even state a basic goal like making sure that on a daily basis, the law is applied impartially to litigants in Colorado state courts, whether well connected to powerful people or not; whether wealthy or not; irrespective of a litigant's sex, race, nationality, etc.

503. Ironically, the artwork chosen for the new Supreme Court law library is a group of paintings, each painting depicting an unsmiling or angry looking person who is not wearing a shirt or a top. It is very ironic that the Colorado Supreme Court has paintings of angry people, who lost their shirts, decorating its library. The old mural that used to be above the old Colorado Supreme Court library had pictures of Hammurabi, Moses, Martin Luther King and John F. Kennedy. (Exhibit  , Wikipedia article on Colorado Supreme Court). One could argue substituting noble historical figures who contributed to the development of the law with angry victims of the law is a sign of the Colorado Supreme Court's nihilism.

504. Justice Bender is in charge of the Judicial Discipline Commission of the Colorado Supreme Court, the committee of judges and lawyers that investigates state court judges and justices for ethical violations.

505. The purpose of the Colorado Commission on Judicial Discipline, provided in the Colorado Constitution, is to investigate allegations of misconduct by Colorado state judges and make recommendations on how to handle the judicial misconduct. Colo.Const. Article VI, section 23(3)(e).

506. The Commission on Judicial Discipline is made up of ## members, mainly lower court judges and large law firm attorneys who rarely appear in person in court for contested hearings or trials in District or County courts, with Justice Bender serving as the chair of the Commission. When the commission meets, Justice Bender brings the power of his office and his "results oriented" philosophy, i.e. personal slant/predetermined outcome, to the meetings.

507. In practice, the executive director of the Colorado Commission on Judicial Discipline, in conjunction with the Office of Attorney Regulation Counsel, works to conceal judicial misconduct.

508. The executive director of the Colorado Commission on Judicial Discipline is William J. Campbell. See Exhibit ## attached.

509. Prior to being appointed executive director of the Colorado Commission on Judicial Discipline, William J. Campell was a partner level attorney in the law firm of Faegre & Benson, LLP where he was a Corporate and Mergers and Acquisition attorney.  See Exhibit ## attached.

510. According to Faegre & Benson's website, William J. Campbell contributed to the Faegre and Benson Fund, a "'527' Political Organization" that made contributions to political and judicial candidates. See Exhibit ## attached.

511. While serving as a partner at the Faegre & Benson law firm, it appears that William J. Campbell's (hereinafter, "the Crocs guy") most public accomplishment, as reported on the internet, was handling the process of taking Crocs Shoes Inc. public on the New York Stock Exchange, a very respectable business/corporate law accomplishment.

512. Between being a partner at Faegre & Benson, and a political contributor, and handling large stock market deals, "the Crocs guy" is probably very well connected to powerful people in the Colorado business and political community, including, maybe, local people who make suggestions to the President, or the United States Attorney General, regarding federal judicial appointments, or cabinet appointments or other patronage positions in the federal government.

513. There is no information that Plaintiff could find online about 'the Crocs guy" ever handling a criminal, civil or domestic relations case in a Colorado state court.

514. Most complaints involving improper behavior by Colorado state court judges are going to involve allegations relating to criminal, civil or domestic relations case in Colorado state court.

515. Most complaints involving improper behavior by Colorado state court judges are NOT going to involve taking shoe companies public on the stock market, under federal law, or corporate mergers and acquisitions, covered by federal law.

516. Having someone like "the Crocs guy" serve as the executive director of the Colorado Commission on Judicial Discipline is analogous to appointing a smart stock broker to handle internal affairs complaints at the Denver Police Department- a smart guy, completely out of his realm of experience, appointed to satisfy a particular, small segment of the legal and political community.###

517. Justice Nathan Ben Coates, some might say the "real chief justice" of the Colorado Supreme Court, is in charge of most of the Colorado Supreme Court's standing committees, including the Attorney Regulation Committee of the Colorado Supreme Court, a committee of large law firm commercial attorneys that reviews legal complaints against attorneys.  It should be noted that there are no reported cases of an attorney from a large Colorado law firm or the Colorado attorney general's office being disciplined by the Colorado Supreme Court in the last 20 years, and very few cases of prosecutors being disciplined.

518. The typical focus of a Colorado Supreme Court ethics case, that gets reported in a published appellate court opinion, is a sole practice attorney or an attorney from a very

small firm, typically someone without the financial means to fight a protracted battle with the Colorado Supreme Court's Office of Attorney Regulation Counsel.

519. That doesn't mean that there aren't any ethical violations by attorneys from large law firms or the attorney general's office, they just are not investigated or punished.

520. Coincidentally enough, sole practice lawyers and small law firms handle the bulk of cases involving every day people in criminal cases and domestic relations case, just the type of cases the people on the Attorney Regulation Committee do NOT have much experience handling.

521. Justice Nathan Ben Coats is the ultimate Denver government and legal community insider.

522. Nathan Ben Coats graduated from the University of Colorado, with a degree in economics, in 1971, and from the University of Colorado law school in 1977. After one year in private practice, Coats worked for the Colorado Attorney General's Office for eight years handling appeals cases and fourteen years for the Denver District Attorney's Office handling appeals cases, and then was appointed to the Colorado Supreme Court in 2000. (Exhibit  ,  ). Coats had been handling criminal appeals cases defending the constitutionality or legality of actions taken by police officers and deputy district attorneys and state judges in criminal cases, mainly in Denver, for nearly a quarter of a century. This work would have frequently involved high level discussions with the Denver Police Chief, the Denver Manager of Safety, the Denver District Attorney and other higher ranking officials in either the Denver District Attorney's Office or the Denver Police and Sheriff's Departments.

523. Denver law enforcement is no stranger to police brutality cases. (See paragraphs xx-yy below and Exhibits   ).

524. Coats is married to former University of Denver law school Dean Mary Ricketson.

525. Coats was also the "reporter' for the Colorado Governor Bill Owens' Columbine Commision.

526. It would also not be surprising to learn that Nathan Ben Coats had conversations with the trial judges in some of the appellate cases he worked on.   Many Colorado state judges have had a history of talking to deputy district attorneys about cases outside the presence of other attorneys, especially after a case is over.

527. The Colorado Supreme Court Office of Judicial Performance Evaluation wrote that surveys of Colorado attorneys said that Nathan Ben Coats "was somewhat weak in the areas of making reasoned decisions based on the law and the facts . . . ", coincidentally the two most important considerations in writing a published or unpublished appellate court decision.   In addition, the Office of Judicial Performance evaluation wrote that Nathan Ben Coats was weak in the area of  "being fair and impartial toward each side of the case." "A number of attorneys in their comments expressed the view that Justice Coats is biased in favor of the prosecution in criminal cases." This is not surprising for a career-long prosecutor/government attorney. "Some attorneys also expressed concern that his dissenting opinions are disrespectful to the justices writing the majority opinions." "Some judges, however, expressed concern in their comments about the harsh tone of some dissenting opinions, and the Commission concurs in that concern." (Please see Exhibit   attached).

528. What is notable about that last comment about Nathan Ben Coats being harsh is that it is extremely, extremely rare for the Office of Judicial Performance to be critical of a judge, let alone a supreme court justice, and usually a judge has to have a serious and pretty frequently complained of problem to get that kind of mild concern from the Office of Judicial Performance.  In essence, a lot of judges and attorneys think that Nathan Ben Coats is pretty mean spirited.

529. It is common to see in Nathan Ben Coats dissenting opinions a tone of haughty condescension toward the other justices, stating that the other justices don't understand fully the legal theories of criminal law or that they are soft on criminals and have a bent of mind against prosecutors.

530. One has to wonder after a while whether this tone and these subtle claims that prosecutors are not getting a fair shake from the Supreme Court bullies, or pressures, or wears down the other justices, who may not want to be labeled as intellectually inferior or soft on crime.

531. When Nathan Ben Coats meets with the Attorney Regulation Committee to discuss allegations of ethical misconduct involving attorneys from small firms handling criminal and divorce cases, he is frequently the only attorney in the room with criminal law experience and he brings the power of his office and his prosecution-slanted and mean-spirited demeanor to the table.  Commercial and business attorneys who are from large law firms and who are trying to build their resume, are not going to be inclined to challenge Justice Nathan Ben Coats face-to-face over legal questions relating to attorneys with whom they have no connection, particularly when Coats may be hearing civil, commercial or real estate appeals cases from their firms.

532. The Colorado Supreme Court's Office of Attorney Regulation Counsel is supervised by head Regulation Counsel John Scott Gleason.

533. Attorney Regulation Counsel John Scott Gleason is supervised by Colorado Supreme Court Chief Justice Michael Bender and Colorado Supreme Court Justice Nathan Ben Coats, who chairs the Colorado Supreme Court's Attorney Regulation Committee.

534. Attorney Regulation Counsel John Scott Gleason has also moonlighted as an adjunct professor at the University of Denver School of Law.  Gleason's supervisor at the University of Denver was Law School Dean Mary Ricketson, who is the wife of Colorado Supreme Court Justice Nathan Ben Coats. (Please see Exhibits ++ and ++ attached).

535. John Scott Gleason is in good favor with the Coats-Ricketson family, since John Gleason has been supervised by both spouses in that family, Justice Nathan Ben Coats and his wife.

536. John Scott Gleason may or may not be related to Rebecca Sperling Gleason, a deputy district attorney within the Eighteenth Judicial District Attorney's Office, formerly supervised by District Attorney Carol Chambers. (Ex.   , "Collins, Gleason, Volz Named as Finalists for the 18[th] Judicial District Judgeship", Law Week Colorado, September 41, 2010).

537. Colorado Supreme Court Justice Nathan Ben Coats is a friend of Carol Chambers and has known her since they both were attorneys in district attorney offices.

538. Upon information and belief, Carol Chambers is a graduate of the University of Denver Law School and it would not reflect well on the University of Denver Law School or Colorado district attorneys, if Carol Chambers had been disciplined strongly.

539. Upon information and belief, Colorado Supreme Court Justice Nathan Ben Coats communicated his feelings regarding the ethics prosecution of Carol Chambers to Colorado Supreme Court Regulation Counsel John Scott Gleason and either directly, or indirectly, to Colorado Supreme Court presiding disciplinary judge William Robert Lucero prior to and/or during the prosecution of Carol Chambers. There will probably not be any written records of this communication.

540. The presiding disciplinary judge, William Robert Lucero, was appointed by the Colorado Supreme Court with the strong influence of Nathan Ben Coats. Lucero was a former Denver deputy district attorney from 1984 to 1990. From 1990 to 2001, Lucero worked at the United States Attorney's Office for the District of Colorado handling criminal prosecutions and appeals, much like Nathan Coats.

541. IT IS THE POLICY OF THE COLORADO SUPREME COURT'S SEVEN JUSTICES, MICHAEL BENDER, NATHAN BEN COATS, GREGORY HOBBS, ANNE RICE, ALLISON EID, BRIAN BOATWRIGHT AND MONICA MARQUEZ TO COVER UP MISCONDUCT OR CRIMINAL ACTIVITY BY COLORADO STATE COURT JUDGES AND PROSECUTORS AND TO SOMETIMES INJURE ATTORNEYS REPORTING THE SAME. The only time minimal action is taken by the Colorado Supreme Court to punish judges or prosecutors for unethical or criminal behavior is when the case is brought to the attention of the media and publicized by the media.

542. As stated above, six of the seven Colorado Supreme Court Justices are former assistant state attorneys general and/or deputy district attorneys.

543. The Colorado Springs Gazette Telegraph reported in a September 9, 2007 article by Dennis Huspeni that "Former . . . Governor Bill Owens appointed more judges in his

two terms in office than any other governor in Colorado's history." In addition, "[a]lmost half of Owens judges were prosecutors or former prosecutors and 70 percent were men. Owens appointed 174 judges to county court, district court, court of appeals and supreme court judicial vacancies, 72 of who were former multi-year prosecutors and four who were public defenders. The article did not mention how many Owens judicial appointees were former federal prosecutors, known as assistant United States attorneys; how many were municipal prosecutors, known as assistant city attorneys; or how many Owens judicial appointees were attorneys employed as assistant Colorado attorney generals, county attorneys or city attorneys who defended other governmental employees in cases involving personal injury, negligence or breach of contract by a government entity or government employee. (Exhibit     , Dennis Huspeni, "Owens' judge picks were many, male and often DAs", Gazette Telegraph, September 9, 2007).

544. The Gazette Telegraph Article acknowledges that the author was unable to obtain biographical/employment history for ten of Governor Owens judicial appointees. (Exhibit     , Dennis Huspeni, "Owens' judge picks were many, male and often DAs", Gazette Telegraph, September 9, 2007).

545. The Gazette Telegraph article by Dennis Huspeni quotes University of Denver law professor Robert Hardaway as making the following statements: " I have always thought it was a terrible idea to appoint a judge who has only been on one side of the fence." "If I were governor, I would never appoint someone who was a lifetime prosecutor." "By the same token, I wouldn't appoint someone who had been a lifetime public defender either." (Exhibit     , Dennis Huspeni, "Owens' judge picks were many, male and often DAs", Gazette Telegraph, September 9, 2007).

**A.    *In Re Matter of Attorney C- According to the Colorado Supreme Court, it's o.k.***

***for a district attorney to delay providing evidence to the defense, showing that a***

***Defendant is not guilty***

546. Most of the justices of the Colorado Supreme Court think that the United States

Supreme Court and earlier justices on the Colorado Supreme Court have made the work

of a prosecutor or state government attorney too hard, with too many constitutional

protections of individual citizens rights, and that state government attorneys are

overworked.  See, People in re Matter of Attorney C, 47 P.3d 1167 (Colo. 2002) in

which Justice Bender and Justices Coats, Hobbs and Rice participated in concealing the

identity of, and rescinding the ethical sanctions against a deputy district attorney in the

rural southwest corner of Colorado, who failed to disclose exculpatory evidence-

evidence tending to show that two defendants might not be guilty, in two separate cases,

to the same defense attorney.  In the first case, "Attorney C" knew of an exculpatory

letter from an alleged victim in an assault case, in which the alleged victim wrote that

the breaking of her finger was accident, **but Attorney C decided not to give a copy of**

**the letter or tell the defense attorney about the letter Attorney C had received,**

**until after the date the preliminary hearing was to have been held.** Id. at 1168. In

the second case, **Attorney C again failed to disclose to the defense attorney, before a**

**preliminary hearing, that the alleged victim in a sexual assault case had changed**

**her story, in front of Attorney C the day of the preliminary hearing, and that the**

**alleged victim who had previously said that the defendant had touched his mouth**

**to her genital area, was now denying ever saying that there had been oral to genital contact.** Id. at 1169.  Attorney C said she didn't disclose the information to the defense attorney because she was afraid her office would be disqualified from the case because Attorney C had become a witness to the alleged victim's contradictory statement.  Id. The Colorado Supreme Court found that Attorney C's conduct in delaying disclosure in both cases was not "intentional".  Id. At 1174.

**B.   *Denver attorney reports two judges using cocaine, FBI enters confidential witness agreement with one judge, Denver attorney gets investigated by disciplinary counsel, no charges or ethics investigation of judges, FBI investigation quietly goes away***

547.   According to the Denver Post newspaper, in 2001, Denver attorney Bill Danks was reportedly investigated for ethical violations by the Colorado Supreme Court, for reporting that two Colorado state court judges, Robert Haeger and Claude Appel, were using cocaine. (See Exhibit  , "Judge not permitted to sue anonymously", Denver Post, October 17, 2003, p.4b).

548.   The October 2003 Denver Post newspaper article fails to discuss the outcome of any law enforcement investigation into the use of cocaine by the two Colorado state court judges and whether or not the Colorado Supreme Court used it's influence to shield the two state judges. (See Exhibit  , "Judge not permitted to sue anonymously", Denver Post, October 17, 2003, p.4b)  The Denver Post article DOES report that Judge Haeger echoed Bill Danks allegations that Judge Claude Appel used cocaine.

549. The Denver Post article reports that a United States District Court Judge Clarence Brimmer, [a Wyoming federal judge who is the father of current Colorado federal judge and former Denver deputy d.a. Philip Brimmer, (Exhibit  , Wikipedia articles on Clarence Brimmer and Philip Brimmer)), was going to dismiss the lawsuit by Judge Haeger against the Federal Bureau of Investigation for violating an agreement to keep his identity as a confidential informant against Judge Appel, secret, unless he refilled the lawsuit in his own name, rather than using the alias 'John Doe". The FBI apparently wanted Haeger, for some unknown reason, to use his own name, even though the FBI had violated a confidentiality agreement with Haeger. (Exhibit , "Judge not permitted to sue anonymously", Denver Post, 10/17/03, p. 4b).

550. From all appearances, it looks like Haeger felt threatened, if it became known he had reported a state judge for illegal drug use, and that the Colorado Supreme Court, which had JusticeBender and Justices Coats, Hobbs, Rice and Martinez at the time, was trying to investigate and punish Danks for his allegations of drug use by both Appel and Haeger.

551. The United States District Court record for the case <u>Haeger v. FBI</u>, 03CV1542, is sealed and the only portions of the court record that is viewable by the public are minute order/court notes reflecting that a trial was held and that, while the FBI reportedly violated the "Privacy Act"/agreement Haeger, federal judge Clarence Brimmer did not find the FBI's violation of the Privacy Act were was intentional, so no damages were awarded to Haeger to be paid by law enforcement.

552. Judge Claude Appel was later appointed to serve as chief judge of Colorado's Third Judicial District, in the area around Trinidad, Colorado, after this very hush, hush, little reported incident.

553. A subsequent article on April 27, 2004 in the Pueblo Chieftain newspaper reported that then United States Attorney, John Suthers stated that "the FBI closed its investigation in 1997 and concluded that there was no evidence of judicial misconduct or substantial evidence of drug use by Judge Appel". (Exhibit , "FBI, Walsenburg Judge Reach Suit Settlement, The Pueblo Chieftain, 4/27/2004).

554. However, the Pueblo Chieftain also reported in the same article that "On December 29, the FBI, in a court filing by one of Suthers' assistants, denied that its investigation 'failed to develop any evidence of criminal or other misconduct by' Appel." (Exhibit , "FBI, Walsenburg Judge Reach Suit Settlement, The Pueblo Chieftain, 4/27/2004).

555. There are no news stories that the alleged cocaine was merely some spilled sugar or coffee cream.

556. The are no reports of criminal cases againt either Judge Appel or Judge Haeger for cocaine use, though the following questions remain: "Why did the FBI enter into a confidentialty agreement with Judge Haeger, if the FBI didn't have evidence of a crime occurring that the FBI planned to ask to be prosecuted?" and "Why did the FBI filing in Judge Haeger's case contradict what then U.S. Attorney John Suthers said?" and "Did the Colorado Supreme Court request U.S. Attorney John Suthers, or his predecessor not to prosecute Judge Appel, and did Suthers or his predecessor agree as a favor the the Colorado Supreme Court, not to prosecute Appel?" .

557. According to Colorado Supreme Court attorney registration records, Judge Haeger is not currently practicing law in Colorado and his whereabouts are unknown. (Please see Exhibit attached).

558. According to Colorado Supreme Court records, attorney William Danks has no reported ethical violations.

559. If the Colorado Supreme Court was investigating William Danks for falsely reporting that a judge was using cocaine, it appears, when considered in conjuction with the FBI confidentiality agreement with Judge Haeger, that the alleged report of cocaine use was determined not to be deliberately false.

560. The incident involving Judge Appel has the appearance of a Colorado Supreme Court cover up and the Colorado Supreme Court attempting to punish an attorney, Danks, for claiming that Judge Haeger had a conflict of interest on a case. (Ex. , "Colorado Judge Loses $1M Case Against FBI", Courthouse News.com, 9/14/04).  As discussed below, similar cover ups appear to have taken place with Denver District Court Judge Larry Manzanares and United States District Court Judge Edward Nottingham.  See paras.

   **C.  *Judge's live-in girlfriend gets caught selling cocaine, no criminal investigation, or ethics investigation of the judge, though the voters in Steamboat Springs take action***

561. A very similar scenario took place in Routt County, Colorado in 2002.

562. Law Week Colorado, a Colorado legal newspaper, reported that Colorado District Court Judge Joel Thompson "was voted out amid scandal after his girlfriend, with whom he shared a home, was arrested on charges of dealing cocaine." (Exhibit,  "Seven Judges Who Got Walking Papers", Law Week Colorado,11/2/2010).

563. Plaintiff is unable to find any newspaper or internet article regarding Judge Joel Thompson, being investigated or prosecuted or any report on Judge Thompson by the Colorado Office of Judicial Performance Evaluation.

564. Apparently no complaints were made to prosecutors, or to the Colorado Supreme Court, that Judge Joel Thompson had any knowledge that the woman he was living with, and presumably was sharing living expenses with, had cocaine in her possession and was making money from selling cocaine.

565. It is very rare for people living with drug dealers not to be investigated for complicity with [aiding] the drug dealer.

566. Colorado Supreme Court attorney registration records show that there is only one attorney named Joel Thompson in Colorado and that he has no record of disciplinary action being taken against him.  (Exhibit   , Colorado Supreme Court webpages for Joel Stetson Thompson).

567. Joel Thompson is identified as an assistant attorney general prosecuting a criminal case in the area of Aspen, Colorado in March 2013.  (Exhibit,  "Ex-Montana quarterback acquitted of rape", Aspen Times, 3/1/13).  It appears that since Thompson was never charged with a crime, the man reportedly living with a cocaine dealer is fit to prosecute criminal cases as part of the Colorado Attorney General's Office, according to John Suthers, the Attorney General, John Gleason, the attorney regulation/discipline lawyer, and JusticeBender and Justice Coats.

568. After Judge Joel Thompson was voted out of judicial office, by the voters of Colorado's Fourteenth Judicial District, the district attorney who did not prosecute Joel Thompson, Paul McLimans, was coincidentally appointed by Governor Bill Owens as Joel

Thompson's replacement as a district court judge. (Exhibit  , Office of the Governor-Press Release, 1/3/03).

D. ***Actual arrests of, and plea bargains by, judges are no basis for disciplinary action by Colorado Supreme Court Justice Bender or Justice Coats***

569. A June 13, 2007 Rocky Mountain News newspaper article has outlined how Colorado state judges have avoided any impact to their judicial careers following criminal arrests and criminal convictions. (See Exhibit  , Sue Lindsay, "Criminal charges may not be career-ending", Rocky Mountain News, June 13, 2007).

570. Arapahoe County District Court Judge Vincent White was arrested for driving under the influence in 2000 with a reported BAC of .117 and a second time in 2005, shortly after he was appointed as a Colorado district court judge. (See Exhibit  , Sue Lindsay, "Criminal charges may not be career-ending", Rocky Mountain News, June 13, 2007). The second time around, White did not take a blood alcohol test and surprisingly the charges were dropped and the Colorado Department of Revenue ***took the highly unusual action of giving Judge White his license back, after refusing to take a blood alcohol content (BAC) test.*** Judge Vincent White was a former assistant attorney general under then Attorney General Ken Salazar and a former Colorado Springs assistant city attorney.

571. The odds of an every day citizen getting their driver's license back from the Colorado Department of Revenue, Motor Vehicle Division, after refusing a blood or breath test, are extremely miniscule, in part because Colorado law provides for a driver's license

suspension for failing to take a blood or breat test upon request by a law enforcement officer.

572. Former Adams County Court Judge Lucinda Hull Bruner was arrested in Denver for public intoxication during the 1990's after she reportedly argued with Denver police and showed them her judicial badge.  Bruner stayed on the bench, presided over criminal cases, and received an award from at least one bar association.  Bruner was a former deputy district attorney in Adams County.

573. No ethics investigation action was taken by the Colorado Supreme Court with respect to Judge Bruner's law license.

574. The Rocky Mountain News article also reports that Denver County Court Judge Johnny Barajas pled guilty to a drunken driving charge in 2006, was removed from presiding over traffic cases, but still continued to work as a judge without censure, suspension or penalty to his law license.  (See Exhibit   , Sue Lindsay, "Criminal charges may not be career-ending", Rocky Mountain News, June 13, 2007).

575. The Rocky Mountain News article also reports on the arrests of two Colorado state Judges, Colorado Court of Appeals Judge Raymond Dean Jones for stealing a pair of slippers in 1986, and Larimer County Court Judge Don Nelson for failing to report fees he earned for performing wedding ceremonies in 1996.  The facts of both cases are unclear from the newspaper article, but the article does report that the criminal cases against both judges were eventually dismissed.  (See Exhibit   , Sue Lindsay, "Criminal charges may not be career-ending", Rocky Mountain News, June 13, 2007).

576. There have been a couple of instances in which Colorado state judges were so out of control, that they killed themselves after committing crimes.

577. The Rocky Mountain News reported that Jefferson County Court Judge E.A. Howard Baker, Jr. shot another judge, Jefferson County District Court Judge George Priest in 1978, before Baker subsequently shot himself.  The Rocky Mountain News article does not disclose what the conflict was between Baker and Priest, or whether Priest had done something to antagonize or threaten or provoke Baker, but the article does say that Priest had received negative reviews on his judicial temperament and his legal ability from lawyers, and he was later voted out of office. (See Exhibit    , Sue Lindsay, "Criminal charges may not be career-ending", Rocky Mountain News, June 13, 2007). No apparent action was taken by the Colorado Supreme Court to address the Priest portion of this situation, regarding his reported temperament problems or poor legal skills.

E.   *The Colorado Supreme Court reportedly attempted to persuade the Denver District Attorney's Office not to prosecute former Denver City Attorney Larry Manzanares, a former Denver County District Court Judge, for reportedly stealing his court-owned laptop computer, which reportedly had large amounts of pornographic material in it.*

578. It is very regrettable that in June 2007, former Denver District Court Judge and former Denver City Attorney Larry Manzanares committed suicide after a court date in a pending felony criminal case against him.

579. According to newspaper reports, Manzanares had resigned from being a Denver District Court Judge in order to be appointed as Denver's city attorney.  According to newspaper reports, after Manzanares resigned, Colorado state court officials reported Manzanares'

Colorado state judicial department laptop computer as stolen to Denver Police. Newspapers have reported that on February 15, 2007, the allegedly stolen computer was found at Manzanares' home by police. According to newspaper reports, large amounts of pornographic pictures and videos (some of people of indeterminate age) had been stored on the computer, along with jury instructions and legal documents. (Exhibit   , "Courts swayed stolen laptop case", Lou Kilzer, Rocky Mountain News, March 8, 2007; "Officials deny preferential treatment in laptop theft", Lou Kilzer, Rocky Mountain News, March 8, 2007; "Computer had 'massive' porn stash, official affidavit says", Sue Lindsay, Rocky Mountain News, June 14, 2007). Reportedly, Manzanares told court officials he bought the laptop in an alley outside the Denver City and County Building, from a man in a pick up truck, as a gift for Manzanares' son. (Exhibit   ).

580.   The news article's on Manzanares report that former Weld County Court Judge Carol Haller, the legal counsel for the state court administrator's office, stated that she had talked to State Court Administrator Gerald Maroney about the police reports and then asked the Denver Police NOT TO PROSECUTE the case. (Exhibit   ).

581.   What is not said in the newspaper articles is that there is no way Carol Haller or Gerald Maroney would have made that request not to prosecute, without first discussing it with the head of the Judicial Branch, and their immediate supervisor, then Chief Justice Mary Mullarkey. Plaintiff believes that it is also quite likely that, since Manzanares was an attorney at the time of the police investigation, Justice Nathan Ben Coats, a former Denver deputy d.a. and chair of the Supreme Court Attorney Regulation Committee, would also have been involved in those discussions whether or not to prosecute former Judge Manazanares for stealing state property with pornographic material stored inside.

582. It would be completely false to think Carol Haller and Gerald Maroney made the decision to ask the Denver Police not to prosecute all on their own, though there will unlikely be any records of consultations with one or more of the Colorado Supreme Court justices.

583. It is also quite unbelievable to think that each of the seven justices on the Colorado Supreme Court were not aware of the charges against Manzanares and the request made by the state judicial branch not to prosecute, particularly since it was the hottest legal news in the Denver newspapers at that time.

584. Apparently Nathan Ben Coats normal outrage at judicial meddling with prosecutors was not so strong, when it came to a fellow wealthy and powerful attorney for the City of Denver. In Nathan Ben Coats elitist view, judges are above other citizens when it comes to the law and criminal prosecution.

585. This incident is the best documented incident in which the Colorado Supreme Court tried to protect a Colorado state judge from criminal prosecution. The unusual actions taken in Vince White's DUI case, probably evidence similar behind-the-scenes activity as well, though, of course there is no way to document this and the justices will certainly deny it. The contradictory statements about whether the FBI found evidence of wrongdoing concerning Judge Claude Appel also causes one to consider whether a Colorado Supreme Court request was made to the United States Attorney to stop investigating/planning to prosecute Appel.

586. Another suspicious case around the same time, that has similarities to the Appel case is what the media calls the "Naughty Nottingham" situation.

587. Former U.S. District Court for the District of Colorado Chief Judge Edward Nottingham resigned his lifetime judicial appointment in October 2008 amid the following reported allegations against him: 1) It has been reported that Judge Nottingham's wife reported that Judge Nottingham spent $3000 in one night on strippers, in documents in the Nottingham divorce case; 2) It has been reported that Judge Nottingham could not recall the details of the $3000 spent on strippers at the Diamond Cabaret strip club in Denver on 9/5/05 because he had been drinking; 3) It has been reported that Judge Nottingham was under investigation for viewing adult web sites on his government computer in his judicial chambers/office; 4) It has been reported that there was an affidavit from a prostitute claiming that Nottingham asked her to lie to federal investigators about Notiingham'srelationship with her; 5) it has been reported that Nottingham turned up on a prostitution business' client list while the business was being investigated by the IRS; 6) it has been reported that Nottingham was a client of an escort business called Bada Bing, that he paid a prostitute $250 to $300 per hour to have sex with him, that he asked the woman to strip to make sure she wasn't wearing a hidden recording device and that Nottingham helped her make up a story to tell federal investigators about how Nottingham knew her, instead of being honest and saying she was his prostitute; 7) it has been reported that Nottingham was on another client list for a prostitution ring called Denver Players; 8) it has been reported by Denver television station 9KUSA that Nottingham was not the only prominent client of Denver Players or Denver Sugar, and that several other clients included judges, lawyers, businessmen athletes and politicians.

588. In spite of all this media information about Judge Nottingham's alleged illegal activity, and the related activity of prominent judges and lawyers and politicians, the normally loud spoken Justice Coats, demanding that the courts not be soft on crime, has silently lurked in the shadows on Judge Nottingham, similar to a pimp silently watching a prostitute from a dark alley.  Justice Coats, the law and order and attorney discipline justice, certainly knows about Judge Nottingham's activity, he just sits silently probably, though there is only vague documentation why, because he either thinks Nottingham, as a judge, is above the law; possibly, though currently there is no evidence, because Coats received something, whether monetary or promises of future favors to do nothing; Coats is scared Nottingham's attorney's would humiliate the Office of Attorney Regulation Counsel in court; or some other reason, like an undisclosed plea agreement.

589. Prostitution laws, like other vice laws, were designed to help protect/discourage the desperate, the poor or the vulnerable, from self-destructive behavior, whether it be gambling, using or selling drugs or selling their bodies for sex to wealthy clients to make some money to live on.

590. It appears that for Justice Coats, not to mention Justice Bender, the exclusive-group-of-friends, anything-goes Dartmouth Animal House guy, and female justices Nancy Rice and Allison Eid, there was something more important than protecting down and out women, when it came to Judge Nottingham and the other prominent legal people on the Denver Players client list.  Though it is only speculation, that unknown, more important consideration might have been getting some sort of "I owe you" from the Colorado federal courts; or maybe promises to the female Colorado justices, from one or more of the male justices, to look the other way on female judge misconduct;  or maybe justices

themselves had to worry about the client list; or maybe certain Denver politicians would back off on punishing overly aggressive Denver Police using excessive force, in exchange for no criminal investigation of the prostitution client list taking place. Plaintiff has no evidence on these possible explanations, but they would seem to explain how the Nottingham situation was handled by the Colorado Supreme Court.

591. Edward Nottingham, has reportedly been the subject of a disciplinary complaint to the Colorado Supreme Court's Office of Attorney Regulation Counsel (attorney ethics prosecutors). (Exhibit ##, Alan Prendergast, "Edward Nottingham: "Naughty" non-investigation proceeds with relentless inertia", Westword, 2/18/10).

592. The Westword newspaper article reports that Sean Harrington, "operator of the Know Your Courts website and a savage critic of Colorado's judicial system", figured that OARC [Office of Attorney Regulation Counsel] should conduct an investigation and wanted to test his "assertion that OARC is highly selective about which behaving badly attorneys it chooses to punish and those it chooses to ignore." (Exhibit ## , Alan Prendergast, "Edward Nottingham: "Naughty" non-investigation proceeds with relentless inertia", Westword, 2/18/10).

593. The Westword article reports that Harrington has made at least three inquiries of the Office of Attorney Regulation Counsel, and that each time he received responses from multiple attorneys, such as, "the investigation you requested is not yet warranted"; the matter was moved "to our trial division for further investigation" [there is no trial division of the OARC in the Colorado Bar Association phonebook, known as the Colorado Legal Directory, though other government offices like the attorney general

and some d.a.s offices have identified divisions]; and "the case was being placed 'in abeyance', for reasons not disclosed."

594. Based on what is written in the Westword article, it appears that the Office of Attorney Regulation Counsel, supervised by Justice Bender and Justice Coats appears to be stalling and hoping that any statutes of limitation will expire before they investigate and possibly prosecute former federal Judge Nottingham for ethics violations.

595. It appears that the Colorado Supreme Court is not following the normal ethical procedure of investigating an attorney, Edward Nottingham, based on alleged criminal activity, in an effort to do a favor for someone, perhaps the judges on the United States District Court for the District of Colorado, though of course judges on either side, if there was such a deal, would claim that their correspondence was confidential and that they were absolutely immune from subpoenas to get the records.

596. Richard Rosenthal was appointed as the Independent Monitor for the Denver (Colorado) Police Department's Internal Affairs Bureau, and conducted investigations of police misconduct involving excessive use of police force. (Exhibit  , attached). Rosenthal was appointed by then Mayor, now Governor, John Hickenlooper.

597. +++Prior to being hired as the Denver Police Department's Independent Monitor, Richard Rosenthal was a deputy district attorney in Los Angeles, California, assigned to prosecute financial crimes and public corruption.  While serving as a deputy district attorney in Los Angeles, Rosenthal uncovered the Los Angeles Police Department Rampart Scandal.  (Exhibit   attached, Westword, "Independent Monitor Richard Rosenthal keeps a close eye on the Denver Police", May 17, 2011).  Rosenthal also served as the police monitor for the City of Portland Oregon. (Exhibit  attached).

598. While serving as the Independent Monitor of the Denver Police Department, Rosenthal faced criticism from both the police union, stating that Rosenthal was too harsh, and from former Colorado Supreme Court Justice Alex Martinez, who was appointed as Denver Safety Manager (Sheriff), and brought the Colorado Supreme Court's particular brand of arrogant, incompetent negligence and cover up to the Denver Police Department.

599. It was reported in a Denver Post newspaper article by Tom McGhee that "Richard Rosenthal frequently recommended discipline that was tougher than officers received in the years before he [Rosenthal] was appointed. He [Rosenthal] also spoke out publicly when he disagreed with the discipline that the safety manager meted out. His tough stance earned him [Rosenthal] the enmity of some who thought he was biased." (Exhibit   , attached)

600. Shortly before resigning as Denver's Independent Monitor,, in January 2012, Richard Rosenthal wrote a report that the Denver Police Department was becoming worse in covering up misconduct. Rosenthal reportedly wrote that "[i]t does appear to be an attempt, a deliberate attempt to protect officers from the imposition of severe discipline." Rosenthal reportedly said lying officers were protected from discipline and that "[w]hat we have here is an entrenched culture of circle the wagons, defend and justify bad conduct."

601. Rosenthal also reported that he had to be very careful about his own personal conduct. (Exhibit   ,Westword, Independent Monitor Richard Rosenthal keeps a close eye on the Denver Police, 5/17/11). While Rosenthal did not expressly come out and say it, in what was reported in the newspaper article,  it is quite likely that Rosenthal was fearful of

getting set up to be arrested. Rosenthal mentioned that he had not had a drop of alcohol in Colorado in six years.

602. In response to Rosenthal's final report, former Colorado Supreme Court Justice Alex Martinez, a career Pueblo public defender and judge, prior to his appointment and retirement from the Colorado Supreme Court and appointment as Denver's Safety Manager (civilian head of the Denver Police Department, Sheriff's Department and Fire Department) was reported by Denver CBS television station KCNC as stating the following about Rosenthal's report: "I characterize it as nitpicky." "By that I mean he's criticizing things that don't affect the final outcome." Martinez reportedly called Rosenthal's report "reckless", "offensive" and "irrelevant". (Exhibit attached).

603. Apparently the wise former Justice Martinez, who never litigated or worked on a case of police misconduct, until he was hired as Denver Safety Manager, unlike the experienced Rosenthal, felt that concerns about police officers lying for each other, to cover up misconduct and avoid discipline, if not prosecution, was unimportant or "irrelevant". To former Colorado Supreme Court Justice Alex Martinez, it's all about local government avoiding getting sued for monetary judgments for governmental misconduct. In plaintiff's opinion, Justice Martinez was hired to put a minority face, with a prestigious former title, in the way of legitimately investigating police misconduct, and the resulting loss of governmental income through court judgments.

604. For people who express views like Alex Martinez, it is more important for government to save money in these tough financial times, to do the important functions he thinks government performs, than to correct government employee misconduct, through training and legitimate employee discipline. Some people with viewpoints like

Martinez may also take the view that a little frontier, roughhouse justice is o.k. and unavoidable, as an informal way to keep a lid on crime and that people who get arrested deserve what they get- people like Martinez, while they will never say it publicly, believe that police officers tend to be dumb and violent, people like Martinez will never say it, but they don't truly believe that arrestees are innocent, until proven guilty, and they are willing to sacrifice people injured by government misconduct to keep money from being assessed in judgments against municipal and state governments.

605. One thing both liberal and conservative politicians can agree on is their dislike of lawsuits against government entities for government wrongdoing.

606. Rosenthal reportedly said the following about former Colorado Supreme Court Justice Alex Martinez's comments about concerns about Denver police officers lying to cover up misconduct: "The reality is that it sends a horrible message to the Denver Police Department and the community and the justice system to suggest that officers can lie and stay on the job as a police officer." "It is unfortunate that the Manager of Safety (former Colorado Supreme Court Justice Alex Martinez) does not appear to understand the significance of the deficiencies of the Denver Police Department's Internal Affairs Bureau. As he is the ultimate decision maker for the Department of Safety, his failure to acknowledge there is even a problem is distressing and evidences a need for outside intervention. It is my opinion that the Department of Justice, Civil Rights Division needs to open an investigation into the Denver Police Department, as the Department has established its inability to protect the public from police misconduct, including violation of civil rights." (Exhibit   attached).

607. Former Colorado Supreme Court Justice Alex Martinez, was appointed to bring the Colorado Supreme Court's particular brand of arrogant, incompetent negligence and cover up to the Denver Police Department. What federal judge, in a federal civil rights lawsuit, would rule against a Hispanic former state supreme court justice, a fellow judge, who was saying there are no civil rights problems in the Denver Police Department? If Colorado Supreme Court Justice Nathan Ben Coats recommended Justice Martinez to his former Denver City government and Denver Police colleagues, it was a brilliant way to provide cover for Denver police misconduct and try to prevent, or reduce, monetary judgments against the City in court.

608. Denver Mayor Michael Hancock subsequently appointed a commercial litigation attorney with a large Denver business law firm, Nicholas Mitchell, to be the new police department independent monitor. Neither Mitchell, nor his law firm, have been reported to have ever investigated or litigated a personal injury case, civil rights case, or a criminal case involving police misconduct, police excessive use of force or police shootings. It does appear that Mitchell will be well prepared for any Denver Police misconduct cases involving stocks and bonds, broken contracts or disputes over shipping documents. Mitchell was reported to have said "In private practice you are a hired gun, serving the highest bidder." "I wanted an opportunity to serve a higher purpose." "I feel I can do it here." (Exhbit  , Denver Post Artice, Tom McGhee). Presumably now he will be a hired gun for the City of Denver, with big law firm connections to judges in state and federal court, against civil rights litigants.

3.  JUDICIAL IMMUNITY FROM CIVIL LAWSUITS-EVEN FOR DELIBERATE
    WRONGFUL BEHAVIOR

609. Colorado and Federal Judges are protected by absolute immunity from civil lawsuits,
     except for injunctions, if the lawsuit is based on the judge's actions as a judicial officer.

610. There is no immunity for judges from criminal law, though at times judges will try to
     shield themselves from criminal law.

611. "Qualified immunity **protects** federal and state officials from liability for discretionary
     functions, and from 'the unwarranted demands customarily imposed upon those
     defending a long drawn-out lawsuit.'" *Roybal v. City of Albuquerque, No. Civ. 08-0181,*
     *2009 U.S. Dist. LEXIS 45670, 2009 WL 1329834, at *10 (D.N.M. Apr. 28,*
     *2009)*(Browning, J.)(quoting *Siegert v. Gilley, 500 U.S. 226, 232, 111 S. Ct. 1789, 114*
     *L. Ed. 2d 277 (1991)).*  Qualified immunity shields government officials from liability
     where "their conduct does not violate clearly established statutory or constitutional
     rights of which a reasonable person would have known." *Pearson v. Callahan, 129 S.*
     *Ct. at 815* (quoting *Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed.*
     *2d 396 (1982)).* In evaluating whether the right was clearly established, the court
     considers whether the right was sufficiently clear that a reasonable government
     employee in the defendant's shoes would understand that what he did violated that right.
     See *Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1327 (10th Cir. 2007).* In
     determining whether the plaintiff has met his or her burden, the court construes the facts
     in the light most favorable to the plaintiff as the non-moving party. See *Scott v. Harris,*
     *550 U.S. 372, 378, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007).* A clearly established
     right is generally defined as a right so thoroughly developed and consistently recognized

under the law of the jurisdiction as to be "indisputable" and "unquestioned." *Zweibon v. Mitchell, 720 F.2d 162, 172-73, 231 U.S. App. D.C. 398 (D.C. Cir. 1983), cert. denied, 469 U.S. 880, 105 S. Ct. 244, 83 L. Ed. 2d 182 (1984).* "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001)).* See *Medina v. City & Cnty. of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992).* On the other hand, the Supreme Court of the United States has observed that it is generally not necessary to find a controlling decision declaring the "very action in question . . . unlawful." *Anderson v. Creighton, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987).* Once the plaintiff has established the inference that the defendant's conduct violated a clearly established constitutional right, a qualified-immunity defense generally fails. See *Cannon v. City & Cnty. of Denver, 998 F.2d 867, 870-71 (10th Cir. 1993).*

***People v. D.S.****, Arapahoe County Court Case No. 2010 M 1127- The Office of Attorney Regulation Counsel starts an attorney ethics investigation, but refuses to provide a copy of the complaint, either because there was no complaint, or because the Office of Attorney Regulation Counsel wants to hide Carol Chambers and the Eighteenth Judicial District Attorney's role in the complaint.*

612. On January 10, 2012, Deputy Regulation Counsel Stephen R. Fatzinger (hereinafter, "Fatzinger") mailed John McNamara a "request for investigation" letter with a case number of 12-00097.

613. A "request for investigation letter" is how the Colorado Supreme Court's Office of Attorney Regulation Counsel begins an ethics violation prosecution against an attorney.

614. The Colorado Supreme Court's Office of Attorney Regulation Counsel is supervised by head Regulation Counsel John Scott Gleason.

615. Attorney Regulation Counsel John Scott Gleason is supervised by Colorado Supreme Court Chief Justice Michael Bender and Colorado Supreme Court Justice Nathan Ben Coats, who chairs the Colorado Supreme Court's Attorney Regulation Committee.

616. John Scott Gleason may be related to Rebecca Sperling Gleason, a deputy district attorney within the Eighteenth Judicial District Attorney's Office, supervised by District Attorney Carol Chambers.

617. Upon information and belief, Colorado Supreme Court Justice Nathan Ben Coats is a friend of Carol Chambers and has known her since they both were attorneys in district attorney offices.

618. John Scott Gleason supervised Fatzinger and April McMurrey a/k/a April Seekamp at the time of the January 10, 2012 letter.

619. There is a Colorado Rule of Civil Procedure that governs when an ethics investigation may begin, that rule being Colo.R.Civ.P. 251.9(a).

620. Colo.R.Civ.P. 251.9(a) provides as follows:

Commencement.  Proceedings as provided in these Rules shall be commenced:

(1) Upon a request for investigation made by any person and directed to the Regulation Counsel; or

(2) Upon a request made by a judge of any court of record of this state and directed to the Regulation Counsel, as provided in C.R.C.P. 251.4;

(3) By the Committee upon its own motion; or by the Regulation Counsel with the concurrence of the Chair or the Vice Chair of the committee

621. Colo.R.Civ.P. 251.9(a) was written in an attempt to comply with the Fourth Amendment to the United States Constitution's requirement of probable cause and bans on government searches and seizures and to prevent attorney regulation attorneys from selecting attorneys, that the regulation attorney does not like, to conduct witch hunts against. There is **supposed to be** a reason or complaint before an ethics investigation begins.

622. The Fourth Amendment to the United States Constitution, one of the first ten amendments to the United States Constitution, known as the Bill of Rights, states as follows: "The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

623. Fatzinger sent the January 10, 2012 request for investigation letter to John McNamara with the knowledge of John S. Gleason and April M. McMurrey (formerly known as April Seekamp).

624. Fatzinger sent this request for investigation letter to John McNamara at the direction of John S. Gleason.

625. A copy of the request for investigation letter is attached hereto as Exhibit   . The January 10, 2012 letter alleges that "[i]t has been brought to the attention of the Office of Attorney Regulation Counsel that you may have practiced law without a license to practice law issued by the Colorado Supreme Court, or while your license to practice law was suspended, in Arapahoe County Court Case *People v. S*------- [name redacted], 2010 M 1127." The letter goes on to say that the investigation will be handled by April M. McMurrey.

626. There has been a history of unhappiness and anger by the Colorado Supreme Court's Office of Attorney Regulation Counsel towards John McNamara, originating with the fact that April McMurrey failed to respond to Colorado Open Records Act and Colorado Criminal Justice Records Act request letters from John McNamara.  When McMurrey failed to respond, John McNamara sent at least one notice of intent to sue to OARC.

627. It is embarrassing for the state Supreme Court's ethics attorneys  to commit misdemeanors by violating the Colorado open records laws, by failing to respond to records requests after being directed to the state law John McNamara was relying on to make his requests.

628. John McNamara was exercising his constitutional rights to due process and equal protection of the laws under the Fourteenth Amendment to the United States Constitution and his statutory rights under the Colorado Open Records Act and/or the Colorado Criminal Justice Records Act to request records about John McNamara, the person in interest.

629. Subsequently, and even worse, assistant regulation counsel April McMurrey presented perjured testimony against John McNamara from a woman John McNamara had sought a contempt citation against in Denver District Court, when the woman, Karen Cole, failed to allow her ex-husband to communicate with their daughter, and secretly enrolled the daughter in an expensive Virginia boarding school to spite the father.

630. John McNamara made a statutory Notice of Claim against John Gleason, April McMurrey and William Lucero and wrote a letter to Chief Justice Michael Bender regarding the concerns addressed above.

631. The D.S. case, Arapahoe County Court Case No. 2010 M 1127, was a case in which the Arapahoe County District Attorney was trying to get a 65-year-old married man to participate in, and of course pay for, sex offender therapy after he was convicted of voting in both Adams and Arapahoe Counties in the 2010 election.  There was no sexual act alleged as part of the voting.

632. Fatzinger failed to attach any written complaint from any party to that Arapahoe County Court Case No. 2010 M 1127.

633. Fatzinger failed to attach any correspondence, complaint or communication from the Arapahoe County Court in that Arapahoe County Court Case No. 2011M1127.

634. Fatzinger, in fact, attached no complaint or documentation supporting any request to investigate.

635. In response to Fatzinger's letter, John McNamara sent a response letter, attached hereto as Exhibit  , addressed to John S. Gleason, and e-mailed it to John S. Gleason and Charles Mortimer Jr.  In the response letter, John McNamara made an Open Records request for the following:

1. Any correspondence received from D---- S------- regarding a complaint made by D---- S-------
   to the Office of Attorney Regulation Counsel;

2. Any correspondence received from D---- S------- regarding a complaint made by the Office of
   Attorney Regulation Counsel regarding John McNamara;

3. Any correspondence received from any employee or attorney from the Eighteenth Judicial
   District Attorney's Office regarding any complaint made by any employee or attorney at the
   Eighteenth Judicial District Attorney's Office to the Office of Attorney Regulation Counsel
   regarding John McNamara;

4. Any correspondence received from any employee or attorney from the Eighteenth Judicial
   District Attorney's Office regarding any complaint made by any employee or attorney at the
   Office of Attorney Regulation Counsel regarding John McNamara;

5. Any correspondence received from any Judge regarding any complaint made by any Judge
   to the Office of Attorney Regulation Counsel regarding John McNamara;

6. Any correspondence received from any Judge regarding any complaint made by any
   employee or attorney at the Office of Attorney Regulation Counsel regarding John
   McNamara;

7. Any correspondence received from the Attorney Regulation Committee of the Colorado
   Supreme Court authorizing an investigation of John McNamara.

636. John McNamara requested that, if the requested records were not in Gleason's

possession, that Gleason identify who has these records and where the records are

located and when such records will be available IN WRITING, pursuant to C.R.S. 24-

72-203(2)(a)-(3)(b)(2011); C.R.S. 24-72-303(2)-(3)(2011); and C.R.S. 24-72-304(2)-(3)

within the statutory three-day time period.

637. John McNamara requested that, if Gleason denied McNamara's request for any of the

records identified above, that Gleason please state IN WRITING the law, or regulation

under which Gleason denied McNamara receiving copies of the requested records, within the statutory 72-hour time period provided in C.R.S. 24-72-305(6) (2011) and C.R.S. 24-72-204(4) (2011).

638. John McNamara also asked for an update of his request for investigation of assistant attorney regulation counsel April McMurrey f/k/a April Seekamp .

639. Like bad bureaucrats with something to hide, John S. Gleason and Fatzinger failed to respond in any way whatsoever to John McNamara's Open Records request; failed to identify a separate records custodian, if it was not Gleason; failed to provide a written reason for failing to provide any responsive document to the Open Records Request; and failed to respond to John McNamara's request for information about his ethics complaint regarding assistant regulation counsel April McMurrey f/k/a April Seekamp.

640. There is no legal reason and no common sense reason to withhold the letter making accusations or a complaint against John McNamara, from John McNamara.  The only two reasons to withhold this information are 1) for Gleason, McMurrey and Fatzinger to bureaucratically toy with John McNamara;  and 2) there was no complaint made by any judge, attorney or party to the case,  and Gleason, McMurrey and Fatzinger conspired to make up the claim themselves, in violation of Colo.R.Civ.P. 251.9(a), in order to hurt John McNamara

641.  The withholding of the information requested by John McNamara is a violation of the due process clause of the United States Constitution, under *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), hardly new case law, after nearly half a century.

670.  John S. Gleason, April McMurrey and Fatzinger are pretty confident that no Colorado district court judge and no Colorado district attorney will hold them responsible-for fear that the district attorney may loose an appeal at the Supreme Court, or have their case denied for review, or that a district court judge will get a call, or an e-mail, or a fellow judge who had lunch with someone on the Colorado Court of Appeals or the Colorado Supreme Court, to tell that judge to dismiss claims against Gleason, McMurrey and Fatzinger, if that judge wants to advance upward to a higher paying, more prestigious appellate judge position and/or not face a disciplinary investigation of the district court judge handling this case.

671.  After John McNamara made his Notice of Claim regarding John Gleason, April McMurrey and William Lucero, and sent a personal letter to Chief Justice Michael Bender regarding the same, John McNamara's appeal at the Colorado Supreme Court of Colorado Supreme Court Case No. 10 PDJ 109 was dismissed, without even a request by the regulation counsel that the case be dismissed.  (Please see Exhibit   attached).

672.  The Justices of the Colorado Supreme Court had read the issues presented in John McNamara's appeal of Colorado Supreme Court Case No. 10 PDJ 109 and the Notice of Claim and knew that if John McNamara's appeal continued, they would have to address issues concerning

673.  The purpose of Fatzinger's letter to John McNamara was to intentionally, willfully and wantonly harass and punish John McNamara by making a mark on John McNamara's license without grounds to investigate.

674. Gleason, McMurrey and Fatzinger know that when an attorney applies for malpractice insurance, or if an attorney applies to be a judge, there will be questions about the

number of grievances or requests for investigation against the attorney, and the more requests

there are, the more expensive the insurance and the more difficult to become a judge.

675.  John McNamara sent a Notice of Intent to John S. Gleason  regarding the failure to

respond to John McNamara's  April 1, 2012 Open Records request.

676.  Well past three days have passed since the sending of the Notice of Intent to file a

lawsuit, without any response or production of documents by John S. Gleason.

677.  John S. Gleason is counting on John McNamara, the Denver District Attorney and a

Denver District Court judge to be too afraid to take any action against them, because of their

rank and position and powerful supervisors in the Colorado Judicial Branch, namely Colorado

Supreme Court Justice Nathan Ben Coats.

678. Since May 7, 2012 April M. McMurrey (a/k/a April M. Seekamp) has disappeared

from the Office of Attorney Regulation counsel, with rumors that she has been fired or is on

maternity leave.

679.     The Colorado Supreme Court is currently hiding her address on its attorney

registration website, in the hope that it will make it more harder to serve McMurrey with a

lawsuit or subpoena and to make it harder to investigate her illegal and unethical actions and

whether she was disciplined, which would dramatically impact McMurrey's actions against John

McNamara.


CLAIM NUMBER ONE

680.     42 USC 1983 provides a federal cause of action for violation of an individual's

civil rights under color of state law, which is independent of, and in addition to,

common law actions for related torts.  Lockhart, J., Cause of Action Under 42 USC

1983 for Unlawful Arrest or Detention, 9 COA 237, 237 (1986).

681.    Subject matter jurisdiction is found under 28 USC 1343 or 1331

682.    Federal Courts may exercise pendent jurisdiction based on a common nucleus of

operative facts.  <u>Raffety v. Prince George's County,</u> 423 F.Supp.1045 (D.Md 1976)

683.    Section 1983 states as follows:

> Every person who, under color of any statute, ordinance, regulation,
> custom, or usage, of any State or Territory or the District of Columbia, subjects,
> or causes to be subjected any citizen of the United States or other person within
> the jurisdiction thereof to the deprivation of any rights, privileges, or immunities
> secured by the Constitution and laws, shall be liable to the party injured in an
> action at law, suit in equity, or other proper proceeding for redress . . . .

684.    To state a claim upon which relief can be granted under *§ 1983*, a plaintiff

must establish (1) a violation of rights protected by the federal Constitution or

created by federal statute or regulation, (2) proximately caused (3) by the conduct of

a "person" (4) who acted under color of any statute, ordinance, regulation, custom[,]

or usage, of any State or Territory or the District of Columbia.

685.    The *Due Process Clause of the United States Constitution* provides that no

state shall "deprive any person of life, liberty, or property without due process

of law." *U.S. Const. Amend. XIV, § 1.*

686.    In <u>Bell v. Burson</u>, 402 U.S. 535 (1971), the United States Supreme Court

held that 14th Amendment procedural due process requires that, when a state

seeks to suspend a motorists' license, it must afford notice and opportunity to

be heard before suspending the license.

687.   In *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the United States Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."

688.   United States Supreme Court case law decisions dealing with the United States Constitution are the law of the land and apply in all fifty states and each of the counties in those states, including even Arapahoe and Denver Counties.

689.   In May, 2012, John McNamara was ticketed for driving under suspension by a police officer from the Lone Tree, Colorado Police Department.

690.   This traffic ticket has become Douglas County, Colorado Court Case No. 12T2132.

691.   The Colorado Department of Revenue had never mailed John McNamara notice of a hearing regarding the suspension of his driver's license, in violation of John McNamara's 14th Amendment rights to procedural due process in the form of notice and hearing before being deprived of a property and liberty interest.

692.   In Bell v. Burson, 402 U.S. 535 (1971), the United States Supreme Court held that 14th Amendment procedural due process requires that when a state seeks to suspend a motorists' license, it must afford notice and opportunity to be heard before suspending the license.

693.   On July 18, 2012, John McNamara faxed two combined Colorado Open Records Act and Colorado Criminal Justice Records Act requests to the

Colorado Department of Revenue, Motor Vehicle Division, one addressed to
Francine Mendez, and hand delivered a third combined Colorado Open
Records Act and Criminal Justice Records Act request addressed to "Records
Custodian" to the Colorado Department of Revenue, Motor Vehicle Division.

694.   On July 23, 2012, the Department of Revenue's Legislative Liason and
Public Information Officer, Mark Couch, responded stating that the records
custodian needed more time to respond. (Please see Exhibit  attached, Letter
from Mark Couch to John McNamara, dated July 23, 2012).

695.   On July 31, 2012, Mark Couch wrote back again stating that he had
assembled all the records John McNamara had requested and indicated that he
would be charging John McNamara for a variety of fees, totaling $233.05 for
73 pages of copies. (Please see Exhibit  attached, Letter from Mark Couch to
John McNamara, dated July 31, 2012).

696.   In neither the July 23, 2012 letter, nor the July 31, 2012 letter, did the
Colorado Department of Revenue claim the John McNamara's records
requests were barred by any law, or state regulation.

697.   The records custodian for the Colorado Department of Revenue, Motor
Vehicle Division is a Colorado attorney named C. Stephen Hooper.

698.   C. Stephen Hooper never responded personally to John McNamara's
combined Colorado Open Records Act and Colorado Criminal Justice Records
Act request, because Mark Couch was injected into the picture to be a shield
for Hooper and start the shell game routine for dodging responsibility for

answering a Colorado Open Records Request and or Colorado Criminal Justice Records Request again.

699.   Francine Mendez, now known as Francine Gonzalez, never responded in writing to John McNamara's request.

700.   Francine Mendez n/k/a Francine Gonzalez is a records clerk for the Colorado Department of Revenue, Motor Vehicle Division that had been contacted by the Eighteenth Judicial District Attorney's Office regarding John McNamara's driving record.

701.   To paraphrase, John McNamara had requested, among other things, that any communication between Colorado Child Support Enforcement and the Colorado Department of Revenue, Motor Vehicle Division regarding John McNamara (hereinafter, "CDOR") be provided; any communication between the Colorado State Patrol and CDOR regarding John McNamara be provided; any communication between the Arapahoe County Sheriff's Department and CDOR regarding John McNamara be provided; any communication between the Douglas County Sheriff's Department and CDOR regarding John McNamara be provided; and any communication between the Eighteenth Judicial District Attorney's Office and the CDOR regarding John McNamara be disclosed.

702.   The CDOR records custodian failed to disclose, copy or provide any written or e-mail communication between the Eighteenth Judicial District Attorney's Office and the CDOR.

703.   However, there was e-mail communication going on between Francine Mendez and Eighteenth Judicial deputy district attorney Erica Reuer. Reuer disclosed a single e-mail to John McNamara in another case between he and the Eighteenth Judicial District Attorney's Office, very shortly before dismissing that case against John McNamara.

704.   From the content of that one e-mail, it was clear that other e-mails existed.

705.   The July 25, 2012 e-mail between Francine Mendez and Erica Reuer states as follows:

"Hello Erika,

   Steve Hooper and I did a thorough review of McNamara's record and found no evidence that would cause us to believe that he received proper notice.

   Our records do show the attached change of address document which show (sic) that the DMV may have entered it incorrectly as you can see it is difficult to decipher the G from a 6.

   Let me know if you have questions!"

706.   Among the records produced by the CDOR were notices allegedly sent by CDOR to John McNamara regarding his driver's license. See Exhibit attached).

707.   What is noteworthy about these Notices is that they were all addressed to either an incomplete address or an incorrect address, in spite of the fact that CDOR had John McNamara's correct address at that time, 22959 Smoky Hill Road, Apartment G-206, Aurora, CO 80015, in other records.

708.    By not sending John McNamara a correctly addressed notice of a hearing or notice regarding action being taken against his license, the CDOR failed to provide John McNamara meaningful notice and hearing regarding his driver's license status, pursuant to Bell v. Burson and the 14th Amendment to the United States Constitution. C. Stephen Hooper, a Colorado-licensed attorney, reviewed John McNamara's driving records, found this error, and did nothing to correct it, including removing any and all suspensions, revocations, cancellations and denials from John McNamara's driving record.

709.    By allowing suspensions, revocations, and other unconstitutional actions taken against John McNamara's driver's license to stand on John McNamara's Colorado driving record, C. Stephen Hooper was committing the misdemeanor crime of making a false report to law enforcement authorities.

710.    By prosecuting John McNamara for Driving Under Suspension, Defendants George Brauchler and Christopher Opfer are conspiring with C. Stephen Hooper to deprive John McNamara of his procedural due process rights, in suspending John McNamara's driver's license without meaningful notice and hearing, and concealing Hooper's false reporting to police authorities, violating 42 U.S.C. β1983.

711.    In reviewing the materials disclosed by CDOR, John McNamara also learned that an employee of American Family Insurance, named Irma Calzada had reported to another auto insurer that John McNamara's auto insurance was not in effect on July 19, 2010, which then caused that insurance company's collection agency to contact CDOR and request that John McNamara's driver

license be suspended regarding the Douglas County District Court case discussed at paragraphs 293-437 above.

712.  As previously discussed, American Family Insurance had issued John McNamara insurance cards for July 19, 2010, before subsequently creating two other documents, after the accident, stating that the policy actually went into effect on July 20, 2010 and the July 21, 2010.

713.  When John McNamara attended his first court appearance in Douglas County Court Case No. 12 T 2132, after the hearing John McNamara was followed by a tall stocky African American male Douglas County Sheriff's Deputy and a white female Douglas County Sheriff's Deputy with dyed blonde hair, who kept asking John McNamara how he was going to get transportation home from court and telling him that it was illegal for him to drive. The two sheriffs deputies followed John McNamara by foot and in a Douglas County Sheriff's patrol vehicle to the Arby's restaurant several blocks from the courthouse, where John McNamara ate lunch and the deputies eventually went away.

714.  Never in John McNamara's experience litigating criminal cases over the last twenty plus years have I seen law enforcement pursue DUS, DUR, DUD, HTO, DUI or DWAI defendants outside of court to harangue them about not driving.

715.  John McNamara is getting this very special attention because his notices of intent to sue and the cases he has been able to get dismissed in the Eighteenth Judicial District have greatly annoyed decision making attorneys in the

Eighteenth Judicial District Attorney's Office, who, so far, have been hiding anonymously.

716.    At the next court appearance John McNamara asked the Douglas County Magistrate handling this case whether she or one of her division clerks had asked the sheriff's deputies to follow John McNamara. She denied that they had and seemed to shrug off the issue of whether this was intimidation of a witness in this case, John McNamara. Witness intimidation is a felony in Colorado.

717.    Subsequent to these activities, Deputy District Attorney Chris Opfer made his own investigation in this case and decided to move to add numerous more charges to this case.

718.    On the same day, Douglas County Court Judge Lawrence Bowling granted Opfer's request to add additional charges, Judge Bowling declined John McNamara's request for the district attorney to provide contact information for the former Lone Tree Police chief, who had made statements reported in the media that many of his former police officers were liars. The Lone Tree Police Department made the arrest in this case.

719.    Judge Bowling knows that Douglas County Court Judge Gomez subsequently grieved me after the trial in the case discussed at paragraphs 293-437 above and that John McNamara appealed her decisions.

720.    Judge Bowling knows that it would help Judge Gomez's grievance against me to hurry up and convict me in Douglas County Court Case No. 21 T 2132, and also help cover any district attorney wrongdoing.

721.    The Douglas County District Court Judge, after notice that John McNamara

could not e-file, not so coincidentally failed to send McNamara a copy of his appellate decision in Judge Gomez' case and has still not sent McNamara a copy of his decision. By doing this, the Douglas County District Court Judge wanted to make it harder to appeal his decision.

722. John McNamara made a motion to continue the trial in 12 T 2132 verbally on April 15, 2012 and in writing again on April 16, 2012, when it was learned that witness Mark Couch was not served a subpoena by the Denver Sheriff's Department. Mark Couch would be able to testify what records were provided to him by C. Stephen Hooper, the CDOR records custodian, which evidence would have shown that Hooper had dishonestly not provided e-mails between Mendez/Gonzalez and the Eighteenth Judicial District Attorney's Office and that such records would have shown that Hooper knew that McNamara did not have proper constitutional notice regarding actions taken against his drivers license, yet Hooper let the records showing the actions taken stay on John McNamara's driving record and potentially be read by law enforcement officials.

723. Judge Bowling denied the first Motion to Continue and is still considering second motion to continue. Speedy trial does not expire until mid July 2013 and John McNamara is willing to waive speedy trial.

724. At the same time, Judge Monica Gomez has scheduled a a new hearing in her courtroom for John McNamara regarding the insurance case. However, the District Attorney's Motion regarding that hearing has not been provided to John McNamara.

725. Judge Gomez and the Eighteenth Judicial District are having ex parte communication in that case in an attempt to jail John McNamara for unknown

reasons.

726.    The United States Supreme Court has ruled that for procedural due process notice and hearing to be meaningful, a person must receive adequate notice of the reasons for the governments requested action and effective opportunity to defend by confronting adverse witnesses and presenting his own arguments. Goldberg v. Kelly, 397 U.S. 254 (1970).

727.    In addition, when John McNamara made the April 15 motion to continue the trial in 12 T 2132, Judge Bowling denied McNamara's motion and indicated for the first time that McNamara would not be able to examine witnesses about the validity of the suspension activity.

728.    In both People v. Reichenberg, 685 P.2d 165 (1984) and Harris v. the State of Colorado, 516 F. Supp. 1128 (D.Colo. 1981), the Colorado Supreme Court and the United States District Court for the District of Colorado ruled that a litigant had a right to challenge the validity of a driver's license suspension in the trial court.

729.    Judge Bowling's decision that McNamara could not challenge the suspension of his license, makes it nearly impossible to defend this case on the grounds that McNamara had no notice of most of the DMV suspension activity, that the district attorney's office dismissed an earlier case on those same grounds and that the underlying suspensions were unconstitutional because McNamara received no procedural due process in the form of notice and hearing.

WHEREFORE, Plaintiff John McNamara respectfully requests damages and interest pursuant to 42 U.S.C. β1983, against George Brauchler, Christopher Opfer and C. Stephen Hooper and an injunction against Douglas County Court Judges Lawrence Bowling and Monica Gomez from conducting any hearings or trials in their respective cases, without John McNamara first receiving adequate notice of and the reasons for such hearing in writing before the hearing with enough adequate time to prepare for the hearing, pursuant to Fed.R.Civ.P. Rule 65.

CLAIM NUMBER TWO

730.   Colorado Supreme Court Attorney Regulation Counsel John Gleason and Timothy O'Neal have filed a sixty claim lawsuit against John McNamara, in which John McNamara has been given roughly two and a half days to defend at trial.

731.   Many of the claims raised in the lawsuit were initially investigated by assistant attorney regulation counsel April McMurrey.

732.   After John McNamara filed a statutory Notice of Claim against April McMurrey, John Gleason and Willliam Robert Lucero with the Colorado Attorney General's Office and Chief Justice Michael Bender, McMurrey's work address disappeared from the Colorado Supreme Court Attorney Registration website, and the same is also true for district attorneys Carol Chambers and Meghan Rasband.

733.   At a January 2013 hearing in the present disciplinary case against John McNamara, John McNamara requested that Presiding disciplinary judge William Robert Lucero order regulation counsel Timothy O'Neill to disclose McMurrey's business address so that John McNamara could conduct discovery with her and obtain exculpatory evidence. O'Neill objected and Lucero failed to grant the motion for disclosure of McMurrey's work address.

734.   By failing to disclose McMurrey's address so that she can be interview or her deposition can be taken, John Gleason and Timothy O'Neil are trying to deny John McNamara's procedural due process rights under the Fourteenth Amendment.

735.   In *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the United States Supreme Court held that "suppression by the

prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."

736.    The concern on Gleason and O'Neill's part is that if McMurrey's location is disclosed, potential information will come out regarding negligent, willful and wanton and criminal behavior on the part of McMurrey, Gleason, Lucero and possibly Justice Nathan Coats.

737.    Part of the reason the Douglas County District Attorney and Douglas County Judges want John McNamara to come to court so badly in April 2013 is so that by putting John McNamara in jail, they can prevent him from suing the Colorado Supreme Court attorney regulation counsel before the statute of limitations on April 26, 2013.

738.    On October 20, 2011, John McNamara sent a Notice of Claim pursuant to C.R.S. 24-10-109 to Colorado Attorney General John Suthers via registered mail, with copies to Chief Justice Michael Bender and attorney regulation counsel John Gleason concerning the willful and wanto actions of Colorado state employees William Lucero, April McMurrey and John Gleason.

739.    The Notice of claim alleges that the actions of McMurrey, Gleason and Lucero were willful and wanton.

740.    April McMurrey worked under the direct supervision of John Gleason and both Gleason and McMurrey's names as counsel of record were on pleadings filed by McMurrey.

741.   McMurrey failed to fully investigate the ethics claims made by Karen Cole against John McNamara.

742.   Karen Cole was a litigant in a child custody/parenting time/child support case in Denver County, Colorado.

743.   John McNamara represented Karen Cole's opposing party in court, Mitchell Cole, her former husband.

744.   Karen Cole had a history of trying to keep her daughter away from the child's father, Mitchell Cole, and had a history of making an ethics complaint against John McNamara, which had been previously dismissed.

745.   In April 2011, April McMurrey put Karen Cole on the witness stand in a lawsuit against John McNamara, where Cole proceeded to perjure herself.

746.   During Cole's testimony, William Robert Lucero sought to shield Cole and supplement her testimony with his own statements.

747.   In addition, McMurrey filed a claim against John McNamara, in which she claimed that John McNamara took money from a client, when she didn't know the name of the client and had received no complaint from the client. William Lucero bent the Colorado Rules of Civil Procedure  to aid McMurrey in this process, in violation of Colo.R.Civ.P. 11, and in the process wrote that John McNamara had negligently converted funds from a client, when in fact the client had committed a crime in bouncing a check to John McNamara, and had not wanted to report the clients criminal actions against John Mcnamara.

748.    By the willful and wanton actions of John Gleason and April McMurrey, Gleason and McMurrey have committed outrageous conduct and intentional infliction of emotional distress against John McNamara.

749.    By the willful and wanton actions of Gleason and McMurrey, Gleason and McMurrey committed intentional and negligent breach of duty to investigate before filing a lawsuit; civil conspiracy; slander and libel; negligence per se for slander and libel; negligent supervision of an employee; malicious prosecution, and abuse of process.

WHEREFORE, John McNamara respectfully requests damages and his costs and interest which he is statutorily entitled to.

*Plaintiff Requests Trial to a Jury*

Respectfully submitted this 25th day of April, 2013.

By: _____

John A. McNamara
P.O. Box 100273
Denver, CO  80250